Elly GROSS, et. al., Plaintiffs,

v.

THE GERMAN FOUNDATION INDUS-
TRIAL INITIATIVE; and Allianz AG;
Basf AG; Bayer AG; BMW AG; Com-
merzbank AG; DaimlerChrysler AG;
Degussa–Huls AG; Deutsche Bank
AG; Deutz AG; Dresdner Bank AG;
Hoechst AG; Rag AG; Robert Bosch
GmbH; Siemens AG; Veba AG; Thys-
senKrupp AG; and Volkswagen AG,
jointly and severally in their respec-
tive capacities as principals, founders,
and alter egos of the German Founda-
tion Industrial Initiative, Defendants.

Barbara Schwartz Lee and Bernard
Lee, Plaintiffs,

v.

Deutsche Bank, AG, and Dresdner
Bank, AG, Defendants.

Civ. No. 02–2936(DRD).

United States District Court,
D. New Jersey.

Aug. 15, 2007.

Allyn Z. Lite, Esq., Lite Depalma
Greenberg & Rivas, LLC, Newark, NJ,
Burt Neuborne, Esq., Milberg Weiss, Esq.,
Melvyn I. Weiss, Esq., New York, NY, for
Plaintiffs, Elly Gross, et al.

Lisa J. Rodriguez, Esq., Trujillo Rodri-
guez & Richards, LLC, Haddonfield, NJ,
Michael D. Hausfeld, Esq., Agnieszka
Frysman, Esq., Hillary Ratway, Esq.,
George Farah, Esq., Cohen, Milstein,
Hausfeld & Toll, P.L.L.C., Washington,
D.C., for Plaintiffs, Barbara Schwartz Lee
and Bernard Lee.

John J. Gibbons, Esq., Terry Myers,
Esq., Thomas R. Valen, Esq., Jeffrey L.
Nagel, Esq., Gibbons, P.C., Newark, NJ,

Defense Liaison Counsel, for Defendants, Degussa AG, ThyssenKrupp AG; Local Counsel for Allianz AG, BASF AG, Bayer AG, Commerzbank AG, Deutsche Bank AG, Deutz AG, Dresdner Bank AG, RAG AG, Robert Bosch GmbH.

Neil McDonnell, Esq., Brian E. McGunigle, Esq., Deirdre Sheridan, Esq., Dorsey & Whitney LLP, New York, NY, for Defendant, Robert Bosch GmbH.

Daniel Gsvoski, Esq., Ian Ceresney, Esq., Herzfeld & Rubin, P.C., New York, NY, for Defendant Volkswagen AG.

Jeffrey L. Chase, Esq., Chase Kurshan Herzfeld & Rubin, LLC, Livingston, NJ, for Defendant Volkswagen AG.

Bud G. Holman, Esq., Paul Doyle, Esq., Kelley Dye & Warren LLP, Parsippany, NJ, for Defendant, Daimler Chrysler AG.

Brant W. Bishop, Esq., Susan Engel, Esq., Oreste P. McClung, Esq., Kirkland & Ellis LLP, Washington, DC, for Defendant, Siemens AG.

Keith G. Von Glahn, Esq., Wilson, Elser, Moskowitz, Edelman & Dicker LLP, Newark, NJ, for Defendant, Siemens AG.

Thomas M. Mueller, Esq., Mark D. McPherson, Esq., Morrison & Foerster LLP, New York, NY, for Defendant, BASF.

Jeffrey Barist, Esq., Sander Bak, Esq., J. Ryan Miller, Esq., Milbank, Tweed, Hadley & McCloy LLP, New York, NY, for Defendants Deutsche Bank AG and Dresdner Bank AG.

Konrad L. Cailteux, Esq., Weil, Gotshal & Manges LLP, New York, NY, for Defendant Bayerische Motoren Werke AG.

Rosemary J. Bruno, Esq., Klett Rooney Lieber & Schorling, P.C., Newark, NJ, for Defendant, Bayerische Motoren Werke AG.

Roger M. Witten, Esq., Louis R. Cohen, Esq., John A. Trenor, Esq., David W. Bowker, Esq., Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, for Defendants, Allianz SE, Bayer AG, Commerzbank AG, Deutz AG, and RAG AG.

Eric M. Rubin, Esq., Walter E. Diercks, Esq., Max Riederer von Paar, Esq., Rubin, Winston, Diercks, Harris & Cooke, LLP, Washington, DC, for Amicus Curiae Federal Republic of Germany.

## OPINION

DEBEVOISE, Senior District Judge.

### Table of Contents

| | | Page |
|---|---|---|
| I. | Introduction | 608 |
| II. | Background | 610 |
| III. | Procedural History | 617 |
| IV. | Gross Plaintiffs' Summary Judgment Motion | 620 |
| | A. *Gross* Plaintiffs' Contentions | 620 |
| | B. Evidence upon which *Gross* Plaintiffs Rely | 622 |
| V. | *Schwartz Lee* Summary Judgment Motion | 628 |
| | A. *Schwartz Lee* Plaintiffs' Contentions | 628 |
| | B. Evidence upon which *Schwartz Lee* Plaintiffs Rely | 629 |
| VI. | Defendants' Motions | 639 |
| | A. Defendants' Motion to Dismiss Both Complaints | 639 |
| | B. Banks' Motion to Dismiss *Schwartz Lee* Complaint | 640 |

C.   Evidence upon which Defendants' Rely ................................ 641

VII.   Federal Republic of Germany, Amicus ..................................... 653
A.   Contentions of Federal Republic of Germany .......................... 653
B.   Evidence upon which Germany Relies ................................. 655

VIII.   Discussion ....................................................... 656
A.   Status of Joint Statement ........................................... 656
B.   *Gross* Case Motions ......................................... : .... 661
1.   Summary Judgment Standards ................................. 662
2.   Joint Statement Ambiguity ................................... 662
3.   December, 1999, Understanding ............................... 664
4.   March, 2000, "Interest" Agreement ........................... 667
5.   Post March, 2000, Negotiations .............................. 670
C.   *Schwartz Lee* Case Motions ....................................... 675

IX.   Conclusion ....................................................... 677

Appendix—Para. 11–15 Roger M. Witten Declaration ........................... 678

## I.  *Introduction*

July 17, 2000, was the occasion of one of the most remarkable diplomatic achievements since the end of World War II. The efforts of two extraordinary diplomats, Secretary Stuart E. Eizenstat, representing the United States, and Count Otto Lambsdorff, representing the Federal Republic of Germany, had, after approximately 19 months of negotiations, secured the signing of two documents that would lead to the creation of the Foundation, "Remembrance, Responsibility and Future" (the "Foundation"), to compensate the victims for wrongs against them committed by German companies during the Nazi-era and to provide an exclusive forum in which the victims could assert their claims.

The documents were i) the Joint Statement on Occasion of the Final Plenary Meeting Concluding International Talks on the Preparation of the Foundation, "Remembrance, Responsibility, and the Future" (the "Joint Statement") and ii) Agreement between the Government of the Federal Republic of Germany and the Government of the United States of America concerning the Foundation "Remembrance, Responsibility and the Future" (the "Executive Agreement"). Shortly

thereafter, the German Bundestag enacted a Law on the Creation of a Foundation "Remembrance, Responsibility and Future" (the "Foundation Law") that, among other things, established the Foundation as a German sovereign instrumentality and as the "exclusive remedy and forum" for resolution of claims against German companies arising out of the Nazi-era and World War II. Collectively those instruments were called the "Berlin Accords."

These two diplomats had mediated so successfully that the Joint Statement was signed by six eastern European countries, Israel, Germany, the United States, seventeen German companies that had established the German Economy Foundation Initiative ("GEFI" or the "Initiative"), the Conference on Jewish Material Claims Against Germany, Inc., and class-action attorneys representing plaintiffs in some of the then pending United States lawsuits against German companies on account of Nazi-era depredations. The Joint Statement provided, among other significant provisions, that DM 10 billion contributed by the German Government and German companies was to be distributed to former National Socialist slave and forced laborers, for other personal injury, for damages

to property and for a Future Fund to fund ongoing projects to prevent religious and ethnic intolerance in Germany.

The Joint Statement provided that the DM 5 billion contribution of the German companies "shall be due and payable to the Foundation and payments from the Foundation shall begin once all lawsuits against German companies arising out of the National Socialist era and World War II pending in U.S. courts ... are finally dismissed with prejudice by the courts." The initial portion of the DM 5 billion German Government contribution was to be made available to the Foundation by October 31, 2000. The remainder of the German Government contribution was to be made available to the Foundation by December 31, 2000. Para. 4(d) of the Joint Statement concluded: "German company funds will continue to be collected on a schedule and in a manner that will ensure that the interest earned thereon before and after their delivery to the Foundation will reach at least 100 million DM."

There was an unexpected delay in obtaining dismissal with prejudice of all the pertinent lawsuits against German companies in the United States courts, and it was not until May 30, 2001, that the Bundestag announced that adequate legal security had been achieved, purporting thereby to trigger the time for the German companies' payment called for by Para. 4(d) of the Joint Statement.

The German Government made its payments in a timely manner. On various occasions after the May 30, 2001 Bundestag announcement, the German companies paid, according to GEFI (but disputed by Plaintiffs), DM 5.1 billion to the Foundation. The Foundation is fully organized and is carrying out its important humanitarian work compensating victims and is pursuing the functions of the Future Fund.

Notwithstanding this felicitous state of affairs, a dispute has arisen between the Plaintiffs in the two cases pending before the Court, who are victims entitled to compensation from the Foundation, and the German companies that were the members of GEFI. Plaintiffs contend that the German companies have failed to comply with their obligations under Para. 4, and, in particular, to pay to the Foundation the interest specified in that paragraph. It is the Plaintiffs' contention that this language contains no ceiling and requires the companies to pay interest on all funds the Initiative collected from the time of their receipt of those funds until payment to the Foundation, or in the alternative, to pay interest on the companies' share from December, 1999.

The *Gross* Plaintiffs differ from the *Schwartz Lee* Plaintiffs about the period for which interest is owing, and the *Gross* Plaintiffs take different positions at different times and places as to the period for which interest is owing. The *Schwartz Lee* Plaintiffs argue that this obligation to pay interest is on the entire DM 10 billion (or at least the companies' DM 5 billion), running from December 14, 1999, when agreement was reached on the DM 10 billion, or from December 17, 1999, when the participants in the negotiations announced their agreement upon the DM 10 billion figure. Occasionally the *Gross* Plaintiffs seem to adopt the *Schwartz Lee* position, but on the present motions they argue primarily (but not exclusively) that the obligation to pay interest commenced on July 17, 2000, the date of signing the Joint Statement.

The German companies contend that the additional DM 100 million was a fixed amount to be added to the DM 10 billion cap to enable the representatives of the victims to reach agreement on the allocation of the DM 10 billion capped amount.

Having reviewed the full record submitted in connection with the pending motions as well as the briefs and arguments of counsel, the court concludes as follows:

1. The Joint Statement is a political document that does not confer upon the signatories, or any portion of them, contractual rights which can be enforced in United States courts. Consequently, Defendants' motion to dismiss each of these cases should be granted.

2. In the alternative, were the Joint Statement found to create contractual obligations between Plaintiffs and the Defendants, enforceable in United States courts, Para. 4(d) concerning interest is ambiguous, requiring resort to the history of the negotiations to determine its meaning.

3. The history of the negotiations of the Berlin Accords establishes, as the Defendants contend, i) in December, 1999, the negotiating parties reached an understanding that the German Government and the German companies would pay into the Foundation a capped amount of DM 10 billion in exchange for "legal peace" with no agreement to pay interest; ii) in March, 2000, the negotiating parties reached an understanding that GEFI would pay an additional DM 100 billion denominated as "interest" in order to enable the victim groups to reach agreement on the allocation of the DM 10 billion, but there was no other commitment on the part of the German companies to pay interest in addition to the DM 100 million; between March, 2000, and July 17, 2000, when the Joint Statement was executed, Secretary Eizenstat and the Plaintiffs' attorneys made repeated demands that the German companies pay interest on their DM 5 billion share of the DM 10 billion total sum. All of these demands were rejected, and as a consequence Para. 4(d) of the Joint Statement cannot be construed as requiring the

German companies to pay to the Foundation more than DM 5.1 billion.

4. If this court has authority under the Joint Statement to do so, it would construe the Joint Statement as not requiring the German companies to pay the Foundation more than DM 5.1 million and deny the summary judgment motions of the *Gross* and *Schwartz Lee* Plaintiffs and grant summary judgment to the Defendants, dismissing both complaints on the merits.

## II. *Background*

A. *Litigation:* On March 13, 1996, the German Federal Constitutional Court decided *Krakauer v. Federal Republic of Germany,* Federal Constitutional Court, Bul 33/93 (March 13, 1996), a decision that was widely interpreted to lift the bar on World War II era claims against German industry imposed by the London Debt Agreement of 1953. In March, 1998, plaintiffs in the *Gross* case filed *Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424 (D.N.J.1999), seeking redress for the widespread use of slave labor by German industry during the Nazi period. *Iwanowa* was followed by the filing of *Burger-Fischer v. Degussa AG,* 65 F.Supp.2d 248 (D.N.J.1999), and more than 60 additional cases throughout the United States. These cases took different forms, including class actions and single plaintiff cases, and dealt with issues other than slave and forced labor, including insurance policies and bank deposits.

In August, 1998, twelve German companies (later joined by five other founding members) formed GEFI. Dr. Manfred Gentz, then CFO of Daimler/Chrysler, and Dr. Michael Jansen, then Executive Vice-President of Degussa, played leading roles in the establishment of GEFI. GEFI was German industry's response to the proliferation of class actions and other lawsuits in the United States against German companies. It sought to obtain all-embracing

and enduring legal peace for German companies by establishing and funding a German Foundation for making payments to certain victims of the National Socialist era and World War II that would be an instrumentality of the Federal Republic of Germany, governed by German institutions and not subject to oversight or review by United States courts.

On or about September 8, 1998, members of GEFI met with Chancellor-elect Gerhard Schroeder to seek support of the German Government for GEFI's objectives, including resolution of the World War II related litigation against German industry pending in the United States. After that meeting, representatives of GEFI and the German government met with Secretary Stuart E. Eizenstat, then United States Assistant Secretary of State, and sought the assistance of the United States government in resolving the litigation. Secretary Eizenstat entered into discussions with German officials concerning the establishment of one or more funds and helping the German companies obtain legal peace from lawsuits in the United States courts.

On December 14, 1998, Bodo Holmbach, Chancellor Schroeder's chief of staff, and the German ambassador to the United States met with Secretary Eizenstat. They stated that Germany wanted to settle not only the slave labor claims but all other claims against German companies, including those against the banks and insurance companies. Mr. Holmbach officially asked Secretary Eizenstat to work with the German government and industry to resolve the class actions. Secretary Eizenstat agreed to do so as long as the class action lawyers also agreed. He persuaded the Germans that, in addition, the negotiations should include the Eastern European countries, whose forced workers had never been paid, the State of Israel, and the

Conference on Jewish Material Claims Against Germany (the "Claims Conference"). During the negotiations that followed, Mr. Holmbach first represented the German government and was succeeded by Count Otto Lambsdorff.

On or about February 8, 1999, the first negotiating session between GEFI and certain plaintiffs' counsel took place at the State Department. Plaintiffs' counsel urged the use of the Federal Rules of Civil Procedure to resolve the pending litigation. GEFI rejected the use of Rule 23, refusing to accept continued involvement of the United States courts and insisting that the institutions established to provide recompense had to be German and not subject to American oversight. On February 16, 1999, Chancellor Schroeder and twelve German companies released a statement confirming the German companies' intention to fund a private foundation that would make payments to former forced and slave laborers and other victims of National Socialism.

On or about May 12, 1999, the first plenary negotiating session was held in Washington, D.C., involving: i) numerous private lawyers (including Melvyn I. Weiss, Esq., Michael D. Hausfeld, Esq., Morris Ratner, Esq., and Professor Burt Neuborne, who acted as spokesmen for the victims); ii) the German defendants acting through GEFI; iii) the Claims Conference; and representatives of six nations with large victim populations—Belarus, Czech Republic, Israel, Poland, Russia, and Ukraine. The session was co-chaired by Mr. Holmbach and Secretary Eizenstat. GEFI and the German government ruled out a United States-style court supervised class action settlement.

As recounted by Secretary Eizenstat: "The first plenary session like the dozen or so that followed over more than a year, were occasions to make set speeches with

maximum demands. The real negotiations took place in small meetings outside the formal sessions, with the plenaries nevertheless bestowing on all parties a sense of involvement." Stuart E. Eizenstat, *Imperfect Justice* 229 (Public Affairs Press 2003).

On or about June 22, 1999, the second plenary negotiating session took place in Bonn. The participants discussed the use of a German Foundation and the use of an Executive Agreement between Germany and the United States as a means of achieving legal peace. On or about July 23, 1999, the third plenary negotiating session took place in Washington, D.C., at which Count Lambsdorff replaced Mr. Holmbach. Agreement in principle was reached on the use of a German Foundation and an Executive Agreement.

The Fourth Plenary session took place on or about August 22–24, 1999, and discussions commenced concerning the size of the Foundation. Various plaintiffs attorneys had been voicing different, but uniformly high, demands, e.g., DM 60 billion, and GEFI was suggesting a dramatically lower amount—DM 1.7 billion. (*Id.* at 240–41). This put Secretary Eizenstat's negotiating skills to a supreme test.

On or about September 6, 1999, the CEOs of the then–16 companies constituting GEFI met with Chancellor Schroeder and agreed to increase GEFI's offer and the German Government agreed to participate. Secretary Eizenstat had persuaded President Clinton to communicate personally with Chancellor Schroeder in an effort to obtain a more substantial commitment by the German companies and the German Government. He had been thinking in terms of a total commitment of DM 10 billion. As a result, two weeks after GEFI's September 6 meeting with the Chancellor, GEFI raised its offer from DM 1.7 billion to DM 4 billion, and the Chancellor proposed a DM 2 billion in

government funds for a total of DM 6 billion. (*Imperfect Justice* at 242–43).

This has been a somewhat bloodless account of the discussions and controversies that took place between the various participants. Secretary Eizenstat's *Imperfect Justice* portrays the charged nature of these interchanges and relates how his and Count Lambsdorff's crucial and continuing interventions prevented the negotiations from collapsing. After the October offer of DM 6 billion from the German side, Secretary Eizenstat's primary efforts were devoted to seeking an increase in this amount and persuading the representatives of the victims to reduce their demands. He concluded that the principal source of additional funds would have to be the German Government and turned once again to President Clinton. In a November 13, 1999, letter to the Chancellor, the President stated that Secretary Eizenstat was acting as his personal representative in insisting that the Germans contribute a total of at least DM 10 billion and that there needed to be " 'a significant increase in the contributions from German companies beyond their opening offer of four billion D-marks' and a willingness by the German Government to increase its two billion D-mark contribution, even if spread over two fiscal years.' " At that point, Count Lambsdorff informed Secretary Eizenstat that the best that could be achieved was a total of DM 8 billion. (*Imperfect Justice* at 248–49).

Various of the victims' lawyers made impossibly high demands and feelings ran high on all sides. Secretary Eizenstat succeeded in obtaining a range of DM 6 billion to DM 10 billion from the German side and DM 10 billion to DM 15 billion from the victims and their lawyers. (*Id.*, at 250–51). He was, however, confronted by the German Government's refusal to move from its "absolute maximum" of DM 3 billion by

another DM 2 billion. Thus, the German position remained fixed at DM 8 billion. As Secretary Eizenstat expressed it, "[t]he Germans suspected that even if they agreed to settle at 10 billion, it would be only a temporary way station to some higher demand." (*Id.* at 252–53).

Secretary Eizenstat then turned to the class action attorneys and ultimately persuaded them to drop their range to DM 10 billion to DM 11 billion. He then broached his "creative accounting" approach, upon which the *Schwartz Lee* and *Gross* plaintiffs rely so heavily.

> I then engaged in what I could only call creative accounting. I persuaded Lambsdorff and Gentz to add interest that would be earned on the money while we were getting the cases dismissed and setting up the foundation, that would now be one joint private section-federal government organization. They ended up agreeing to pay at least 100 million DM in interest. But the most ambitious was my idea to create a "mirror image" fund for the dozens of American companies whose big German subsidiaries had employed slave labor. According to a 1943 Treasury Department list, the most celebrated names included Ford, General Motors, Gillette, IBM, and Kodak, among many others.

(*Id.* at 254).

This plan did not come to fruition. Not surprisingly, the American companies were not interested in participating and, as Secretary Eizenstat stated, "[a]ll my creative accounting still could not bridge the gap, with the Germans stuck at 8 billion and the lawyers at 11 billion." (*Imperfect Justice* at 255). In early December, the lawyers were backtracking, raising their demands. However, Count Lambsdorff approached Secretary Eizenstat and told him that "whatever Schroeder might be saying about sticking to 8 billion marks, if [Eiz-enstat] could organize a unified front from the victims for a settlement of 10 billion marks, the chancellor would rethink his position." (*Id.* at 255–56).

Secretary Eizenstat described what happened next:

> [Obtaining an organized front from the victims] would be no easy task with that fractious coalition. Singer [of the Jewish Claims conference] said that he, Weiss, Neuborne, Swift, and Fagan could accept 10 billion, but Hausfeld was the holdout.

> I went back to Hausfeld and urged him to be a statesman. He now held the agreement in his hands, I said. After a long pause he said, "Okay." But getting to 10 billion marks was not so simple. A few days later, Hausfeld, Weiss, and Neuborne marched into my office and announced they had reached a consensus. Hausfeld crowed proudly that they all would settle at 10.5 billion DM plus the additional costs of administering the foundation. I blew up at them, practically shouting, "You're going to screw it all up over 500 million." They asked to rethink the matter and marched out.

> Neuborne and Hausfeld called later in the day to explain that they needed the extra 500 million DM to satisfy all the competing demands. I told them to forget it. Here again, Neuborne was a constructive influence, convincing Hausfeld to give in. Hausfeld then backed away, agreeing to 10 billion if I could raise an additional fund from American corporations. I foolishly said I hoped I could raise the equivalent of another 1 billion DM, or a half billion U.S. dollars, the figure Rintamaki had given me.

> They took this as a commitment but agreed to settle with the Germans now

and hope I could raise the next later....

(*Id.* at 256)

Secretary Eizenstat telephoned Count Lambsdorff at 9:00 a.m. on Sunday, December 12, 1999, stating that he had a firm figure of DM 10 billion from the lawyers that the Count could take to Chancellor Schroeder. At 5:00 p.m. Count Lambsdorff telephoned Secretary Eizenstat, informing him that the Chancellor wanted a letter from President Clinton confirming the lawyers agreement accepting the DM 10 billion and guaranteeing to end all legal action. (*Imperfect Justice* at 256).

The agreement for a capped fund of DM 10 billion and for providing legal peace was memorialized in President Clinton's December 13 letter to Chancellor Schroeder and in Chancellor Schroeder's December 14 response. A formal signing ceremony took place on December 17, 1999. (*Imperfect Justice* at 258–59).

After the amount to be paid to the Foundation had been agreed upon, the German companies had to go about the difficult task of raising the DM 5 billion; the German government had to draft the legislation establishing and governing the Foundation; an agreement between the United States and the Federal Republic of Germany had to be drafted; and the various groups of victims had to agree upon allocation of the DM 10 billion. Secretary Eizenstat described the allocation process:

> But the problems with the draft legislation paled by comparison with the three-month torment of deciding how to allocate the 10 billion DM. Whatever semblance of unity there had been among the Eastern Europeans, plaintiffs' attorneys, and Claims Conference in persuading the Germans to pay the maximum possible broke into open warfare as they tried to divide the pie. The process brought out the worst in everyone.

> . . .

> There were essentially three categories of claims that had to be satisfied. First were those of conscripted workers. The issue of how much should be allocated to each pitted Eastern Europeans against the Claims Conference. Second was banking and insurance. Here the principal battle engaged the class-action lawyers, who fought for individual claimants seeking damages for Aryanized assets and unpaid life insurance policies, and the Claims Conference, which sought a large humanitarian fund to help Holocaust victims in general, since most of the claimant families had been killed by the Nazis. And third was the Future Fund, so important to the German companies because it would identify them with project of tolerance and help them raise funds from German companies not implicated in World War II.

(*Imperfect Justice* at 261–62).

Count Lambsdorff and Secretary Eizenstat had hoped to remain uninvolved in these disputes. However, it developed that their intervention was required to help resolve the differences between the various groups. The differences were so vast and the parties so intransigent that, as Secretary Eizenstat put it, "My job was clear. The only way to bring everyone together was for me to persuade Lambsdorff to forge a joint proposal and ram it down everyone's throat. Even the lawyers were ready. 'Someone needs to break the tie, and we trust you to do it,' Neuborne told me. So Lambsdorff and I set a 'make or break' session for Berlin for March 22–23. We had to put an end to the haggling or let everyone know the entire enterprise would collapse." (*Id.* at 264).

Before the "make or break" session, Count Lambsdorff and Secretary Eizens-

tat agreed on what they called the "Joint Chairman's Proposal." There followed furious further discussions and secret understandings. At the end of the day, as Secretary Eizenstat stated, "[w]e had the 10 billion DM. We had agreed on how to divide it down to the last pfennig." There remained the question of the mechanics of establishing legal peace, but the allocation was agreed upon. (*Id.* at 268).

There was one aspect of the contentious efforts to reach agreement on the allocation of the DM 10 billion that Secretary Eizenstat did not refer to in *Imperfect Justice.* It became apparent during the bitter negotiations that agreement could not be reached within the DM 10 billion and that DM 100 million more would be needed to fund the amounts allocated to the various categories of participants. In March, 2000, rather than have the whole process break down, GEFI and the German Government agreed that an additional DM 100 million would be paid, but, in order to avoid affecting the agreed upon DM 10 billion cap and thus weaken GEFI's fund raising efforts, and breaching the Government's and GEFI's commitment to the legislature and public, the additional funds would be designated "interest." This amount appears in Annex B of the Joint Statement, which allocates the DM 10 billion plus precisely DM 100 million in "interest."

Secretary Eizenstat's counterpart, Count Lambsdorff, described the process as follows:

When it became clear that my American counterpart had incurred certain verbal obligations with the two leading partners, the Polish Government and the World Jewish Congress, which could be only matched by raising the Foundation Initiative's contribution by 100 Mio. DM, after long and arduous talks the Foundation Initiative agreed under the provi-

so that this additional amount did not enter into the principal of the promised amount in public. This was the genesis of the word "interest", in reality covering the fact that so far the total does not preclude the fact that once the sum was deposited in the Foundation's Account, it generated a much higher interest than this sum and, as a matter of fact, the Future Fund of the Foundation is meant to be financed perpetually from interest earned.

In regard to that issue, on April 19, 2000, I wrote the following in a letter to Deputy Secretary Eizenstat: "In December 1999 the companies of the German Foundation Initiative agreed to do everything to contribute the amount of 5 billion DM to the Foundation capital, and in March this year they agreed to a specific allocation of further 100 Mio. DM generated by interest. Although the Initiative's difficulties raising this substantial amount are well known and have been deplored by the German Chancellor and myself publicly, I have no doubt that the Initiative will finally succeed".

(Lambsdorff Decl. at Para. 12, 13).

Even though in December, 1999, all the participants had agreed, in accordance with the Clinton–Schroeder correspondence, that the obligation of the German Government and the German companies was limited to DM 10 billion, Secretary Eizenstat pressed for an agreement to accelerate payment of this sum or to pay interest on it in addition to the DM 100 million pending the attaining of legal peace through the dismissal of the American lawsuits. For the laudable purpose of achieving greater compensation for the victims, Secretary Eizenstat vigorously pursued this objective, repeatedly submitting drafts of a Joint Statement that included provisions that the German company contribu-

tion of DM 5 billion would be a "present value" as of a specified date, or would be deposited in an interest—bearing account as of a specified date, or would earn interest from a specified date. The German side uniformly rejected these proposals except that the German Government agreed that the initial portion of its DM 5 billion contribution would be made available to the Foundation by October 31, 2000, and the remainder of its contribution would be made available to the Foundation by December 31, 2000.

This strenuous, March to July, 2000, negotiating process over what was the equivalent of interest, is referred to in only a passing comment in *Imperfect Justice:*

> But Gentz's greatest concern was over timing of German industry's requirement to pay its 5 billion DM share of the 10 billion DM settlement. To avoid delay, I had suggested a certain date, like January 1, 2001. The Germans had rejected my suggestion, and in a major concession to them, I had reluctantly agreed that no payments would be required until all cases were dismissed. (*Id.* at 276).

The participants continued negotiating the terms of the Joint Statement, reaching agreement on July 12, 2000, on the language that appeared in the final version of the Joint Statement signed on July 17, 2000. Representatives of the United States and Germany signed the Executive Agreement, which, among other things, obligated the United States Government to file an agreed-upon Statement of Interest in support of dismissal of any pending or future Nazi-era litigation. On or about October 19, 2000, an exchange of diplomatic notes brought the Executive Agreement into full force and effect.

On August 12, 2000, the German Bundestag enacted the Foundation Law establishing the German Foundation "Remembrance, Responsibility and the Future." On August 22, 2000, Professor Neuborne was designated by the United States as a trustee of the Foundation to occupy the vacancy set aside for a lawyer representing the victims. He joined Ambassador J.J. Bindenagel, the other United States designated trustee of the Foundation.

On or about August 30, the first meeting of the Board of Trustees of the Foundation took place in Berlin. On or about September 22, the second meeting of the Board of Trustees was held, at which the trustees elected three Directors to manage the day-to-day affairs of the Foundation and adopted a notice to victims and other programs.

On or about October 1, 2000, the German government transferred DM 2.5 billion to the Foundation. On or about December 1, 2000, the German government transferred an additional DM 2.5 billion to the Foundation.

The attorneys for the plaintiffs and for the defendants in the United States Nazi-era cases proceeded to seek their dismissal with prejudice in order to fulfill one of the provisions of the Joint Statement. On November 13, 2000, Judge Bassler permitted voluntary dismissal with prejudice of forty World War II—related cases against German industrial defendants, including eleven members of the Initiative [1]. Defendants' attorneys assured the court that the financial commitments contained in the Joint Statement would be honored. *See In re Nazi Era Cases Against German Defendants Litig.,* 198 F.R.D. 429 (D.N.J. 2000).

---

[1] Several Plaintiffs refused to seek voluntary dismissal, requiring defendants to move for involuntary dismissal.

On or about December 8, 2000, and December 14, 2000, Chief Judge Mukasey of the Southern District of New York permitted dismissal with prejudice of German insurance cases.

The parties incurred a snag when they sought dismissal of the German banking cases pending before Judge Kram in the Southern District of New York. Although on December 28, 2000, Special Master Charles Stillman recommended dismissal of these cases, on January 20, 2001, Judge Kram denied dismissal. On March 28, Judge Kram denied a motion to reconsider her refusal to permit dismissal despite the fact that the Initiative's founding members issued press statements that they had volunteered to make up any shortfall in the German company contribution.

On May 12, 2001, the Court of Appeals for the Second Circuit issued a writ of mandamus directing Judge Kram to permit dismissal of the German banking cases. On May 18 and 21, 2001, Judge Kram dismissed the German banking cases.

On May 30, 2001, the German Bundestag announced that "adequate legal security" had been achieved. As of that date at least seven lawsuits against German companies arising out of the Nazi-era and World War II remained pending before United States courts.

On or about August 21, 2000, German companies had advanced DM 2.7 million to the Foundation for start-up costs, particularly for notice to potential claimants. The German companies transferred additional funds to the Foundation beginning in June, 2001.

Controversy arose concerning GEFI's obligation to pay interest, on what Plaintiffs have referred to as "6000 independent contributions during the deferral period," and concerning a credit Allianz and other companies received for contributions they made to the International Commission on Holocaust Era Insurance Claims.

Professor Neuborne, acting in his capacity as a trustee of the Foundation, filed litigation in the Eastern District of New York challenging the insurance credit and seeking to enforce his claim that additional interest was owing. In December, 2001, the German insurance companies made an additional payment to the Foundation of DM 63 million. The lawsuit was withdrawn without prejudice.

### III. *Procedural History*

In June, 2002, Elly Gross and others filed their Complaint as third-party beneficiaries seeking recovery for breach of contract against the Initiative (GEFI) and against its founding companies. They allege that Defendants are obligated to pay interest at the rate of at least 4% per annum on the unpaid balance of the Initiative's DM 5 billion obligation from and after July 17, 2000, the date of signing the Joint Statement, and that Defendants are obligated to pay to the Foundation all interest earned on approximately 6000 contributions the Initiative received from non-members of the Initiative.

In July, 2003, Bernard and Barbara Schwartz Lee brought a similar breach of contract action as third-party beneficiaries against Deutsch Bank AG and Dresdner Bank AG. They allege that in December, 1999, the German companies agreed to pay interest earned on their DM 5 billion from December 14, 1999. The Schwartz Lee complaint also includes a count alleging misrepresentation.

These complaints were assigned to Judge Bassler. The Initiative and the Defendant corporations moved to dismiss the complaints pursuant to Fed.R.Civ.P. 12(b)(6) and argued, in the alternative, that the claims were nonjusticiable, i.e., that

the political question and act of state doctrines as well as principles of international comity necessitated dismissal. In addition, the Defendants argued that Plaintiffs' complaints were barred by the doctrine of *res judicata* as well as Plaintiffs' inability to establish Article III standing. *In re Nazi Era Cases Against German Defendants Litig.*, 320 F.Supp.2d 235 (D.N.J. 2004), *rev'd sub nom. Gross v. German Foundation Indus. Initiative*, 456 F.3d 363 (3d Cir.2006).

Judge Bassler held that the court had diversity jurisdiction but did not have federal question or supplemental jurisdiction. He found that venue was proper and that Plaintiffs adequately demonstrated that they had standing.

Judge Bassler addressed Defendants' *res judicata* argument. In 2002, a California citizen filed a similar action in *Widerynski v. Deutsche Bank AG*, No. BC 274449 (Cal.Sup.Ct.), alleging, *inter alia*, that the same defendants named in the *Schwartz* complaint failed to timely contribute the agreed sum of DM 5 billion, thereby misappropriating interest due to the survivors of Nazi atrocities. Among the grounds on which the California Court dismissed the complaint with prejudice was international comity, concluding "that the German Government has 'exclusive supervision of the Foundation and on the exclusive postwar intergovernmental resolution of matters arising out of the Nazi era'." *Gross*, 320 F.Supp.2d at 244. Judge Bassler held that the Plaintiffs were not bound by this decision under the doctrine of *res judicata* and observed in a footnote that "[t]he Court notes that the Foundation's responsibility lies primarily in its efforts to distribute compensation to surviving Holocaust victims, not in how monies, including interest, owed it are calculated. Therefore, Defendants' position that the German Government, specifically

via the Ministry of Finance, has exclusive jurisdiction over the interest issue is debatable." *Id.* at 244, n. 9.

Judge Bassler also addressed and rejected Plaintiffs' contention that Defendants' promise to make "appropriate" interest payments (including the disputed payments) induced the court to dismiss the class actions against the German companies. He noted that Plaintiffs' counsel recognized that the interest issue is ambiguous, and Professor Neuborne acknowledged that "reasonable people can disagree" over the interest issue embodied in Para. 4(d) of the Joint Statement. Judge Bassler concluded that "[c]learly German Industry made no misrepresentation to this Court as to any definable interest obligation." *Gross*, 320 F.Supp.2d at 248.

Judge Bassler turned to Plaintiffs' argument that the Joint Statement was a classic bilateral contract that the court should enforce. He noted that "[t]he Joint Statement places the Foundation 'as the exclusive remedy and forum for the resolution of all claims that have been or may be asserted against German companies arising out of the National Socialist era and World War II'." *Id.* He also noted that the Joint Statement did not delegate similar jurisdictional authority over Para. 4 obligations of governmental and other parties under the Joint Statement, including the obligations of the German Government and German industry to pay principal and interest contributions under Para. 4(d). He concluded, "[a]s such, Defendants' interpretation that the Joint Statement itself provides that the interest obligations are properly decided by the Foundation appears incorrect. Otherwise, the other directives listed in Para. 4 of the Joint Statement should also rest in the Foundation's 'exclusive remedy and forum[.]'. However, that conclusion is tenuous at best from a

review of the other directives." *Id.* at 248–9.

Having expressed the foregoing opinions, however, Judge Bassler ultimately concluded that "[n]otwithstanding this Court's reservations over whether the Ministry of Finance does in fact maintain exclusive jurisdiction over the interest issues, the Court is convinced that the political question doctrine precludes adjudication of whether additional interest is owed. That both Germany and the United States have committed the resolution of this issue to diplomacy over litigation is supported not only by the above correspondence but, more importantly, by history." *Id.* at 253. Accordingly, Defendants' motion to dismiss on the ground of nonjusticiability was granted.

Plaintiffs appealed, and the Court of Appeals reversed. *Gross v. German Foundation Industrial Initiative*, 456 F.3d 363 (3d Cir.2006). The Court held "that adjudicating the 'interest' dispute would not present a nonjusticiable political question." *Id.* at 378. The Court observed that "the 'interest' dispute is distinct from the underlying reparations claims, which led to the creation of the Foundation." *Id.* at 381. It further observed that "[t]he language [of the Berlin Agreements] supports the view that the claims for which the Foundation is the exclusive forum and remedy, and for which the United States is required to file a Statement of Interest, are reparations and restitution cases, and not the present 'interest' dispute." *Id.* at 383.

As a part of its discussion of the political question doctrine the Court noted that "there is much to support the view of the German Foundation Industrial Initiative that the Joint Statement is a political document" and not a contract, *id.* at 385, but that "the parties' characterizations of the Joint Statement bear primarily on the merits of the 'interest' dispute and not the question of justiciability." *Id.* at 386.

The Court also rejected Defendants' arguments that the District Court should have restrained from adjudicating the claim under the act of state or international comity doctrines. The Court reversed and remanded the case for further proceedings, observing:

> In adjudicating the case a court would have to interpret the Berlin Accords—specifically, Section 4(d) of the Joint Statement—to determine whether there is a binding, contractual "interest" obligation. A court would face at least two questions on the merits of this dispute: (1) is the Joint Statement, or part of the Joint Statement, enforceable as a private contract, and (2) if so, what "interest" obligation, if any, did the parties intend for the German Foundation Industrial Initiative?

*Gross,* 456 F.3d at 387.

The case was remanded and, upon Judge Bassler's retirement, reassigned. The parties in each of the cases conferred with the Court and filed four dispositive motions: i) the *Gross* Plaintiffs' motion for summary judgment; ii) the *Schwartz Lee* Plaintiffs' motion for partial summary judgment; iii) the *Gross* Defendants' motion to dismiss the *Gross* complaint for failure to state a claim; and iv) the *Schwartz Lee* Defendants' motion to dismiss the *Schwartz Lee* Complaint.

There were renewed pending motions to dismiss for lack of jurisdiction over the person filed on behalf of Defendants Allianz AG, Bayer AG, DaimlerChrysler AG, Degussa AG (sued as "Degussa–Huells AG"), Deutz AG, RAG AG, Robert Bosch GmbH, ThyssenKrupp AG (sued as "Friedr, Krupp AG Hoesch Krupp"), Siemens AG and Volkswagen AG.

The Federal Republic of Germany moved in each case for leave to appear amicus curiae.

## IV. *Gross Plaintiffs' Summary Judgment Motion*

The *Gross* Plaintiffs have moved for summary judgment. The reasons they advance to support their interest claims differ somewhat from those of the *Schwartz Lee* Plaintiffs, and, although they rely upon substantially the same evidence to support their respective claims, they interpret the evidence somewhat differently. Basically, however, their claims will rise or fall together.

A. *The Gross Plaintiffs' Contentions:* The *Gross* Plaintiffs allege that Paras. 4(a) and 4(d) of the Joint Statement constitute a legally binding contract obligating Defendants to pay interest on the DM 5 billion from July 17, 2000, the date of signing the Joint Statement, until payment of that sum to the Foundation, at the rate of 4% per annum. According to Plaintiffs, Para. 4(d) provides for a guaranteed DM 100 million interest on the DM 5 billion obligation in connection with a deferral period estimated by the parties on July 17, 2000, to be approximately six months, which translates into annual interest at 4%. Because the deferral period extended much longer than the parties anticipated, interest for that period, according to Plaintiffs, is owed in an amount far greater than DM 100 million. Further, Plaintiffs contend that, because Defendants failed to make full payment on or shortly after May 30, 2001, when they claim the DM 5 billion payment was due, under Section 288(2) of the German Civil Code, interest is owing on the amounts in breach at 8% above the German market rate as calculated under Section 247 of the German Civil Code.

In addition, Plaintiffs assert that, during the deferral period, more than 6,000 small businesses, individuals, and institutions having no connection with Defendants' unlawful World War II activities contributed funds to the Foundation and that the Initiative used interest on the 6,000 contributions to defray a portion of its DM 5 billion financial obligation to the Foundation. Plaintiffs seek summary judgment ordering Defendants to account for that interest and to pay it to the Foundation.

The Joint Statement is unique in that it is an undertaking signed by 36 private entities[2], as well as by eight nations, and, if fully implemented, would result in dismissal with prejudice of pending litigation between private parties, in return for the payment of governmental and private funds. The specific obligations of the German companies are set forth in Para. 4(a) (to contribute DM 5 billion to the Foundation), and Para. 4(d) (to make the contribution "once all [designated] lawsuits against German companies ... pending in U.S. Courts ... are finally dismissed with prejudice by the courts," and "to make available reasonable advanced funding to provide appropriate publicity ..." and to continue to collect funds "on a schedule and in a manner that will ensure that the interest thereon before and after their delivery to the Foundation will reach at least 100 million DM.") Para. 4(g) sets forth the obligation of the Plaintiffs to file motions or stipulations to dismiss with prejudice all lawsuits they have filed currently pending in United States courts against German companies arising out of the National Socialist era and World War II.

Other paragraphs of the Joint Statement contain the undertakings of Germa-

---

**2.** Dr. Manfred Gentz signed the Joint Statement on behalf of GEFI's then–16 corporate members. Robert Bosch GmbH subsequently joined GEFI. Nineteen private lawyers signed the Joint Statement.

ny, the United States, the participating Central and Eastern European states, and Israel. Plaintiffs contend that, even though the obligations of the government parties cannot be enforced in a court of law, the mutual undertakings of the private parties are enforceable as a binding contract, with the state undertakings constituting conditions precedent, all of which have been performed.

In support of their position Plaintiffs cite *Sosa v. Alvarez–Machain*, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), for the proposition that there can be privately enforceable claims based on firmly established provisions of customary international law similar to Plaintiffs' slave labor claims against German industry. It must be noted that the Alien Tort Claims Act, 28 U.S.C. § 1350, with which *Sosa* was concerned, bears no resemblance whatsoever to the Joint Statement.

Despite the uniqueness of the Joint Statement, Plaintiffs point to the London Debt Agreement of 1953 as the closest international law analogy. The Agreement on German External Debts, Feb. 27, 1953, 4 U.S.T. 443, 333 U.N.T.S. 3. That Agreement involved close cooperation between governments and private creditors in restructuring post-war Germany's external debt. It was not formally signed by any private parties. Nevertheless, the private rights acquired by German companies under the London Debt Agreement have been judicially enforced. By the same token, Plaintiffs contend, the obligations of the private parties who did sign the Joint Statement should be enforced.

In *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003), defendants enforced the Joint Statement against the State of California, successfully arguing that the terms of the financial agreement in Para. 4(a) established a "hard law" judicially enforceable ceiling that invalidated California's attempt to provide additional relief to victims.

In *Winters v. Assicurazioni Generali S.p.A.*, No. 98–9186, 2000 WL 1858482, 2000 U.S. Dist. LEXIS 18193 (S.D.N.Y. Dec. 18, 2000), Defendants, including counsel for GEFI, argued before Chief Judge Mukasey that plaintiffs' promises in Para. 4(g) and Annex A of the Joint Statement generated judicially enforceable "hard law," entitling the Swiss parent of German insurers to dismissal of World War II-related insurance cases. At defendants' request, Chief Judge Mukasey agreed to construe the terms of Para. 4(g), holding that "[a]s applied to this case, the Berlin Agreements constitute, collectively, a settlement agreement" that would bind the plaintiffs. *Id.*

The Plaintiffs' position is well summarized in the following statement:

> In fact, the Joint Statement, a unique public/private hybrid, contains *both* a private settlement agreement between and among 36 private signatories, *and* a series of nonbinding political undertakings by eight sovereigns that function as conditions precedent to the enforceability of the private bargain. *See O'Leary v. Grace/Newark Hous. Ltd. P'ship.*, 31 Fed.Appx. 784, 786 (3d Cir.2002) ("Under basic contract law, a condition precedent is 'an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.' ").

(Pl.s' Br. at 51–52).

and

> ... Viewed *ex post* from May 30, 2001, the date the German Bundestag formally recognized that all conditions precedent had been satisfied no basis whatsoever exists to fail to recognize that the private financial bargain at the core of

the Joint Statement is legally binding. Accordingly, given the performance of the conditions precedent set forth in paragraphs 1, 2, 4(b), 4(c) and 4(g), defendants' financial promises in paragraphs 4(a) and 4(d) are contractually binding as a matter of law.

(*Id.* at 58).

In further support of their contention that the financial undertakings recited in Para. 4 of the Joint Statement were intended by the private signatories to be legally binding, Plaintiffs rely on the definitiveness of the language of Para. 4 itself, the intensity with which the parties negotiated the reciprocal obligations of the parties (to pay a designated sum for complete "legal peace") during a six-month period, multiple declarations of the parties, and the Post–Berlin Agreement activities of the parties, including Defendants' representations to federal judges during proceedings when the parties were seeking dismissal with prejudice of the more than 60 cases pending against Defendants in United States courts.

To support their contention that Para. 4(d) does not constitute a DM 100 million fixed sum, but, rather, requires payment of interest at the rate of 4% per annum from July 17, 2000, Plaintiffs rely in the first instance on what they claim is the unambiguous language of the Joint Statement. They contend that "[c]ourts in both Germany and the United States share a common approach to the construction of a contract. Each begins with the text. An unambiguous text with a 'plain meaning' cannot be altered by extrinsic evidence." (*Id.* at 74–5). Applying this principle, Plaintiffs argue that "[t]he plain meaning of the term 'at least' as connoting a minimum makes it impossible for Defendants to argue persuasively that the term establishes a *ceiling* on interest, as opposed to a floor ... It is equally impossible to

argue that the word 'interest' really means 'additional principal'." (*Id.* at 45). The language of the Joint Statement alone, Plaintiffs urge, entitles them to summary judgment.

B. *Evidence Upon which Gross Plaintiffs Rely:* Were the court to perceive an ambiguity in the meaning of "at least," however, Plaintiffs contend "the massive extrinsic evidentiary showing by plaintiffs, including Secretary Eizenstat's firm recollection that the terms 'at least' was designed to set an interest floor not a ceiling ... together with declarations from the principal negotiators for the victims attesting to a similar understanding of the text, renders it impossible to treat the term 'at least' as setting an interest ceiling." (*Id.* at 86).

The extrinsic evidence upon which the Plaintiffs rely is set forth in a number of Declarations. Principal among these are the Declarations of Professor Neuborne, which identify and rely upon a large number of critical documents. In addition, Plaintiffs submit the Declarations of Professor Michael J. Bazyler, Melvyn I. Weiss, Esq., and Secretary Eizenstat. Secretary Eizenstat's Declaration incorporates by reference chapters 10–13 of his book, *Imperfect Justice: Looted Assets, Slave Labor, and the Unfinished Business of World War II* (2003). These chapters describe the negotiations leading to the Berlin Agreements, and the court has relied upon them extensively in formulating the Background section of this opinion.

Professor Burt Neuborne, co-counsel for the *Gross* Plaintiffs, has been a leading champion of the slave and forced labor victims from the start of their pursuit of their claims in United States courts. He was co-counsel in numerous cases seeking recovery. He participated at the invitation of the United States in the complex negotiations with representatives of GEFI that

led to the establishment of the Foundation. He is one of the signatories of the Joint Statement. He is the United States attorney-appointee to the German Foundation Board of Trustees with special responsibility for protecting the interests of victim beneficiaries.

In his Declaration, Professor Neuborne asserts that "representatives of victims believed that the text of the Joint Statement assumed that interest would be earned on the funds constituting the Initiative's DM 5 billion principal obligation: (a) during the deferral period [the period between July 17, 2000 and the date of the Initiative's payment to the Foundation]; and (b) subsequent to payment to the Foundation, but before substantial payments could be distributed by the Foundation." (Neuborne Dec. at Para. 79). This would provide the extra funds needed to meet the demands of the various representatives of the victims. It was estimated that the deferral period, the time required to dismiss the United States lawsuits, which would trigger payment by GEFI, would be six months. At a 4% interest rate, interest on DM 5 billion would result in an additional payment of DM $100,000 million by GEFI. Because GEFI agreed to pay certain sums into the Foundation immediately upon the signing of the Joint Statement to permit notice and administrative programs to commence, "the parties agreed that DM 100 million interest minimum payable by the Initiative would include interest on both German Foundation funds retained by the Initiative during the deferral period pending transfer to the Foundation, and funds transferred to the Foundation prior to the expiration of the deferral period." (*Id.* at Para. 84).

According to Professor Neuborne, "[t]he Initiative agreed that the DM 100 million interest guarantee would be payable to the Foundation even if the deferral period

were shorter than the anticipated six months needed for the dismissal of the American cases. But the parties were careful to insert the phrase 'at least' into the interest provision to make it clear that if the deferral period lasted longer than six months, additional appropriate interest would be payable." (Neuborne Dec. at Para. 85, 86).

In a Supplemental Declaration, dated January 18, 2007, Professor Neuborne spelled out in more detail the rationale of the Plaintiffs' position on interest. He states "aided by exhortations from President Clinton and Chancellor Schroeder, on December 17, 1999, the parties firmly agreed to the establishment of DM 10 billion Foundation plus interest, in return for the dismissal with prejudice of all pending litigation and the signing of an Executive Agreement providing protection against future litigation." (Neuborne Supp. Dec. at Para. 16). Because potential claims upon the fund far exceeded DM 10 billion and many classes of victims and distribution agencies were to be recipients of the funds, "the allocation discussions [among representatives of the victims, agencies and nations] were extremely difficult, reaching a potential breaking point in mid-March, 2000." (*Id.* at Para. 17). On March 22, 2000, "with Secretary Eizenstat's help, the negotiators agreed on a general allocation of DM 8.1 billion to slave and forced laborers; DM 1 billion to property and personal injury claimants; DM 700 million to the Future Fund; and DM 200 million to the administrative costs of operating the Foundation, including the payment of all attorneys' fees. [A total of DM 10 billion]. The formula is set forth in *Appendix B* to the Joint Statement." (Neuborne Supp. Decl. at Para. 20).

Attention then turned to interest and "focused on the likelihood that substantial interest would be earned on the Founda-

tion's DM 10 billion principal during the time needed to dismiss the American cases and to verify and process claims.... Estimates of potential earned interest centered on DM 400 million in the first year of the Foundation, premised on a 4% return on the Foundation DM 10 billion principal." (*Id.* at Para. 22).

Para. 4(d) of the Joint Statement was not in existence until after these discussions of the use of various sources of interest to fatten the DM 10 billion available to compensate victims. When the paragraph was agreed to, the representatives viewed "[t]he language of paragraph 4(d) contractually assuring an earned 'interest' floor of 'at least DM 100 million' during the period required to dismiss the United States cases permitted a formal allocation of DM 10.1 billion to be reflected in Annex B to the Joint Statement and the Foundation Law, satisfying concerns of Eastern European countries, the Claims Conference, and prospective insurance claimants." (*Id.* at Para. 23). Further, "the prospect of substantial additional earned interest over and above the DM 100 million guaranteed interest floor was viewed by the negotiators as a crucial hedge against the unavoidable uncertainty surrounding the Neithamer demographic estimates of the number of eligible beneficiaries in various countries, especially surviving slave laborers." (*Id.* at Para. 24).

The negotiators for the victims sought to ensure payment of interest by having the respective DM 5 billion principal obligations of both GEFI and the German government paid into the Foundation prior to dismissal of the United States cases "in order to maximize the earned interest for the victims during the time needed to achieve the dismissal of the cases pending in the United States." (Neuborne Supp. Decl. at Para. 30).

The German government agreed to pay its DM 5 billion debt to the Foundation in two equal installments of DM 2.5 billion each, on October 31 and December 31, 2000. Each installment was paid a month in advance and, once paid, the Foundation commenced earning interest on the funds.

GEFI refused to pay its DM 5 billion until the United States lawsuits were dismissed with prejudice but agreed to pay "interest" of "at least DM 100 million" in addition to the DM 5 billion. Contrary to Defendants' position that the DM 100 million "interest" in Para. 4(d) was a fixed figure, Plaintiffs' position is:

> The negotiators were hopeful that the deferral period needed to secure dismissal of the cases pending in the United States would approximate six months. It was believed that the Panel on Multidistrict Litigation would consolidate the large number of pending cases before a single judge for orderly and expeditious dismissal. The negotiators fully understood, however, that the words "at least" were crucial to assuring that earned interest would continue to accrue during the deferral period if, despite the expectations of the parties, the deferral period extended beyond the estimated six month period.

(*Id.* at Para. 33).

In addition to the Declaration of Professor Neuborne, Plaintiffs submitted in support of their position the Declarations of Professor Michael J. Bazyler, Melvyn I. Weiss, Esq., and, most importantly, former Assistant Secretary of State, Stuart E. Eizenstat. Further, Plaintiffs in the *Gross* case relied on the Declaration of Michael Hausfeld, Esq. The substance of that Declaration will be set forth in the summary of the evidence that the *Schwartz Lee* Plaintiffs rely upon.

Professor Bazyler is one of the foremost scholars studying and analyzing the efforts

of Holocaust victims to secure redress against private defendants for Nazi-era economic losses. He has written widely on the subject, taught and testified about it. He has conducted vast research in the field, including interviewing participants in the negotiations culminating in the establishment of the Foundation and reviewing public statements and publicly available papers of these participants.

Professor Bazyler concluded from his research that "[f]rom the beginning of the negotiations on February 8, 1999 through the signing of the Joint Statement in Berlin on July 17, 2000, the paramount aim of the Initiative was to secure: (i) dismissal with prejudice of all WWII-era litigation pending in the United States courts against German industrial defendants; and (ii) protection against future similar litigation, at the lowest possible cost to the defendant industrial corporations that constituted the Initiative." (Bazyler Decl. at Para. 8(c)). He concluded that "[t]he Joint Statement signed by all parties was viewed as a private settlement agreement that would be legally and mutually binding on the Initiative and the class action victims once the Initiative had achieved its goal of 'legal peace.' " (*Id.* at Para. 8(g)).

Concerning the role of interest, Professor Bazyler stated:

a. Beginning with the November 13, 1999 plenary negotiating session, the negotiators were intensely concerned with the prospect that earned interest could expand the capacity of the German Foundation to provide compensation to victims. Deputy Treasury Secretary Stuart Eizenstat has confirmed in his memoir *Imperfect Justice* (at pg. 254) that, at the November 13 plenary, he persuaded the Initiative to commit to paying "at least" DM 100 million in "interest" during the period needed to se-

cure the dismissal of cases pending in the United States.

b. The negotiators' concern with earned interest took on greater intensity once the German Foundation's principal was fixed at DM 10 billion at the December 17, 2006 [1999] plenary negotiating session. Since the negotiators for the victims understood that the victims' valid claims on the German Foundation assets could very likely exceed DM 10 billion, the prospect of earned interest was an essential component of the final allocation agreement.

c. It would have been impossible for the negotiators to reach an allocation agreement on March 22, 2000 in the absence of calculations indicating that the Foundation's DM 10 billion principal would be able to earn an additional DM 400 million in its first year under the then-prevailing 4% interest rate. The estimated DM 400 million interest figure included the guaranteed DM 100 million in interest on the Initiative's DM 5 billion obligation payable during the period needed to secure the dismissal of the United States cases, a process that the negotiators believed would take not more than six months.

(Bazyler Decl. at Para. 9).

Professor Bazyler then repeated Professor Neuborne's analysis of the reasoning that resulted in the DM 100 million figure and his rationale supporting the Plaintiffs' position that GEFI's payment of interest at 4% was a continuing obligation until payment of the full DM 5 billion to the Foundation.

Mr. Weiss had served as counsel for the Plaintiffs in numerous cases against German industrial defendants seeking relief in connection with unlawful behavior by German industry during the Nazi era. In February, 1999, he was one of those invited by Secretary Eizenstat to participate in

negotiations with GEFI and with representatives of the German government in an effort to resolve the pending litigation in the United States courts. He participated fully in the ensuing negotiations as one of the principal negotiators for the victims.

Mr. Weiss described how, at the first meeting with GEFI, which took place on February 8, 1999, he urged that the pending litigation be settled by negotiating a class action settlement pursuant to Fed. R.Civ.P. 23(e). GEFI firmly rejected the use of Rule 23 and insisted that no funds be paid until all pending World War II era litigation was dismissed with prejudice and adequate protection was provided against future litigation. Eventually agreement was reached on use of the Foundation as the settlement vehicle. Mr. Weiss states that "[s]ince the negotiations were like any other settlement, discussions, we insisted that all of the contracting parties sign a binding agreement, resulting in the execution of the Joint Statement. I was adamant that any document memorializing the final bargain be legally binding. I would never have signed the Joint Statement if I believed that it committed me to dismiss my clients' claims with prejudice in the absence of any legally binding obligation on the part of the Initiative." (Weiss Decl. Para. 8).

With respect to interest on the DM 10 billion, Mr. Weiss states, "[i]n connection with those negotiations, the parties discussed the prospect that the Foundation's DM 10 billion would earn substantial interest at market rates during the period needed to dismiss cases pending in the United States and process the victims' claims. Since the prevailing German market rate was 4% in 2000, the negotiators anticipated that the Foundation would earn DM 400 million on its DM 10 billion

principal during its first year of operation." (*Id.* at Para. 11).

Mr. Weiss described the attempts of the victims' negotiators to prevail upon the German government and GEFI to place their respective DM 5 billion obligations into the Foundation prior to dismissal of the actions pending in the United States "so that the funds could begin earning interest for the victims." (*Id.* at Para. 13). The German Government agreed to pay its share on October 31 and December 31, 2000, but GEFI insisted upon waiting until dismissal with prejudice of the United States cases. With respect to the DM 100 million "interest" payment GEFI agreed to pay, Mr. Weiss stated:

Thus, the parties assumed that within approximately six months of the execution of the Joint Statement, the Initiative would place its DM 5 billion obligation into the foundation, together with a guaranteed "interest" payment of "at least" DM 100 million accrued during the deferral period. The Foundation would then consolidate the combined total of DM 5.1 billion with the German government funds already in the Foundation, plus the interest that had accrued on those funds, and so that all of the funds held by the Foundation would earn interest for the victims at 4% during the period needed to process claims. In order to assure that the DM 5 billion obligation would earn uninterrupted interest for the victims during any unexpected prolongation of the deferral period, negotiators for the victims, with the support of the United States, insisted that the term "at least" modify the guaranteed figure of DM 100 million. It was clear to me that the promise to pay "at least" DM 100 million in "interest" during the deferral period established a DM 100 million floor on interest, not a ceiling. I would not have agreed to such a

ceiling because it would have created a substantial risk of a "dead" period during which the Initiative's DM 5 billion principal obligation would have ceased to earn interest for victims, thereby undermining the carefully negotiated allocation agreement which assumed the uninterrupted flow of earned interest.

(*Id.* at Para. 16, 17).

Secretary Eizenstat, along with his German counterpart, Count Lambsdorff, played a momentous role in bringing the governments, parties, and other agencies to agreement. During the period 1993–2000 he had served as United States Ambassador to the European Union, Assistant Secretary of Commerce, Assistant Secretary of State, and Deputy Secretary of the Treasury. With that vast range of experience he was well suited to serve as President Clinton's Special Envoy for Holocaust Restitution. He proved to be a zealous negotiator and advocate for the victims during the period when the Berlin Agreements were being forged. Despite his pursuit of maximum compensation for the victims, all parties to the negotiations trusted Secretary Eizenstat totally. He described the negotiations in chapters 10–13 of *Imperfect Justice*. In his Declaration, submitted in support of Plaintiffs' position in this case, Secretary Eizenstat reaffirms the description of the negotiations set forth in *Imperfect Justice*.

In the present case, Professor Neuborne relies upon Secretary Eizenstat's book, stating, not in his Declaration, but in Plaintiffs' Brief (at 19–20):

At the November 13 plenary, Secretary Eizenstat, seeking to narrow the gap [concerning the size of the fund] raised the issue of interest for the first time. In his words:

"I then engaged in what I could only call creative accounting. I persuaded Lambsdorff and Gentz [the Initiative's chief negotiator] to add the interest that would be earned on the money while we were getting the cases dismissed and setting up the Foundation ... They ended up agreeing to pay *at least* 100 million in interest." [3]

In a footnote to this quotation, Plaintiffs add, "[t]hus, the agreement to pay interest during any deferral period was in place on December 17, 1999." (Pl.s' Br. at 19–20).

Nowhere in his one and one-half page Declaration does Secretary Eizenstat state that "the agreement to pay interest during any deferral period was in place on December 17, 1999." Rather, he states:

It is my firm recollection that sentence 7 of paragraph 4(d) of the Joint Statement of Principles, which reads:

German company funds will continue to be collected on a schedule and in a manner that will ensure that the interest earned thereon before and after their delivery to the Foundation will reach at least 100 million DM.

was intended to establish a minimum interest figure payable to the Foundation in connection with the deferral during the period needed to attain "legal peace" of the German Foundation Industrial Initiative's obligation to pay DM 5 billion to the Foundation. The language, which was carefully negotiated, was not intended to establish an interest ceiling, or to describe an addition to principal. It was a highly contentious matter in negotiations and the understanding was carefully negotiated.

The foregoing is a summary of the *Gross* Plaintiffs' contentions and of the evidence

---

3. This quotation from *Imperfect Justice* is taken totally out of context, a subject that will be dealt with more extensively in subsequent sections of this opinion.

that they contend entitles them to summary judgment.

## V. *Schwartz Lee Summary Judgment Motion*

A. *Schwartz Lee Plaintiffs' Contentions:* Plaintiffs, Bernard and Barbara Schwartz Lee, allege that not only were they compelled to perform slave labor for German industry during World War II but also that they lost extensive family property and assets to Aryanizations by Defendants, Deutsche Bank and Dresdner Bank. The backdrop of the complaint is the same as that of the *Gross* complaint—the international talks that led to the Berlin Agreements and the creation of the Foundation. The Complaint asserts two causes of action—one for breach of contract and the other for fraudulent misrepresentation[4].

The breach of contract claim starts with the undisputed allegation that in December, 1999, the German Government and German industry agreed that they would pay DM 10 billion to the Foundation for compensating victims. The consideration for this payment was resolution of existing and avoidance of future lawsuits in United States courts against German companies for wrongs arising during the Nazi-era. The dispute among the parties arises from Plaintiffs' claim that in December, 1999, the German Initiative agreed to pay interest on the promised funds.

Plaintiffs allege that in December, 1999, an agreement was reached requiring the German Government and German industry to contribute DM 10 billion to the Founda-

tion "to terminate litigation pending in American courts against German defendants." (Compl. Para. 23–32). Plaintiffs further allege that in early December, 1999, the Germans made an offer of DM 8 billion, which Plaintiffs rejected. (*Id.* at Para. 23). On December 13, 1999, the Complaint alleges, Mr. Hausfeld wrote to Count Lambsdorff extending a counteroffer with the language, "[t]he German side agrees to a 10 billion DM present value settlement, excluding costs of administration, distribution, notice, and fees . . ." (*Id.,* at Para. 24). The Complaint alleges that Secretary Eizenstat responded the next day by informing Mr. Hausfeld in a phone call that "[t]he Germans have accepted. You have a deal." (*Id.,* at Para. 26). Plaintiffs claim that this interchange constituted the Agreement and that the Agreement committed the German companies to provide the Foundation with all interest earned on their DM 5 billion contribution as of December, 1999. (*Id.* at Para. 3, p. 83–86).

It is the Plaintiffs' contention that the July 17 Joint Statement confirmed the Agreement reached in December, 1999, and provided for the timing of the payments and other steps to be taken by the signatories to the Joint Statement. Anticipated interest was the source of funds needed to satisfy the demands of all those representing victims. Unless the demands were satisfied they would not have signed the Joint Statement which permitted the settlement to proceed.

---

4. Plaintiffs do not seek summary judgment on their fraudulent misrepresentation claim, although that claim is a subject of Defendants' motion to dismiss. This claim rests on the allegations of Para. 86 of the complaint:

Defendants and/or the German Industry Initiative [sic] made numerous representations of fact, including the representations that funds were being collected on schedule, interest would accrue on the DM 10

billion present value as of December 1999, and payment in full had timely occurred, among others. Defendants and/or the German Industry Initiative made these representations to induce Plaintiffs to act and/or refrain from acting and knew or should have known that these representations were false. Plaintiffs justifiably relied on these representations.

Plaintiffs allege that legal peace was achieved on May 30, 2001, when the German Bundestag issued a Resolution declaring that "legal peace" had been achieved, thus triggering German industry's obligations under Para. 4(d) of the Joint Statement. According to the Complaint, not only did German companies fail to remit to the Foundation the DM 5.1 billion they admitted they owed, they failed to pay over, or even acknowledge that they owed, interest in excess of DM 100 million on assets they had held for the Foundation.

Plaintiffs' legal arguments parallel those of the *Gross* Plaintiffs. Their specific claims against Defendants are:

i) Defendants paid only DM 3.9 billion in principal immediately upon the achievement of legal peace, not completing payment of principal until at least 2002.

ii) Defendants' use on account of their principal obligation of a) interest on amounts collected for ultimate distribution to the Foundation and b) interest on the 8,500 contributions (See *Schwartz Lee* Memo in Support of Motion for Partial Summary Judgment at p. 31 for this figure) by generous parties for ultimate distribution to this Foundation was improper.

iii) Defendants have failed to pay all interest earned on the principal collected for the Foundation.

Plaintiffs note that "[w]hether Defendants owe interest dating back to the date of the oral agreement, December 17, 1999, or only to the date of the Joint Statement, July 17, 2002, cannot be resolved on summary judgment prior to discovery. Plaintiffs are moving solely for summary judgment on the fact that, irrespective of which date interest began to accrue, Defendants have failed to pay that interest to the Foundation." (*Id.* at 33).

B. *Evidence Upon which Schwartz Lee Plaintiffs Rely:* In support of their motion for partial summary judgment the *Schwartz Lee* Plaintiffs rely upon the Declaration of Michael D. Hausfeld, Esq., and documents accompanying the Declaration created during, or describing, the negotiations of the Berlin Agreements. The following portions of this opinion summarize Mr. Hausfeld's Declaration and draw upon the documents he relies upon.

Mr. Hausfeld played a leading and critical role in the process that led to these Agreements. He served as counsel in a number of cases raising claims against German industry for its use of forced and slave labor during the Nazi era. He served as counsel for those Plaintiffs in negotiations to resolve the claims. He advised the Central and East European nations and their survivor associations that participated in the negotiations in order to support the claims of their nationals, who made up the largest proportion of forced and slave laborers.

In early October, 1998, Martin Mendelsohn, Esq., and Mr. Hausfeld approached Secretary Eizenstat, then Under Secretary of State for Economic, Business, and Agricultural Affairs, with a detailed proposal for resolving the lawsuits through an international conference that would bring together the private sector and the German government, combining funds for global resolution. (Hausfeld Decl. at Para. 13). The proposal contemplated negotiations in three separate areas—Slave/Forced Labor, Banking, and Insurance—and that the agreed upon settlement fund would be under United States court supervision. (*Id.* at Exh. 4). Secretary Eizenstat reacted positively to the approaches of the Plaintiffs' attorneys to him. He advised President Clinton, Vice President Gore, and Secretary Albright of the suggestion and communicated with the German government. He arranged with Minister Holm-

bach for a second meeting with Plaintiffs' attorneys in Germany. (*Id.* at Exh. 6).

In October, 1998, Gerhard Schroeder was Chancellor-elect of Germany. His predecessor, Helmut Kohl, had rejected proposals for a Government fund to compensate forced/slave laborers, contending that the German Government had already paid out tens of billions of dollars in various forms of compensation for Holocaust victims and did not want to pay more. Representatives of German industry approached Chancellor-elect Schroeder urging that, in light of the serious direct and indirect consequences of the lawsuits upon German industry, the Government should take a lead in creating a fund to compensate former workers to which the industry representatives volunteered to contribute. (*Id.* at Exh. 7).

In February, 1999, Mr. Hausfeld met with Germany's Minister of the German Chancellory, Bodo Holmbach, and Secretary Eizenstat for initial discussions. (Hausfeld Decl. at Para. 16), and a February 17, 1999, New York Times article announced that "Chancellor Gerhard Schroeder today announced establishment of a fund, projected to amount to $1.7 billion financed by 12 German companies, to compensate victims of the Nazis era and end what he called 'the campaign being led against German industry and our country.'" (*Id.* at Exh. 9).

On May 11 and 12, 1999, the United States Department of State hosted the first plenary session to explore the possibility of settling the litigation against German companies. Further plenary sessions took place in Bonn and Washington from June 22, 1999, through July 17, 2000 (*Id.* at Para. 19, 20). The plenary sessions were attended by Plaintiffs' counsel; representatives of German industry; representatives of the governments of Belarus, the Czech Republic, Israel, Poland, Russia,

and Ukraine; representatives of the Central and East European Reconciliation Foundations; officials of the Government of the Federal Republic of Germany; officials of the United States Government; and representatives from the Conference on Jewish Material Claims Against Germany. (*Id.* at Para. 21). Secretary Eizenstat, on behalf of the United States, and Bodo Holmbach, on behalf of Germany, chaired the negotiations. Later, Count Otto Lambsdorff replaced Mr. Holmbach. (*Id.* at Para. 22).

During the plenary sessions and during working sessions dealing with specific problems, the participants had to address numerous complex issues such as the amounts of German Government and industry contributions, the categories of victims who would share in the fund, the method of terminating the lawsuits in the United States, how to ensure that German industry would have "legal peace," i.e., not be subjected to future lawsuits, how the fund would be operated, establishment of a "future fund" for humanitarian and Holocaust-related projects, and dealing with issues of banks, Aryanized property, and insurance.

At the June 22, 1999 plenary session, among the agreed positions was:

> The participants were unanimous that the call of the participating companies and the German government for a final and comprehensive legal settlement as a prerequisite for their financial commitment was legitimate. They should not be asked to pay twice. As concerns the class actions in the USA, the search for a third way should be accelerated, since the U.S. Government has rejected the idea of an Executive Agreement excluding law suits, and the companies do not want to accept a settlement in court. Under Secretary Eizenstat appealed to the creativity of the plaintiffs' lawyers,

who likewise accept the desirability of legal closure.

(Hausfeld Decl. at Exh. 19).

On June 30, 1999, Roger M. Witten, Esq., counsel for GEFI, submitted to Secretary Eizenstat a "Third Way" designed to assure the German companies that they would be protected from future litigation.

> The essence of our proposal is that, simultaneous with the achievement of consensus on the structure, operation, and funding of the Foundation Initiative, the U.S. Government would commit itself in a bilateral executive agreement with Germany to seek dismissal of all current and any future lawsuits in view of the establishment of the Economy Foundation. The executive agreement would require the United States to fulfill this commitment by filing a Statement of Interest in each court where a current or future case is pending. That Statement of Interest would urge the court to dismiss—not on the ground that the executive agreement legally binds the court to dismiss under the *Dames & Moore* line of cases, but rather on the ground that the court should dismiss for the reasons set forth in the Statement. With respect to the currently pending cases, the United States would file this Statement of Interest in a context in which the participating parties had achieved consensus on the Foundation Initiative and, on that basis, would simultaneously ask the court to dismiss.

(*Id.* at Exh. 20, p. 1–2). The Legal Closure Working Group concluded that the Witten proposal was a viable option.

Mr. Hausfeld hired economists to put together a framework for determining the total number of foreign forced laborers and to estimate the economic value of the forced labor (Hausfeld Decl. at Para. 42–44). During August, 1999, Mr. Hausfeld and Dr. Manfred Gentz, who represented German industry, exchanged correspondence in which they disagreed about a number of points and in which Mr. Hausfeld expressed exasperation about the pace of negotiations. (*Id.* at Exh. 27, 28).

In September, 1999, the participants in the negotiations sought resolution of the amount that would be paid into the fund. On September 13, 1999, Chancellor Schroeder wrote to President Clinton, agreeing that "this Initiative is an extremely important project concerning a matter of unique moral and human significance" but observing that "the conclusion of pending civil actions, as well as the prevention of future actions based on new facts in connection with the Nazi era are, in view of the German Government, further imperative prerequisites for the success of the Initiative." (*Id.* at Exh. 33).

A memorandum to the President, cleared by Secretary Eizenstat, addressed a number of subjects, but got to the heart of the matter—money:

> Deputy Secretary Eizenstat told Count Lambsdorff in late August that the German government and companies would need to provide the proposed German foundation with a combined contribution of 10 billion D-marks ($5.5 billion). We would need this amount so that we could argue publicly and in court that the German offer is a fair settlement. That amount is also critical because the Germans have also insisted on a settlement which would cover all injuries from World War II related to German companies: not only forced/slave labor cases, but bank cases involving the aryanization of property, insurance cases, and other matters, e.g., medical experimentation.
>
> Our information is that the Germans may propose in this week's round of talks an amount that will be no more than 6 billion D-marks. German industry

would provide only 4 billion D-marks and the German government would provide only 2 billion. The German companies are disappointed that their government will fail to match fully their offer, as they had expected. Schroeder's budget constraint is a factor. The expected low German offer is probably also based on the assumption that they have no legal liability and that Poland and the Czech Republic will not wish to create a public political dispute with Germany at this time. However, this position fails to take into account a negative public reaction if the offer is too low, and also fails to recognize that class action lawyers will be unwilling to settle for this amount. Moreover, there is a prospect that the judges erred and the lower court rulings will be reversed on appeal. We recommend that you praise the Chancellor for his leadership in this matter and argue for an opening German offer closer to 10 billion D–Marks, with an eventual willingness to go up to this level if necessary. We believe that an eventual settlement will not be possible if it is much below 10 billion D–Marks.

(Hausfeld Decl. at Exh. 34, p. 4–5).

At a Fifth Plenary session held on October 7, 1999, the German side offered a total of DM 6 billion to resolve the lawsuits, which the Plaintiffs rejected (*Id.* at Para. 55, 56). Mr. Hausfeld engaged in discussions with Count Lambsdorff after he received an October 29, 1999, letter from Dr. Gentz. Dr. Gentz reported that Count Lambsdorff "is striving hard and not always to the applause of other German participants to bring the German offer closer to a point where he feels everybody should be, as Graf Lambsdorff puts it, 'mildly dissatisfied.' I have to assure you, however, that the figure he has in mind is nowhere near the 12 billion dollars

you proposed and is not even 10 billion marks as ventilated elsewhere." He added, "I think we also agree that there is no alternative to investing the Reconciliation foundations and similar organization with the execution of payment." (*Id.* at Exh. 37).

On November 4, 1999, Reuters reported that mediators Eizenstat and Lambsdorff were to meet in Washington in "troubled talks on compensation." (*Id.* at Exh. 38). On December 1, 1999, Count Lambsdorff wrote to Mr. Hausfeld stating that "[t]he German side agreed to a foundation capital of 8 billion DM," of which German industry was to pay DM 5 billion and the German government was to pay DM 3 billion. (*Id.*, Para. 61, 62, Exh. 40).

Secretary Eizenstat communicated with Central and East European governments and urged them to accept a settlement of DM 8 billion. The Government of Poland on behalf of the group refused. (Hausfeld Decl. at Para. 63). Mr. Hausfeld, on December 2, 1999, wrote to Count Lambsdorff rejecting the offer of the German side and stating Plaintiffs' counsel "were told that you had a negotiating range between 6 and 10 billion DM. We responded that we were prepared to negotiate between 10 and 15 billion DM." (*Id.* at Para. 64, Exh. 41).

In early December, 1999, Secretary Eizenstat urged the European delegations to accept the German offer, rather than hold out for the higher amounts sought by Plaintiffs' lawyers. (*Id.* at Para. 66).

The Department of State sent two faxes to the Embassies of Poland and Belarus. The first included the following:

As Deputy Secretary Eizenstat made clear to your delegation in Bonn at the conclusion of the Nov. 16–17 negotiating round, enormous progress has been made. All of the elements are in place for a settlement, except agreement on

the total funding level of the German Foundation that will pay former forced and slave laborers, and the allocation of funds among beneficiary groups and companies.

Since Bonn, Deputy Secretary Eizenstat has been focusing his attention on ways in which to bridge the remaining gap between what the German side is offering, DM 8 billion (DM 5 billion from German Industry and DM 3 billion from the German government), and what the Class Action Plaintiffs' lawyers demanded in Bonn, a settlement of between DM 10 and DM 15 billion.

While how the money will be allocated between classes of beneficiaries and among countries remains a critically important issue to be resolved—and one on which Eizenstat has, and will continue to want to consult closely with your government—the focus now must be on negotiating a final capped amount, and to do so before the offer from German Industry expires on December 8.

(*Id.* at Exh. 43).

The second fax that the State Department sent to the two Embassies contained substantially the same admonitions as the first. With success so close, "the focus must be on negotiating a final capped amount," and Secretary Eizenstat "has instructed me to say that you have his personal assurance that once a capped amount for the German Foundation is agreed, he will accelerate his efforts to work-out a just distribution of those funds, both among classes of beneficiaries and participating countries." (Hausfeld Decl. at Exh. 44).

A December 13, 1999, letter to Count Lambsdorff is at the heart of the claim that interest is owing on DM 10 billion from December 14 or 17, 1999. The letter was signed by Mr. Hausfeld, several other attorneys, and on behalf of the Republic of Poland, the Czech Republic, the Republic of Belarus, and Ukraine. It read in its entirety:

At this point there must be no misunderstanding. The undersigned counsel, the governmental delegations, individuals and organizations they represent, have extended an offer to resolve the issues which have been the subject of the international conference on German offenses on the following terms.

1. The German side agrees to a 10 billion DM present value settlement, excluding costs of administration, distribution, notice and fees.

2. That there be firm commitment from non-German firms which used forced labor during World War II in an amount no less than 1 billion DM. (This would be a parallel mirror fund to be added to the 10 billion DM German commitment).

3. That reasonable administrative, distribution, notice costs and fees be paid by the German side over and above the 10 plus 1 billion DM commitment from German and non-German companies using forced labor during World War II.

4. That the German and non-German companies using forced labor commit to having their documents publicly archived at a reasonable expense to be determined in an appropriate historical repository.

(*Id.* at Exh. 49).

On December 13, 1999, President Clinton wrote to Chancellor Schroeder. He reported to the Chancellor that "Deputy Secretary Eizenstat was intensively engaged this past week with the plaintiffs' attorneys with whom he has dealt to move them closer to the German offer. On Sunday, he reported to Count Lambsdorff that they, the Conference for Jewish Material Claims Against Germany, the Central and

Eastern European Governments, and the Government of Israel would agree to settle at DM 10 billion.... This counteroffer is a firm commitment for settlement of which we both could be proud...." President Clinton also described the mechanism for ensuring legal peace for the German companies (Hausfeld Decl. at Exh. 50).

In his Declaration Mr. Hausfeld states, "[t]he following day, December 14, 1999, Deputy Secretary Stuart Eizenstat telephoned me and told me that the German government and German Industry had accepted the December 13, 1999 offer. Mr. Eizenstat told me: 'Congratulations. The Germans have accepted. You have a deal.'" (*Id.* at Para. 76).

Most curiously, Mr. Hausfeld's Declaration next refers to, and provides a copy of, an April 3, 2000, letter from a Special Assistant to the President informing Mr. Hausfeld that the December, 1999, exchange of letters between President Clinton and Chancellor Schroeder concerning the amount of the German payment to the Foundation did not constitute "an international agreement or a statement of the existence of an international agreement. Rather, it is a political exchange discussing issues to be resolved by ongoing negotiations." (*Id.* at Para. 77, Exh. 51). President Schroeder's December 14, 1999, letter is available. It is highly relevant to the issue of the validity of the claim that interest is owing on the DM 10 billion from December 14 or 17, 1999. It is extraordinary that Mr. Hausfeld did not include it in his Declaration. It will be the subject of further discussion.

After agreement on the DM 10 billion figure was reached, President Clinton, Secretary Albright and Secretary Eizenstat made appropriate remarks. (Hausfeld Decl. at Exh. 52, 54). Secretary Eizenstat's December 17, 1999, statement at the Berlin Plenary Session included the following:

> I am very pleased the German enterprises and the Government of the Federal Republic have agreed to raise their combined contribution to the Fund for Remembrance, Reconciliation and the Future to DM 10 billion ... [The other parties to the negotiations] have accepted DM 10 billion as the capped amount for the foundation and the sum that will resolve the lawsuits in the U.S. Courts. We have for the first time agreed on a capped amount—a ceiling—to resolve the lawsuits against German companies and to make dignified payments to former public and private sector Nazi-era slave and forced laborers and all those who suffered at the hands of German companies during this period.
>
> . . .
>
> In addition as a result of negotiations yesterday, all participants have agreed to use interest earned on contributions to the Foundation for the furtherance of the purposes of the Foundation.
>
> This agreement is the keystone in the arch of this long and difficult negotiation. We shall now proceed to conclude matters necessary to implement the overall agreement so that payments can begin to be made as soon as possible. These include reaching agreement on the allocation of the DM 10 billion among the various categories under the German Foundation, and the relationship of insurance matters between the Foundation and the International Commission on Holocaust Era Insurance Claims chaired by former Secretary of State Larry Eagleburger.
>
> . . .
>
> We will act to resolve all of the outstanding issues as expeditiously as possi-

ble. But it is important not to raise unrealistic expectations on the timing of payments. It will take some time to implement the details of an agreement, to have lawsuits dismissed, to have the German Bundestag enact the necessary legislation; to have the German economy raise their share of the DM 10 billion, to provide notice to the potential recipients; and to file, process, and pay claims. Consequently, it may take up to a year before dignified payments can be made, although we will do all we can to shorten this time period.

(*Id.* at Exh. 54).

A December 17, 1999, GEFI press release welcomed the agreement and stated that "[t]he DM 10 billion includes all associated costs of administration, legal fees and other expenses, and will not be increased in the future." (Hausfeld Decl. at Exh. 55). A January 11, 2000, Agence Presse release reported that "[t]he spokesman for German industry in the matter, Wolfgang Gibowski, said last week that German industry was still far from having reached its pledged goal of collecting five billion marks. By Christmas, only 75 firms accounting for two billion marks had been gathered. However, Gibowski was optimistic the promised sum could be reached by summer. He said two or three more firms a day were now joining." (*Id.* at Exh. 57).

Count Lambsdorff's February 9, 2000, testimony before the Committee on Banking and Financial Services of the United States House of Representatives gave a detailed summary of the status of negotiations as of December 17, 1999, the agreements that had been reached as of that date, proposals for allocating the DM 10 billion, and steps that remained to be taken (*Id.* at Exh. 58). He cited the exchange of letters dated December 13 and 14, 1999, between President Clinton and Chancellor Schroeder and verbal confirmation of the agreement between the heads of state on December 17 in the presence of Secretary Albright, German Foreign Minister Fischer, delegations from Israel, Belarus, the Czech Republic, Poland, Russia and Ukraine, as well the Claims Conference and groups of American plaintiffs' lawyers. Count Lambsdorff reported that ". . . a capped capital of 10 billion marks has been established for the Foundation" (*Id.* at Exh. 58, p. 3), adding, ". . . believe me, I wish I had greater funds available for distribution, but 10 billion marks is what we got and what was agreed upon by all of the participating parties after long and arduous negotiations." (*Id.* at Exh. 58, p. 5).

Count Lambsdorff stated that "[t]ogether with my respected colleague Stuart Eizenstat, I shall continue over the next few weeks to try to arrive at solutions regarding allocation." (*Id.*). He proposed an allocation of the DM 10 billion which was not meant to be binding, but was to be the subject of future negotiation among the victims and their representatives:

*DM 7.7 billion*—victims of slave and forced labor as well as victims of certain other personal injuries, medical tests, Kinderheim cases.

*DM 1 billion*—property claims, including insurance and bank issues.

*DM 1 billion*—a Future Fund to preserve the values and fund projects that will advance the values of the Foundation.

*DM 300 million*—for administration costs, including lawyers' fees.

Hausfeld Decl. at Exh. 58, p. 4, 4, 5.

Speaking before the Committee on Domestic Affairs of the German Bundestag on February 16, 2000, Secretary Eizenstat urged adoption of the legislation needed to implement the Foundation project. He, like Count Lambsdorff, described the De-

cember 17, 1999 agreement of the German government's and the German companies' "commitment to contribute a total of DM 10 billion to the Foundation." (*Id.* at Exh. 59, p. 1). He noted that "[b]efore I begin discussing the legislation, however, I want to note that the DM 10 billion capped amount has been agreed to by all of the participants and nothing I will say would increase the obligation of either the German Government or German companies by one pfennig or reopen any issues closed over the years since the end of World War II." (*Id.* at Exh. 59, p. 2).

Secretary Eizenstat referred to one of the "seminal elements" of this process, "that in return for their participation in funding a German Foundation, [the German companies] receive legal peace in U.S. Courts from pending and future law suits arising out of the Nazi era." (*Id.*). Secretary Eizenstat discussed at length the complex problem of allocating the funds among victims and victim groups, a problem yet to be resolved. Secretary Eizenstat advanced an observation on the subject of interest, a matter that was not the subject of the December 17, 1999, announcement and, in fact, conflicted with the agreement that administrative costs and attorneys' fees would be paid from the DM 10 billion. This note was to the effect: " . . . it is critically important that the German companies deposit their DM 5 billion contribution as soon as possible in an interest bearing account. The interest should support the purposes of the Foundation and would be the source used to pay administrative expenses and negotiated legal fees." (Hausfeld Decl. at Exh. 59, p. 9). Secretary Eizenstat repeated these remarks at a press conference held the same day and referred to the negotiations concerning the allocation of the DM 10 billion, stating "[t]hrough our discussions, we were able to further narrow our differences so that we are now within striking

distances of an agreement on allocation." (*Id.* at Exh. 60).

During the next few months talks proceeded on how the DM 10 billion should be allocated among the victims. The negotiations were very difficult and, according to Mr. Hausfeld, "were resolved only when the expected interest on the principal was factored in." (*Id.* at Para. 89, 91).

On March 23, 2000, Secretary Eizenstat reported to the 11th Plenary Meeting a "consensus agreement" on the allocation of the DM 10 billion in the German Foundation to which all parties agreed. He stated that "Count Lambsdorff and I met with each group of participants. All vigorously defended their positions, but all recognized the larger imperative of reaching agreement now so that funds could promptly go to survivors. Count Lambsdorff and I introduced a joint proposal that sought to meet the basic needs of each participant." (*Id.* at Exh. 62, p. 1). It is difficult to reconcile all the figures Secretary Eizenstat sets forth so as to arrive at DM 10 billion or DM 10 billion with an additional DM 50 million in interest, but the report stated that "[t]here will be DM 8.1 billion allocated to make payments to surviving slave forced laborers and to others for other personal injuries. The German Foundation will allocate the DM 8.1 billion from within the DM 10 billion to labor. The DM 8.1 billion will be increased by anticipated interest earnings of DM 50 million, for a total of DM 8.150. We also hope there will be a contribution from the Swiss settlement to the Foundation." (*Hausfeld Decl. at Exh. 62, p. 1*).

When reporting on negotiations to the Senate Foreign Relations Committee on April 5, 2000, Secretary Eizenstat recited an allocation summary that accounted for the full DM 10 billion:

| | |
|---|---|
| DM 8.1 billion— | slave forced laborer and others for personal injuries |
| DM 1.0 billion— | property claims, insurance claims, property and insurance humanitarian funds |
| DM .7 billion— | Future Fund |
| DM .2 billion— | Administration of Foundation |
| DM 10.00 billion— | Total |

Secretary Eizenstat stated that there would be added to the DM 8.1 billion, "50 million in anticipated interest earnings." When recounting the individual payouts to the nations handling payments to their citizens, Secretary Eizenstat included "an amount of estimated earned interest." (*Id.* at Exh. 63, p. 2–3). As in past reports, Secretary Eizenstat stated, "All the parties to these negotiations accepted the 10 billion DM offer as the capped amount for the German Foundation and the sum that will resolve the lawsuits." (*Id.* at Exh. 63, p. 2).

On July 17, 2000, the Joint Statement was signed by Plaintiffs' attorneys, a representative of German industry, and the Governments of Germany, the United States, Belarus, the Czech Republic, Israel, Poland, the Russian Federation, and Ukraine. (Hausfeld Decl. at Para. 97). As to his understanding when he signed the Joint Statement as one of the attorneys for the Plaintiffs, Mr. Hausfeld states:

I signed the Joint Statement. I believed at the time and I believe now that the commitments made in December 1999 and in the Joint Statement were binding agreements that were legally enforceably in a court of law in the United States.

Based on the history of the negotiations, it was clear that interest was expected to accrue on the funds, and would ultimately exceed DM 100 million. The term "at least" DM 100 million in the Joint Statement was not meant to be a ceiling.

I would not have advised my clients to sign the arguments or to dismiss their claims if I believed it was unenforceable. (*Id.* at Para. 98–100).

Mr. Hausfeld refers to a July 17, 2000, Declaration of the Central and Eastern European States that includes criticism of the negotiating process, makes several demands upon the Kuratorium of the Foundation, including:

that the Kuratorium supports the proposal that interest earned above 100 million DM, which is included in Annex B Distribution Plan to the Joint Statement, be used for direct payments to victims of slave and forced labor in Central and Eastern Europe and be allocated to partner organizations in Central and Eastern Europe according to the proportions adopted in that Annex.

(*Id.* at Exh. 66, para. 3(j), p. 2).

At the 12th and Concluding Plenary on the German Foundation held in Berlin on July 17, 2000, on the occasion of the Joint Statement, Secretary Eizenstat recited the terrible history, ignored for 55 years, that led to the negotiations resulting in the agreement reached that day. He described the negotiations themselves and the roles played by the various participants. In one place he referred to "the capped 10 billion DM—plus interest fund." (*Id.* at Exh. 68, p. 3). He added, "We all expect this money to be provided as soon as possible in an interest—bearing account so that any delay in settlement and dismissal of cases will not further disadvantage aging victims." (Hausfeld Decl. at Exh. 68, p. 5).

A March 13, 2001, GEFI report announced that "[a]s of today the German Industry Foundation Initiative has raised the full required amount of 5 billion marks. In a large-scale campaign of letters and telephone calls the Foundation Initiative is calling on its members, now numbering

around 6000 to increase their previous pledges. Non-members are also being approached and encouraged to join. The campaign is still underway ... As soon as sufficient legal security has been achieved for German Companies in the United States, and that should be the case very soon, it will be possible to start making compensation payments to surviving forced laborers who were victims of the Nazi regime." (*Id.* at Exh. 76).

On March 20, 2001, Judge Kram denied the motion to reconsider her March 7, 2001, order denying plaintiffs' motion to dismiss the Consolidated Class Action Complaint. (*Id.* at Exh. 77). A May 22, 2001, German Industry Press release announced the May 17, 2001, Court of Appeals declaration that the conditions that Judge Kram imposed on the May 10 dismissal of ten consolidated class actions were inadmissible and ordered dismissal of the cases. Judge Kram complied with the Court of Appeals order the next day. On May 22, 2001, the companies that had started GEFI declared that in light of these developments a sufficient level of legal security had been achieved. (*Id.* at Exh. 78).

On May 30, 2001, the German Bundestag determined "that adequate legal security has been established pursuant to Section 17, Para. 2 of the Law on the Creation of a Foundation 'Remembrance, Responsibility, and the Future.'" The Bundestag determination continued:

> The German Bundestag takes note of the fact that the Foundation Initiative, according to number 4d of the "Joint Declaration" of July 17, 2000, will pay the contribution of the German enterprises in the amount of DM 5 billion plus at least DM 100 million to the Foundation "Remembrance, Responsibility, and the Future." The German Bundestag understands that these funds will be transferred immediately to the Foundation "Remembrance, Responsibility, and the Future."

(Hausfeld Decl. at Exh. 80, p. 2).

On June 11, 2001, a GEFI press release announced that "[l]ast week the ... Initiative transferred the money accumulated in its accounts, in the amount of DM 3.9 billion, to the federal foundation. Accrued interest in the amount of DM 100 million will be transferred this week. The other sums of money, for which binding pledges were given, will also be made available to the federal foundation in the near future." (*Id.* at Exh. 83).

On September 5 and 12, 2001, Mr. Hausfeld wrote to Ambassador Dieter Kastrup, Chairman of the Foundation challenging on many grounds whether the Foundation had been fully funded by the German Government and German industry and claiming that funds in addition to the DM 10.1 billion belonged to the Foundation. (*Id.* at Exh. 84, 85). It is unnecessary to detail all of Mr. Hausfeld's claims, as those that survive are the subject of the present law suits.

In an October 5, 2001, press release the GEFI announced that on that date it had transferred just under DM 550 million to the Foundation, asserting that "[w]ith this payment, the financial obligation for German industry, as laid down in the law creating the foundation ... i.e. to pay the amount of DM 5 billion has been complied with in full. In addition, the German Industry Foundation Initiative has transferred DM 100 million in accrued interest to the Foundation." (*Id.* at Exh. 87).

On March 22, 2002, Mr. Manfred Gentz, GEFI's representative, wrote to Ambassador Kastrup, setting forth GEFI's response to the contentions that it had not fulfilled all of its obligations towards the Foundation, noting that the Foundation's

Board of Directors and Federal Ministry of Finance agreed that GEFI had complied in full with its obligations. (Hausfeld Decl. at Exh. 89). It is unnecessary to provide a full summary of this communication, because the contentions sets forth are fully explored in the present action.

## VI. *Defendants' Motions*

A. *Defendants' Motion to Dismiss Both Complaints:* The Defendants in the *Gross* and *Schwartz Lee* cases cross-move to dismiss the complaints in accordance with Fed.R.Civ.P. 12(b)(6) on the grounds that i) neither the Joint Statement, nor any part of it, is enforceable as a private contract, but rather is a political document, leaving its participants to their remedies in Germany through the Foundation and the German Ministry of Finance, or through U.S.-German diplomacy, and ii) even if construed as a contract, the Joint Statement did not obligate GEFI or the present Defendants to pay any specific amount themselves, did not require that the German company funds earn more than DM 100 million in interest, and did not require that any particular fraction of this amount be earned before, rather than after, German company funds were transferred to the Foundation.

Defendants cite and rely on the three instruments constituting the Berlin Accords: i) The July 17, 2000, bilateral Executive Agreement between the United States and the Government of the Federal Republic of Germany Concerning the Foundation Remembrance, Responsibility and the Future; ii) the July 17, 2000, "Joint Statement on occasion of the final plenary meeting concluding international talks on the preparation of the 'Foundation Remembrance, Responsibility and the Future,'" a document that the United States, Germany, six other nations and a number of private parties signed; and iii) legislation (the "Foundation Law") that the Ger-

man Bundestag enacted shortly thereafter that, among other things, established the Foundation as a German sovereign instrumentality and as the "exclusive remedy and forum" for resolution of asserted claims against German companies arising out of the Nazi-era and World War II.

The German companies have delivered DM 5.1 billion to the Foundation, which, according to Defendants, meets the requirements of Para. 4(d) of the Joint Statement. Defendants reject the Plaintiffs' contention that the German companies owe more interest to the Foundation pursuant to the last sentence of Para. 4(d), noting that the competent German institutions specified in the Berlin Accords, namely, the Foundation's Board of Directors and the German Ministry of Finance, concluded that no additional interest is owed.

Defendants' initial contention is that the Complaint fails to state a claim because the Joint Statement does not create privately enforceable obligations, quoting the Court of Appeals's observation that "[t]here is much to support the view ... that the Joint Statement is a political document." *Gross,* 456 F.3d at 385.

First, Defendants argue that the plain language of the Joint Statement, without recourse to parol evidence, compels the conclusion that the Joint Statement is not a departure from the general rule of international law that international diplomatic documents do not create privately enforceable rights. On its face, the Joint Statement is a declaration of mutual expectations, describing commitments between and among the nation-signatories and declaring broad principles. The language, according to Defendants, rejects the possibility of litigation: (i) "[t]he establishment of the Foundation does not create a basis for claims against the Federal Republic of Germany or its nationals." (Joint Statement at Preamble ¶ 11) and (ii) the

Preamble expresses the objective of all signatories that there be "all embracing and enduring legal peace" for German companies. (*Id.* at ¶ 9).

The Joint Statement contains no language granting rights of private enforcement or specifying how a party should proceed if it wished to enforce the Joint Statement. According to Defendants, the title, structure and language of the Joint Statement are incompatible with the conclusion that, by silent implication, it created obligations that could be privately enforced in court, contrasting the very title of the Joint *Statement* with that of the Executive *Agreement.* The Defendants contrast the obligatory language of the Executive Agreement with that used in the Joint Statement. Further, eight sovereign nations which were immune from suit as well as non-governmental agencies, signed the Joint Statement. According to Defendants, the language regarding interest in Para. 4(d) is descriptive of when interest will start accruing and imposes no obligation on the part of the German government or the German companies to pay interest starting at any particular time or at any particular rate.

Defendants further argue that the language and structure of the Berlin Accords in their totality demonstrate that the Joint Statement did not create legal privately enforceable obligations, noting in particular Article 1(3) of the Executive Agreement that provides that Germany, not the United States or its courts, is to supervise the Foundation:

> The Federal Republic of Germany assures that the Foundation will be subject to legal supervision by a German governmental authority; any person may request that the German governmental authority take measures to ensure compliance with the legal requirements of the Foundation.

Defendants point to the Foundation Law and the detailed manner in which it provides for the governance of the Foundation, the amounts that the Federal Republic of Germany and the German companies were to contribute to the Foundation, and oversight by the German Federal Ministry of Finance, which has concluded that the German companies do not owe any additional interest to the Foundation. In these circumstances, Defendants argue, that "it is clear on the face of the documents constituting the Berlin Accords and Foundation Law that the participants did not intend the Joint Statement, or any part of it, to be a contract enforceable in a U.S. Court, but provided other institutions to govern and oversee the Foundation." (Def.s' Br. at 27).

Further, Defendants assert even if the Joint Statement were a contract binding on the German companies, in Para. 4(d) the Defendants did not undertake to pay interest in any amount or to collect contributions on a schedule that would earn any interest in excess of DM 100 million. The court will defer giving a synopsis of Defendants' argument about the meaning of the interest provision in Para. 4(d) until it addresses the question whether that provision is ambiguous, requiring a review of extrinsic evidence.

B. *Banks' Motion to Dismiss Schwartz Lee Complaint:* The only two Defendants named in the *Schwartz Lee* complaint are Deutsche Bank AG ("Deutsche Bank") and Dresdner Bank AG ("Dresdner Bank") (collectively "the Banks"). They are also Defendants in the *Gross* case and are parties to the motion to dismiss in that case. The *Schwartz Lee* complaint contains two causes of action: breach of contract and fraudulent misrepresentation.

Plaintiffs allege that in December, 1999, an Agreement was reached requiring the German Government and German industry

to contribute DM 10 billion to the Foundation "to terminate litigation pending in American courts against German defendants." (Compl. Para. 23–32). Plaintiffs further allege that in early December, 1999, the "Germans" made an offer of DM 8 billion, which was rejected by Plaintiffs. (*Id.* at Para. 23). On December 13, 1999, the Complaint alleges, Michael Hausfeld wrote to Count Lambsdorff, the lead negotiator for the German Government, extending a "counteroffer" with the language, "[t]he German side agrees to a 10 billion DM present value settlement, excluding costs of administration, distribution, notice, and fees ..." (*Id.* at Para. 24) (the "Hausfeld Letter"). Stuart Eizenstat, the lead negotiator for the U.S. Government, is alleged to have responded the next day by informing Mr. Hausfeld in a phone call that "[t]he Germans have accepted. You have a deal." (Compl. at Para. 26). Plaintiffs claim that this correspondence and telephone call constituted the "Agreement" (*id.* at Para. 3) committing the German companies to provide to the Foundation all interest earned on their DM 5 billion contribution as of December, 1999. (*Id.* at Para. 3, pp. 83–86).

The Banks note that there is no allegation that any of the participants in the correspondence (Hausfeld, Eizenstat, and Lambsdorff) had authority to act on behalf of the Banks or that an offer was transmitted to, or accepted by, the Banks. Further, the Banks note that Chancellor Schroeder wrote to President Clinton the day after Mr. Hausfeld made his counteroffer and specifically rejected Mr. Hausfeld's demand that the German contribution be DM 10 billion "present value" as of December, 1999. Finally, the Banks contend that documents post-dating December, 1999, that are attached to and cited throughout the Complaint, establish that no binding agreement was reached in December, 1999.

As to the fraudulent misrepresentation claim, the Banks seek dismissal on the ground that the Complaint fails to identify a single statement made by any representative of the Banks, any statement directly attributed to the Banks, or any misrepresentation of any kind relied on by Plaintiffs.

C. *Evidence upon Which Defendants Rely:* Defendant Banks submitted the Declarations of four of the active participants in the negotiations leading to the Berlin Accords: Count Otto Lambsdorff, Chancellor Schroeder's special representative and lead negotiator for the Federal Republic of Germany during most of the negotiations; Roger M. Witten, Esq., a partner of the firm of Wilmer Cutler Pickering Hale and Dorr LLP which represented GEFI in connection with the negotiations; Dr. Manfred Gentz, who held the position of Chief Financial Officer of DaimlerChrysler AG during the negotiations and who was de facto spokesman and negotiator for GEFI; Dr. Klaus Kohler, Group General Counsel of Deutsche Bank from 1995 through 2000 and who chaired the legal working group of GEFI.

Count Lambsdorff, representing the German government, was Secretary Eizenstat's counterpart. The two worked closely and cooperatively together to achieve a final resolution of the victims' claims. Opening his Declaration, Count Lambsdorff stated the continuing objective of the German side-Government and companies:

The principal aims of the German Government and German companies in establishing the Foundation, "Remembrance, Responsibility and the Future," were: a) to establish and fund a German Foundation for making payments to certain victims of the National Socialist era and World War II that would be an

instrumentality of the FRG governed entirely by German Laws and institutions and which would not be subject to oversight or review by U.S. courts; and b) to obtain all-embracing and enduring legal peace for German companies, not only in the U.S. but elsewhere.

(Lambsdorff Decl. Para. 2).

Count Lambsdorff views the Joint Statement as a political statement rather than a contract enforceable in a court:[5]

> The JS, which was signed by eight sovereign nations as well as by private parties (e.g. Conference on Jewish Claims in Germany), was a political statement describing the results of the talks leading to the establishment of the Foundation, through German legislation, as a German sovereign instrumentality. While I have no reason to doubt that all the participants who affixed their signatures to it expected that they themselves and the other signatories would in fact take the steps set forth therein, there was no agreement, express or implied, that a signatory to the JS (or any other person) could institute litigation in the U.S. or elsewhere to enforce the JS. To my knowledge, at no point in the negotiations that led to the BAs did anyone even propose to the German side that the JS be enforceable through private litigation, and I am certain that the German side did not agree that a signatory or other person could bring litigation in a U.S. court to compel action by a JS signatory. That is why both the JS and EA were written (i) to make no provision for private enforceability; and (ii) instead to provide for oversight, in the event of disputes, by designated German governmental authority. Notably in this regard, the JS specifically provides that the creation of the Foundation does not

provide a basis for the assertion of any claims against Germany or German companies. In these respects, the JS and EA are entirely consistent with the objectives set forth in the first paragraph above.

(*Id.* at Para. 4).

In particular, Count Lambsdorff states that the interest issue had already been resolved in the manner contemplated by the Berlin Accords:

> German institutions have, in the manner provided for in the BAs, considered whether German companies owe additional interest to the Foundation Remembrance, Responsibility and the Future and, correctly in my view, have concluded that none is owed. Those decisions were taken by the Foundation's Board of Directors, as well as by the German Ministry of Finance exercising its statutory authority under the Foundation Law. That conclusion has been communicated to the United States Government through diplomatic channels and has appropriately been the subject of diplomatic correspondence between the two countries, as reflected in the Eichel letter (attached as Exhibit A) and the Armitage letter (attached as Exhibit B). Notably, Undersecretary Armitage's letter on behalf of the U.S. Government to me states that the interest dispute is not for resolution "by the courts," a view that is of course consistent with my own understanding that the JS is not privately enforceable.

(*Id.* at Para. 5)

The Exhibit A to which the Declaration referred was a letter from the German Minister of Finance to Secretary of State Colin Powell stating that he had reviewed the contentions of the Plaintiffs' attorneys

---

**5.** In his Declaration Count Lambsdorff refers to the Berlin Accords as "BA", to the Joint Statement as "JS", and to the Executive Agreement as "EA".

and found that "[t]he German Federal Government shares the position of the Foundation Initiative that, under paragraph 4(d) of the Joint Statement of July 17, 2000, the Foundation Initiative of German Industry was obligated to pay a total of DM 5.1 billion as capped amount." The letter also stated, "I am convinced that the Government of the United States will be able to defend German companies against suits in United States courts as promised under the Executive Agreement of July 17, 2000."

Exhibit B to which reference is made in Para. 15 of the Lambsdorff Declaration is a copy of Undersecretary Armitage's letter to Count Lambsdorff stating that "[t]he U.S. Government has no independent information that conclusively resolves disagreements surrounding the interest issue," but that "[t]he policy of the United States has been that the proper venue for addressing issues concerning the Foundation are in the Foundation or through U.S. German diplomacy. Therefore, the U.S. Government believes that matters concerning interest payments should be resolved as a political matter in these domains, and not by the courts."

Count Lambsdorff addressed Plaintiffs' contention that there was an agreement that interest would be payable on the DM 10 billion from either December 9 or December 14 or December 17, 1999:

On December 13, 1999, I received a letter from Michael Hausfeld (attached as Exhibit C) with the language, "The German side agrees to a 10 billion DM present value settlement, excluding costs of administration, distribution, notice, and fees...."

As of the date of Mr. Hausfeld's letter, the discussions had always focused on a capped amount to be contributed by the German side. As of that date, there certainly was no agreement that any interest would be contributed by the German Government or the German companies.

I did not convey authority to Mr. Eizenstat or to anyone else to accept the proposals contained in Mr. Hausfeld's December 13, 1999 letter on behalf of the German Government. I certainly did not convey authority to Mr. Eizenstat or to anyone else to accept the proposals contained in Mr. Hausfeld's letter on behalf of the German companies. I did not believe that I had authority to speak on behalf of the German companies.

As demonstrated by the December 1999 exchange of letters between President Clinton and Chancellor Schroeder (attached as Exhibits D and E) most of the terms in Mr. Hausfeld's December 13, 1999 were summarily rejected. Indeed, Chancellor Schroeder's letter dated December 14, 1999, referenced Mr. Hausfeld's December 13, 1999 letter and then expressly rejected the further demands by plaintiffs' lawyers, including the suggestion in Mr. Hausfeld's December 13, 1999 letter that the DM 10 billion cap represented a present value sum. The December 17, 1999 announcement (attached as Exhibit F) also identified only a specific and capped amount of DM 10 billion and made absolutely no mention of any interest accruing for the benefit of the German Foundation. That is because at that time there simply was no agreement between the German and U.S. governments concerning interest on that Capped amount. Nor, to my knowledge, did the German companies agree at that time to any interest payment on the capped amount.

(*Id.* at Paras. 6–9).

Exhibit D, to which the Declaration referred, was President Clinton's December 13, 1999 letter to Chancellor Schroeder,

noting that Secretary Eizenstat had informed him that the Plaintiffs' attorneys and the other claimants "would agree to settle at DM 10 billion," and that this "will establish for the first time a flat sum and ceiling agreed by all participants in this process." President Clinton urged Chancellor Schroeder to prevail upon the German side to agree to this capped amount.

Exhibit E to the Lambsdorff Declaration is Chancellor Schroeder's December 14, 1999 letter responding to President Clinton's letter in which he accepted the President's proposal and announced that "we have decided to increase the financial endowment of the Federal Foundation to a total of 10 billion DM." He further specifically rejected Mr. Hausfeld's December 13 demands:

> Two aspects were particularly important for this decision: First of all, the amount of 10 billion DM which will be furnished by the German side is the final amount. All contributions of the Federal Foundation—for NS forced laborers, for property damages and for the Future Funds—will be financed from this amount. All the other costs related to the Federal Foundation are included. Further demands, as they were presented by attorneys for the plaintiffs yesterday, are being rejected by the Federal Government in accordance with the U.S. government.

> The second central argument for your proposal are the substantial improvements concerning legal closure which were reached during the last few days. I appreciate very much the promise made by the U.S. Government to point to the foreign-policy interests in all pending and future litigation and to use its influence to reach a dismissal of action. The same goes for the willingness of the U.S. Government to give a Statement of Interest which is independent from the attitude of the plaintiffs. I am by the way proceeding on the assumption that this consensus will take away the basis for legislative and administrative actions against German enterprises and that the U.S. Government will enforce the annulment of the actions on the Federal and state level.

> The Federal Government went to the limits of what was possible in order to achieve [the agreement]. Therefore it will decisively reject any further demands. I am also aware of the substantial efforts of the U.S. Government. I am very grateful for the special involvement in this cause to you, your government and especially to our special envoys, Stuart Eizenstat and Otto Graf Lambsdorff.[6]

Count Lambsdorff categorically denied that there was a subsequent agreement that interest would accrue on the DM 10 billion. He stated that despite Secretary Eizenstat's repeated requests that an interest factor be added, Secretary Eizenstat ultimately dropped his proposals that the German companies pay interest and instead explored with Count Lambsdorff whether the due date for the German Government's money could be advanced so it could start earning interest. (*Id.* at Paras. 10, 11).

---

**6.** Remarkably, in his Declaration seeking to establish the existence of an agreement to pay interest on the DM 10 billion from December 1999, Mr. Hausfeld fails to attach a copy of Chancellor Schroeder's December 14, 1999, letter. Instead, in what can only be an attempt to conceal or camouflage it, he attaches a copy of an April 3, 2000 letter from a Special Assistant to the President stating that the December, 1999 exchange of letters between the heads of state did not constitute "an international agreement or a statement of the existence of an international agreement."

It is important to understand that the German Government contribution was not due to be contributed to the Foundation until the dates specified in the JS, and the German company contribution was not due to be contributed to the Foundation until all the cases were dismissed with prejudice. Thus, there was no "deferral period." It is entirely mistaken to suggest that the money was to be contributed at some earlier date, that the date for such a contribution was deferred to a later date; and that interest was owed in light of the passage of time. Accordingly, there was no agreement that interest would run during any so-called "deferral period."

After the December 17, 1999 announcement that an agreement in principle had been reached, the U.S. Government, through Deputy Secretary of the Treasury Stuart Eizenstat, from time to time sought, in meetings with the German side alone, an agreement that the German companies contribute their funds to the Foundation at a date prior to the dismissal of the cases pending in the U.S. or, alternatively, that German company funds would accrue interest for the benefit of the Foundation. The German companies with the full consent of the German Government, however, repeatedly rejected the U.S. Government's proposals, and the U.S. Government ultimately abandoned its position in this regard.

(*Id.* at Paras. 10, 11).

Secretary Eizenstat was engaged with Count Lambsdorff in the extremely difficult task of allocating the DM 10 billion among the various claimants. According to Count Lambsdorff, Secretary Eizenstat had hit an impasse and had to obtain an additional DM 100 million to prevail upon the Polish Government and the World Jewish Congress to accept a final alloca-

tion. This amount could only be obtained by raising GEFI's contribution by that amount:

> ... after long and arduous talks the Foundation Initiative agreed under the provision that this additional amount did not enter into the principal of the promised amount in public. This was the genesis of the word "interest", in reality covering the fact that so far the total amount of 10 billion DM was no longer capped. So the interest was in reality no interest, which does not preclude the fact that once the sum was deposited in the Foundation's Account, it generated a much higher interest than this sum and, as a matter of fact, the Future Fund of the Foundation is meant to be financed perpetually from interest earned.
>
> In regard to that issue, on April 19, 2000, I wrote the following in a letter to Deputy Secretary Eizenstat: "In December 1999 the companies of the German Foundation Initiative agreed to do everything to contribute the amount of 5 billion DM to the Foundation capital, and in March this year they agreed to a specific allocation of further 100 M.O. DM generated by interest. Although the Initiative's difficulties raising this substantial amount are well known and have been deplored by the German Chancellor and myself publicly, I have no doubt that the Initiative will finally succeed. The Initiative, however, has always underlined that it will turn its contribution over to the Foundation only when the class action suits have been dismissed, which is hopefully the case well before the end of the year." My personal hope did not, however, become the basis for assumption of an interest obligation by the German companies.

(*Id.* at Paras. 12, 13).

Count Lambsdorff set forth his interpretation of paragraph 4(d) of the Joint Statement:

Paragraph 4(d) reflects the agreement as I understood it: the German Government's contribution to the Foundation would be made on two specified dates prior to the dismissal of the lawsuits in the U.S. and interest on those German Government funds could be collected from those dates for the benefit of the Foundation; by contrast, the DM 5 billion contribution by the German companies was not to be contributed to the Foundation until all cases against the German companies in the U.S. had been dismissed with prejudice; and that the German companies would continue to collect funds so that, during the period before the German transfer, the German company contributions would generate in the aggregate at least the sum of DM 100 million that had been mentioned. It is my view that the German companies fulfilled that obligation by transferring DM 5.1 billion to the Foundation. I am informed that the German company contribution generated substantial interest for the Foundation after its transfer to the Foundation, as anticipated.

(*Id.* at Para. 14).

Roger M. Witten, Esq., who represented GEFI during the negotiations, states in his Declaration that "I can unequivocally state that the participants did not reach an agreement in December 1999 or at any other time that the capped amount of DM 10 billion was a 'present value' figure. That notion was, as far as I am aware, floated only in a letter dated December 13, 1999 from Michael Hausfeld to Otto Graf Lambsdorff . . . and was promptly rejected by the German Government . . . in a letter dated December 14, 1999 from Chancellor Schroeder to President Clinton." (Witten Decl. at Para. 8).

Further, according to Mr. Witten, he discussed Mr. Hausfeld's demand with Secretary Eizenstat: "On December 13,

1999, my then partner Lloyd N. Cutler and I spoke by telephone with Deputy Secretary Eizenstat and objected to Mr. Hausfeld's letter to Graf Lambsdorff; Deputy Secretary Eizenstat advised us that we could ignore Hausfeld's letter, which he referred to dismissively, because he (Eizenstat) had 'taken care of it' " (*Id.* at Para. 8).

Mr. Witten also explained how in March, 2000, the additional DM 100 million so-called "interest" was agreed upon:

Second, in March 2000, during negotiations regarding how the DM 10 billion would be allocated among the different categories of victims and all other programs and expenses of the Foundation, it became apparent that political agreement could not be reached within the capped sum of DM 10 billion, and that a further DM 100 million would be necessary to fund the allocated amounts. It was observed that interest on the DM 10 billion capped amount could be used to meet the DM 100 million shortfall. Thus, in order to avoid affecting the previously agreed DM 10 billion capped sum, GEFI and the German Government took the position that the additional DM 100 million be designated as "interest." On March 23, 2000, the participants in the negotiations resolved the allocation issue (the result of which is attached to the Joint Statement as Appendix B), allocating DM 10 billion plus precisely DM 100 million in interest (DM 50 million in interest for slave and forced labor payments to Central and Eastern European and DM 50 million in interest for insurance claims). I am not aware of any direct oral or written communication between any plaintiffs' lawyer and GEFI prior to the signing of the Berlin Accords regarding the subject of expected interest other than the DM 100 million which was

unanimously agreed to and set forth in Annex B of the Joint Statement. At no point, did Burt Neuborne, Mr. Hausfeld, or their colleagues communicate to GEFI the theories regarding interest found in their briefs and declarations in this litigation, for example, the "deferral period" theory. GEFI never agreed to any of the interest theories Plaintiffs' counsel now put forward.

(*Id.* at Paras. 9, 10).

Mr. Witten described in great detail his discussions with Secretary Eizenstat during which Secretary Eizenstat argued forcefully for an interest provision, requiring the German companies to either pay over their contribution before dismissal of the U.S. law suits or to pay interest on the funds collected. Mr. Witten further describes how he, on behalf of GEFI, rejected these demands:

As next described, the content of discussions regarding interest and the history of the drafting of the Joint Statement demonstrate that while Deputy Secretary Eizenstat made certain proposals relating to interest, GEFI rejected those suggestions, and Deputy Secretary Eizenstat acquiesced in GEFI's position.

In particular, on June 12, 2000, I attended a meeting hosted by Deputy Secretary Eizenstat at the U.S. Treasury Department in Washington, D.C. with representatives of the U.S. and German Governments. The attendees included Graf Lambsdorff and Dr. Manfred Gentz, who was the de facto spokesperson for GEFI. At that meeting, the German side reconfirmed its longstanding position that German company payments to the Foundation would not be due until all cases were finally dismissed with prejudice. In response, Deputy Secretary Eizenstat said that plaintiffs' lawyers might object to this position but might be placated if the

German companies agreed to pay interest on their DM 5 billion contribution as of a certain date, and he suggested January 1, 2001. Dr. Gentz rejected that proposal and stated that GEFI had only two commitments: first to pay DM 5 billion to the Foundation; and second, to generate DM 100 million in interest. Dr. Gentz said GEFI would keep those commitments but would not discuss any other arrangements. Count Lambsdorff volunteered that the German Government (not German companies) might agree that its own DM 5 billion contribution could be made to the Foundation before the dismissal of all cases against German companies. The focus of how to generate funds in excess of DM 100 million subsequently switched from German companies as the potential source to the German Government. In fact, as reflected in paragraph 4(d) of the Joint Statement, as signaled by Count Lambsdorff at this meeting, the German Government committed to pay its DM 5 billion to the Foundation in two tranches on specified dates that preceded dismissal of all the cases against German companies and that German Government funds would begin earning interest for the benefit of the Foundation immediately upon being made available to the Foundation.

On June 30, 2000, I attended another meeting with Deputy Secretary Eizenstat and other representatives of the U.S. Government at the U.S. Treasury Department in Washington, D.C. At that meeting, Deputy Secretary Eizenstat again sought, unsuccessfully, to persuade German companies to generate interest in addition to the DM 100 million. He noted that the German companies would not agree to a deadline when their DM 5 billion would be collected or would begin earning interest. He again asked us to consider agreeing to raise

the full DM 5 billion by a date certain, suggesting December 31, 2000, and further suggested that we should agree that interest would accrue on the entire amount from that date forward for the benefit of the Foundation. He pointed to a draft of the joint Statement that the U.S. Government had recently circulated dated June 24, 2000 (attached as Exhibit D) in which the U.S. Government had proposed to include the following sentence at the end of paragraph 4(d): "The DM 5 billion contribution of German companies will be collected in full and begin to earn interest no later than October 31, 2000." Echoing what Dr. Gentz had said on June 12, I told Deputy Secretary Eizenstat that: German companies would not agree to transfer any funds until all cases had been dismissed; German companies had made a commitment to collect DM 5 billion and to earn DM 100 million in interest; German companies had not made any other commitments; and the U.S. Government's proposed addition to the language of paragraph 4(d), just quoted, was not acceptable to German companies. At the meeting, Deputy Secretary Eizenstat dropped his proposal and said he would as an alternative speak with Count Lambsdorff to see if the German Government's money (not the German companies' money) could earn interest. The language quoted above that the U.S. Government sought to insert into paragraph 4(d) was not agreed to and does not appear in the signed version of the Joint Statement.

Attached to Mr. Witten's Declaration as Exhibits D–O are copies of each of the drafts of agreements to which he refers in his declaration. Each sought to increase the amount of interest the German companies would pay to the Foundation beyond the DM 100 million agreed to in March, 2000, by accelerating payment of the DM 5 billion or by depositing the collected funds in an interest bearing account or by paying interest from a specified date. Each demand was categorically rejected. The series of U.S. Government proposals as described by Mr. Witten are set forth in Appendix A to this opinion.

Defendants also submit the Declaration of Dr. Manfred Gentz. During the period of negotiations he held the position of Chief Financial Officer of Daimler Chrysler AG, one of the twelve companies (later expanded to seventeen) that were the founding members of GEFI. GEFI proposed the establishment of the Foundation and led the campaign to raise money from German companies for the DM 5 billion company contribution to the Foundation. He was a de facto spokesman and negotiator for GEFI.

Echoing Count Lambsdorff, Dr. Gentz recited that "[i]n proposing the creation of a foundation, the primary objectives of GEFI were: (i) to establish and raise voluntary contributions to fund a German foundation that would operate as a German institution to address the moral and historical responsibility of German companies for the use of forced labor and other injustices arising out of the Nationalist Socialist era and World War II; (ii) to establish a Future Fund to foster sensitivity re. human rights violations and the protection of minorities as well as the better understanding between peoples; and (iii) to obtain all-embracing and enduring legal peace for German companies in the United States and elsewhere without entering into a class action settlement or its equivalent." (Gentz Decl. at Para. 3).

Dr. Gentz described how in 1998 the founding members of GEFI approached German Chancellor-elect Schroeder to obtain German Government support for the initiative to establish a foundation. The

German government offered its support, first as a solely German company initiative, but later as a joint German company-German Government effort. (*Id.* at Para. 4). The German Government approached the United States Government in 1998 for assistance, and the two governments thereafter agreed to sponsor international negotiations in order to reach consensus among as many interested participants as possible. This led to negotiations with six additional governments (the Republic of Belarus, the Czech Republic, the State of Israel, the Republic of Poland, the Russian Federation, and Ukraine); GEFI; the Conference on Jewish Material Claims Against Germany, Inc., and some of the plaintiffs' lawyers who had initiated lawsuits in the United States against German companies. These talks were co-chaired by Secretary Eizenstat and Count Lambsdorff. (*Id.* Paras. 5–6).

Dr. Gentz recited that early in the negotiations both the German companies and the German Government rejected the proposal of Plaintiffs' counsel that the U.S. litigation be resolved through class action settlement agreements between Plaintiffs and defendants in the lawsuits. Dr. Gentz stated the reasons for rejecting the class action settlement mode:

> These proposals were rejected for several reasons. First, German companies viewed the claims asserted in the U.S. cases as involving reparations that, under international law, could only be asserted by governments and not their citizens; class action settlements would have been inconsistent with this strongly held German view. Furthermore, the notion of U.S. court supervision was contrary to the underlying objective of German companies and the German Government to address their moral and historical responsibility through German institutions and under German law and not through American legal procedures.

As set forth in the Joint Statement, the German company proposal was "to send, as the century draws to a close, 'a conclusive humanitarian signal, out of a sense of moral responsibility, solidarity and self-respect.'"

Moreover, the Federal Republic of Germany categorically rejected class action settlements and any notion of U.S. court jurisdiction over any aspect of the Foundation because of issues of sovereign immunity. As stated in the Berlin Accords, the establishment of the Foundation was the culmination of 55 years of German Government and intergovernmental efforts to address the consequences of the National Socialist era and World War II. Thus, the German side—both GEFI and the German Government—repeatedly stated their objective of establishing a German Foundation under German law, to be governed and regulated by German institutions outside any oversight or review by U.S. courts. In my view, that is precisely what the Berlin Accords and Foundation Law achieved.

The German side—GEFI and the German Government—also repeatedly explained their primary objective in establishing "all-embracing and enduring legal peace" for German companies. This meant not only the final dismissal with prejudice of all pending cases in U.S. courts but also a mechanism for securing dismissal of any cases filed in the future. Again, this is repeatedly stated in the Berlin Accords.

(*Id.* Paras. 8–10).

Citing the December, 1999 exchange of letters between President Clinton and Chancellor Schroeder, Dr. Gentz, stated that "[i]n December 1999, the German and U.S. Governments reached political agreement on a capped sum for the Foundation

of DM 10 billion, with the German Government and German companies each agreeing to contribute DM 5 billion ... All participants in the negotiations expressed their agreement that the DM 10 billion figure represented a capped sum and that no further contributions were expected from either the German Government or German companies." (*Id.* at Paras. 11, 12).

Addressing Plaintiffs' claim that in December, 1999, the German side agreed to pay interest, Dr. Gentz stated, "[c]ontrary to plaintiffs' assertions, neither GEFI nor any German companies agreed in 1999 to the payment of any interest on either the DM 10 billion capped amount or on the German company contribution. In fact, there was no discussion at all in 1999 involving GEFI or any German companies regarding interest. Indeed, as far as I am aware, the only mention in 1999 of 'interest' that was ever communicated to the German side was a *demand* by Michael Hausfeld that the DM 10 billion capped sum must be a 'present value settlement' ... Mr. Hausfeld's demand was never accepted by GEFI or any German companies. Indeed, it was expressly rejected the very next day by the German Government in Chancellor Schroeder's letter to President Clinton dated 14 December 1999 ..." (*Id.* at Para. 13).

Dr. Gentz addressed DM 100 million "interest" payment—how it arose and the extent of the commitment:

Following the December 1999 agreement on a capped sum of DM 10 billion, the participants sought to reach agreement on an allocation of that amount for payments to the various categories of victims and all other programs and expenses of the Foundation. In March 2000, during these negotiations on allocation, it became apparent that political agreement among all participants in the talks could not be reached within the capped sum of DM 10 billion and that a further DM 100 million would be necessary to fund the allocated amounts. It was observed, however, that interest on the DM 10 billion capped amount could be used to meet the DM 100 million shortfall. In order to avoid affecting the previously agreed DM 10 billion capped sum, GEFI and the German Government took the position that the additional DM 100 million be designated as "interest," and a consensus was reached to this effect.

On 23 March 2000, the participants in the negotiations reached agreement on an allocation of the capped sum. That allocation agreement is attached to the Joint Statement as Annex B. It allocates DM 10 billion plus precisely DM 100 million in interest (DM 50 million in interest for slave and forced labor payments to Central and Eastern Europeans and DM 50 million in interest for insurance claims).

I am not aware of any discussion involving GEFI or any German companies in which any amount of expected interest—other than the DM 100 million which was unanimously agreed to and set forth in Annex B to the Joint Statement—was mentioned, let alone agreed to. There certainly was no agreement on the part of GEFI or German companies that any transfer of interest in excess of DM 100 million was expected.

(*Id.* at Paras. 14–16).

Dr. Gentz described how after the March, 2000 agreement on allocation was arrived at, the issue of timing of the contributions arose, with Mr. Eizenstat pushing for payment by the companies prior to dismissal of the U.S. cases, or, alternatively, for an agreement that the German company funds would accrue interest from a date prior to the transfer of German com-

pany funds to the Foundation. As Dr. Gentz stated, "I and others on the German side repeatedly rejected these U.S. Government proposals, and the U.S. Government ultimately abandoned its efforts in this regard. Instead, the U.S. Government focused its efforts on establishing dates certain for the contribution of German *Government* funds, at which point those government funds would begin to accrue interest immediately. I and others on the German side repeatedly stated that the only date that was acceptable to the German companies for triggering the transfer of German company funds to the Foundation was the date on which all pending cases in the United States were dismissed with prejudice. This is reflected in paragraph 4(d) of the final version of the Joint Statement that was signed." (*Id.* at Paras. 17, 18).

Dr. Gentz describes in his Declaration that the United States made several proposals to incorporate in the Joint Statement a date certain by which interest would begin to accrue and to place contributions into interest bearing accounts, all of which GEFI rejected. GEFI also rejected the drafts of the Joint Statement incorporating such proposals, none of which were included in the July 17, 2000 Joint Statement. (*Id.* at Para. 19).

Dr. Gentz described a June 12, 2000 meeting hosted by Secretary Eizenstat at which Count Lambsdorff and Mr. Witten were also present:

> On 12 June 2000, I attended a meeting at the U.S. Department of Treasury hosted by Mr. Eizenstat. Graf Lambsdorff and Mr. Witten of Wilmer, Cutler & Pickering also attended the meeting. Mr. Eizenstat again sought to persuade the German side to agree to begin accruing interest for the benefit of the Foundation on the full DM 5 billion amount of German company funds as of

a date certain, which he suggested should be 1 January 2001. Mr. Eizenstat explained that he thought this would satisfy the plaintiffs' lawyers who might otherwise object, given the position I had repeatedly stated that the German companies would not transfer their DM 5 billion contribution to the Foundation until all cases pending in U.S. courts were dismissed with prejudice. I rejected this U.S. Government proposal by Mr. Eizenstat and reiterated that the German companies had made and would make only two financial commitments: (i) to contribute DM 5 billion to the Foundation when all cases were dismissed; and (ii) to collect German company funds on a schedule and in a manner so that they would include DM 100 million designated as interest. Mr. Eizenstat later did not insist any longer to persuade German companies to agree to contribute their DM 5 billion before dismissal of all cases and abandoned his proposal that German company funds should begin earning interest as of a date certain.

(*Id.* at Para. 21).

Dr. Gentz's Declaration concludes with his understanding of the meaning of the disputed terms of the Joint Statement, which are those which Defendants advocate in this case.

Finally, Defendants rely on the affidavit of Dr. Klaus Kohler to support certain of their contentions advanced in the Banks' motion to dismiss the *Schwartz Lee* complaint. He served as Group General Counsel of Deutsche Bank from 1995 through 2000.

Deutsche Bank was one of the twelve founding members of GEFI, and Dr. Kohler chaired GEFI's legal working group. (Kohler Decl. at Paras. 1–2). In his Declaration he described the formation of GEFI, its enlistment of Chancellor Schroe-

der and the German Government as participants in the efforts to create the Foundation, and the convening of plenary sessions during the course of the negotiating process. (*Id.* at Paras. 3–6).

Dr. Kohler cited the agreement that the Foundation was to be funded by a DM 5 billion contribution of the German government and a DM 5 billion contribution to be raised from "the German economy." Referring to Mr. Hausfeld's December 13, 1999 letter, he stated: "My assumption, however, is that the following passage cited from the letter of December 14th, 1999, of the German Chancellor Schroeder to President Clinton is exactly referring to and, in full conformity with GEFI's view, clearly rejecting any claims made in the Hausfeld letter beyond a capped amount of DM 10 billion: ... 'All the other costs related to the Federal Foundation are included. Further demands, as they were presented by attorneys for the plaintiffs yesterday, are being rejected by the Federal Government in accordance with the U.S. Government ...'" (*Id.* at Para. 8).

Dr. Kohler was not authorized to accept and did not accept the Hausfeld terms nor did he authorize anyone else to do so. Further: "Count Lambsdorff's involvement in the negotiations was as a representative of the German Chancellor. Mr. Eizenstat acted on behalf of the U.S. Government. Neither Count Lambsdorff nor Mr. Eizenstat had the power or were authorized to bind Deutsche Bank or any of the GEFI companies in any way, let alone to a '10 billion DM present value' settlement." (*Id.* at Para. 10).

Dr. Kohler described how, following the announcement of the DM 10 billion capped fund, Deutsche Bank, together with the other funding members of GEFI, intensified their participation in the fund raising effort to collect DM 5 billion, "but at no time did Deutsche Bank agree to individually pay a principal amount of DM 5 billion to the Foundation, either in its own name or as a part of the Foundation Initiative." (*Id.* at Para. 12).

Concerning the DM 100 million "interest" amount, Dr. Kohler stated:

I understand that by the end of March 2000, the parties recognized that an additional DM 100 million was needed to satisfy all of the parties to the negotiations. To resolve the allocation problem, GEFI eventually agreed that it would collect the funds in a manner that would ensure that an additional DM 100 million would be available to cover the agreed allocation. That resolution to the allocation issue is reflected in Annex B to the Joint Statement. It allocates DM 10 billion plus precisely DM 100 million in interest (DM 50 million in interest for slave and forced labor payments to Central and Eastern Europeans and DM 50 million in interest for insurance claims).

In order to avoid affecting the previously agreed DM 10 billion capped sum, also being confirmed both by President Clinton and Chancellor Schroeder, GEFI and the German Government took the position that the additional DM 100 million be designated as "interest," and a consensus was reached to this effect.

(*Id.* at Paras. 17–18).

Dr. Kohler addressed the Plaintiffs' contention that in addition to the DM 100 million, interest is owing on the German companies' DM 5 billion:

Although the size of the contribution to the foundation was agreed upon in December 1999, this was not the end of the negotiations. Many critical issues remained unresolved and negotiations and discussions continued through July 17, 2000 on such major issues as allocation of the DM 10 billion, the language of the

Foundation Law, the structure of the Foundation, dismissal of the pending cases in U.S. courts, and other issues. Throughout the discussions in the first half of 2000, the U.S. Government raised the issue of the timing of the transfer of GEFI's DM 5 billion to the Foundation. On several occasions, the U.S. Government, through Mr. Stuart Eizenstat, proposed specific dates on which the German companies would contribute their DM 5 billion in funds to the Foundation. Dr. Gentz regularly rejected that request, informing Mr. Eizenstat that the German companies refused to permit transfer of GEFI's funds to the Foundation prior to the dismissal of all cases pending in the United States. The final language of paragraph 4(d) of the Joint Statement reflects my understanding that all parties agreed that the DM 5 billion contribution would not be provided to the Foundation until there was dismissal of all pending cases.

Another proposal made by the U.S. Government was an attempt to impose an obligation that interest accrue on GEFI's DM 5 billion contribution as of a specific date prior to the transfer of the funds to the Foundation. Dr. Gentz rejected this proposal on behalf of GEFI, too. The signed version of the Joint Statement does not require interest to begin accruing on German Economy's DM 5 billion contribution as of any specific date. This is consistent with my understanding of GEFI's position throughout the negotiations and the agreement among the parties.

(*Id.* at Paras. 14–16).

## VII. *Federal Republic of Germany, Amicus*

A. *Contentions of Federal Republic of Germany:* The Federal Republic of Germany ("Germany") moved in the *Gross* and the *Schwartz Lee* cases for an order granting leave to file an amicus brief in support of the Defendants' position that they fulfilled all of their commitments regarding the funding or any related matter thereto, of the Foundation, which is an instrumentality of Germany. The motion was granted.

By way of background, Germany summarizes its efforts during the past 55 years to meet its moral and historical responsibility arising from racial and religious persecution and other injustices of the National Socialist era and to provide restitution and compensation to the victims of the Nazi era. It provided more than approximately $75 billion ($100 billion in today's value) in restitution and compensation to victims of National Socialism on the basis of German laws and ratified international treaties. Germany has consistently ensured that all restitution and reparation mechanisms are ultimately established by and subject to German law, regulated and administered by the German Government and its specialized administration at the federal and regional level and overseen by German courts. These restitution efforts, according to Germany, culminated in the Berlin Accords—the Joint Statement, the Executive Agreement, and the Foundation Law.

Germany challenges Plaintiffs' action in courts of the United States against GEFI and GEFI's founding members, seeking to require them to pay additional interest to the Foundation despite the fact that both the German Ministry of Finance and the Foundation itself have stated that no such additional interest is due. According to Germany, "[s]uch a ruling would interfere with Germany's sovereignty, show a lack of respect for Germany's legal system and is contrary to the above—stated interests of Germany." (Germany's Brief at 4).

Germany relies upon the July 17, 2000, Executive Agreement between Germany and the United States, a product of nearly two years of negotiation under the leadership of Chancellor Schroeder and President Clinton, which calls for Germany to establish the Foundation pursuant to German law. The Executive Agreement makes it clear that it is in the foreign policy interests of the two nations for the Foundation "to be the exclusive remedy and forum for the resolution of all claims that have been or may be asserted against German companies arising from the National Socialist era and World War II" and that "both parties desire all-embracing and enduring legal peace" for German companies with respect to the Nazi-era "to advance their foreign policy interests." (Executive Agreement Preamble Para. 15, *et seq.*).

Germany also relies on the Foundation Law that the German Bundestag adopted on August 2, 2000, creating the Foundation. This legislation implements the Executive Agreement. It establishes the Foundation as the exclusive forum for all Nazi-era claims against German companies and excludes further claims. Foundation Law, Para. 16(1). Germany maintains legal supervision over the Foundation. *Id.* § 8(1).

Germany cites the August 17, 2000 official statement of the U.S. Department of State issued in recognition of Germany's passage of the Foundation law:

> The United States welcomes German Acting President Biedenkopf's signature on August 12 of a law establishing the foundation "Remembrance, Responsibili-

ty and Future." The United States believes that the foundation should be the exclusive remedy for the resolution of all asserted Claims against German companies arising from the Nazi era. Claims covered by the law include slave and forced labor, aryanization, medical experimentation and other cases of personal injury and damage to or loss of property including banking assets and insurance policies.

(Statement by Philip T. Reeker, Deputy Spokesman, German Foundation for Holocaust Era Claims Established (U.S. Dept. of State, Office of the Spokesman, Aug. 17, 2000)) [7].

Germany vigorously disputes that the Joint Statement is a private settlement agreement or a contract. Rather, Germany contends that it is what it says it is, a Joint Statement, signed by a number of governments, non-governmental entities and individuals, as a result of long and intense negotiations on a diplomatic level: "[I]t is a statement jointly given by all parties involved in the lengthy and complicated negotiations. The Joint Statement contemplated the establishment of the Foundation 'Remembrance, Responsibility and the Future.' It is a document that reflects the high level diplomatic and other efforts that were necessary to find a solution and sets forth a schedule or outline of the next steps the parties involved in the negotiations would take. It is not a settlement agreement subject to the jurisdiction of a court of the United States." (Germany's Brief at 7).

Germany contends that read in the context of the other documents that are part

---

**7.** Germany notes that during its six years of existence, the Foundation made nearly $6.33 billion in payments available to approximately 1,700,000 former forced laborers and other persons eligible for payments. By doing so, the Foundation paid approximately

$427,142,000 more than initially estimated to these approximately 1,700,000 aging victims. This surplus was derived from interest earned by the Foundation after its endowment had been transferred to it through the investment of the original funds.

of the Berlin Accords and considering the kind of non-contract language used in the Joint Statement, the Joint Statement cannot be viewed as a contract, i.e., it is a statement of principles rather than a binding agreement. Germany quotes Ronald J. Bettauer, Deputy Legal Adviser in the United States Department of State, who participated in the negotiations; "It would not have been appropriate to have an international agreement between individual lawyers, private companies, an NGO and sovereign states. We therefore developed a document that set forth political rather than legal commitments—that is, undertakings that various participants 'will' take various steps rather than legal commitments that they 'shall' do so." Ronald J. Bettauer, *Keynote Address—The Role of the United States Government in Recent Holocaust Claims Resolution,* 20 Berkeley J. Int'l L. 1, 3 (2002). Germany's position is:

It is the position of the German Government that the Joint Statement is not subject to enforcement by a United States Court, and that any dispute regarding the Joint Statement cannot be resolved through litigation in a United States court. All the diplomatic efforts put into the current solution to the long lasting issue of compensation and restitution programs for the victims of the Nazi-era which created the Foundation would be called into question if the Court found in favor of Plaintiffs.

(Germany's Brief at 10).

Germany contends that the Foundation is funded in full, noting that in implementing the Executive Agreement, the Foundation was established pursuant to a legislative act of the German Bundestag and the Foundation Law, which sets forth the governing structure of the Foundation, defines the overall endowment and allocation of Foundation funds and establishes criteria for payment. The Foundation Law also establishes that administration of the Foundation is subject only to the legal supervision of the German Government through the Federal Ministry of Finance. The Foundation Law "does not provide for this legal review of the Foundation's actions by any United States court. Even if review by some sort of appeal in Germany is possible, the Act does not authorize litigation in the United States." *Ukrainian Nat'l Ass'n of Jewish Former Prisoners of Concentration Camps & Ghettos v. United States,* 182 F.Supp.2d 305, 310 (E.D.N.Y.2001).

Germany notes that the Federal Ministry of Finance has held, after it reviewed the books of the Foundation, that no additional funds were owed to the Foundation and that Defendants have fulfilled their commitment to the Foundation in full. Under the Berlin Accords and in particular the Foundation Law, that should end the matter unless any person or entity that objects seeks review in the German legal system.

B. *Evidence upon Which Germany Relies:* Germany relies selectively upon exhibits that the parties to this action have submitted, in particular the Joint Statement, the Executive Agreement, and the Foundation Law. Germany has submitted certain other exhibits supporting its position.

The findings of the Federal Ministry of Finance that the Defendants have fulfilled their commitment to the Foundation in full were summarized by Hans Eichel, the head of the supervisory authority over the Foundation, in his letter of July 17, 2002 to Secretary of State Powell. He concluded, "Your Government, Mr. Secretary, has recognized as legitimate the interest of German companies in all-embracing and enduring legal peace. I am convinced that the Government of the United States will

be able to defend German companies in United States courts as promised under the Executive Agreement of July 17, 2000." (Germany's Brief Exh. A).

Exhibit B of the German Brief constitutes the Remarks of Randolph Bell, Special Envoy for Holocaust Issues, U.S. Department of State, delivered at the June 14, 2002 Konrad Adenauer Sifting Dialogue. He refers to the "Foundation's total endowment of DM 10.1 billion," and, referring to the concept of "all embracing legal peace," ... "it amounts to a commitment on the U.S. side, where our bilateral Executive Agreement requires, to file Statements of Interest in U.S. courts seeking the dismissal of civil actions arising out of the Holocaust era. This is an obligation the United States takes extremely seriously ...". (Germany's Brief Exh. B).

Exhibit C to the German Brief quotes what it characterizes as the erroneous statement of Professor Neuborne made during oral argument of this case before the Court of Appeals on April 26, 2006. Specifically, Professor Neuborne states that except for the courts of the United States "I know of nowhere else to go at this point [on behalf of Plaintiffs]," when in fact there are remedies available under German law, including the assistance of a German Administrative Court, to challenge the decision of the supervisory authority that no additional funds are owed.

Exhibit D is Professor Neuborne's October 24, 2001 letter to Judge Weinstein in the *Ukranian National Association* case, in which he states, "[i]f judicial review of the activities of the German Foundation is deemed necessary by aggrieved parties, the German legal system is unquestionably the appropriate forum." (Germany's Brief Exh. D).

## VIII. *Discussion*

A. *Status of Joint Statement:* One of the questions that the Court of Appeals left to this court was: "is the Joint Statement, or part of the Joint Statement, enforceable as a private contract?" Plaintiffs, of course, contend that it is, stating "[t]he document embodies *both* a private settlement agreement between and among the 36 private signatories, *and* a set of nonbinding undertakings by eight nations that operate as conditions precedent to the enforceability of the private bargain. Since all such conditions precedent have been fully performed, defendants' financial promises are legally binding." (Pls.' Mem. at 4). Plaintiffs note that the German companies have received the full benefit of the bargain, namely, "legal peace," which is defined as: i) dismissal with prejudice of more than 60 WWII-related cases pending in the United States and ii) adequate protection against future similar litigation in the United States. Plaintiffs having performed their part of the bargain, Defendants should be subject to a legal action to perform theirs.

Plaintiffs recognize that the Joint Statement is an unusual hybrid with both private and state parties. They could find but a single international document to be signed both by private parties and by sovereigns—the 1838 Treaty of Buffalo Creek, Jan. 5, 1938, 6 Stat. 550, an Indian land treaty signed by the United States, several Indian tribes, and joined by two private land speculators, who bound themselves to purchase certain Indian lands. The land speculators do not appear to have signed the treaty. *See United States v. New York Indians,* 173 U.S. 464, 19 S.Ct. 487, 43 L.Ed. 769 (1899) (discussing terms of treaty); *New York Indians v. United States,* 170 U.S. 1, 18 S.Ct. 531, 42 L.Ed. 927 (1898) (same).

Plaintiffs point to the London Debt Agreement of 1953, which involved close cooperation between governments and pri-

vate creditors in restructuring post-war Germany's external debt, but which was not formally signed by any private parties. The private rights acquired by German companies under the London Debt Agreement to be free from WWII-related litigation were judicially enforced against Plaintiffs for almost a half century, *see, e.g., Iwanawa* and *Burger–Fischer* cases. Similarly, Plaintiffs argue, the Joint Statement should be legally enforceable by the private signatories.

Plaintiffs cite the Warsaw Convention, 137 L.N.T.S. 11 (1929), an international agreement signed solely by sovereign nations governing, *inter alia,* liability for damages suffered during international air travel. The Convention set a ceiling of $8,300 on such damages, and in 1965, the United States threatened to withdraw unless the ceiling was raised. A consortium of private international airlines entered into a private written agreement waiving the $8,300 ceiling and replacing it with a ceiling of $75,000, thus mollifying the United States. The privately generated codicil to the Warsaw Convention is legally binding on the signatory airlines.

Plaintiffs argue that just as the private agreement executed in relation to the Warsaw Convention and the London Debt Agreement generated legally binding and judicially enforceable law, so do Defendants' promises in the Joint Statement. The argument can be summarized as follows:

> In fact, the Joint Statement, a unique public/private hybrid, contains *both* a private settlement agreement between and among 36 private signatories, *and* a series of nonbinding political undertakings by eight sovereigns that function as conditions precedent to the enforceability of the private bargain. *See O'Leary v. Grace/Newark Hous. Ltd. P'ship.,* 31 Fed.Appx. 784, 786 (3d Cir.2002) ("Un-

der basic contract law, a condition precedent is 'an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.'") ... (Pls.' Mem. at 51, 52).

Plaintiffs take note of the Court of Appeals statement that "[m]uch of the text of the Joint Statement ... supports the German Foundation Industrial Initiative's view [that the document is nonbinding]." *Gross v. German Found. Indus. Initiative,* 456 F.3d 363, 385–86 (3d Cir.2006), observing that "[p]laintiffs have no quarrel with the Third Circuit's sensible observation that a judicial effort to enforce the forward-looking political commitments made by eight government signatories would violate the Political Question doctrine ... but the fact that a court is not empowered to compel performance of a given condition precedent does not detract from the legally binding nature of the underlying contract, once the condition precedent has been satisfied." (Pls.' Mem. at 52–53).

Plaintiffs challenge the statement of State Department official, Ronald Bettauer, included in a 2000 address he delivered at a conference on the Recent Holocaust Claims Resolution: "It would not have been appropriate to have an international agreement between individual lawyers, private companies, an NGO and sovereign states. We therefore developed a document that set forth political rather than legal commitments ..." (Pls.' Mem. at 53).

Plaintiffs observe that Bettauer's statements are pure hearsay. Further, he was not qualified to opine on the legal status of the private bargain between and among 36 private signatories. Nor was he entitled to speak on behalf of any of the private signatories or the Claims Conference or, in fact, on behalf of the diplomatic represen-

tatives of the six nations with substantial victim populations that signed the Joint Statement.

Finally, Plaintiffs contend that "both the text of the Joint Statement, and the objectively expressed intentions of the private signatories, demonstrate conclusively that the financial undertakings recited in paragraph 4 of the Joint Statement were intended by the private signatories to be legally binding. Indeed, the objective evidence that the private signatories intended defendants'. financial promises in paragraphs 4(a), and 4(d) to become legally binding upon satisfaction of the conditions precedent spelled out in paragraphs 4(b), 4(c) and 4(h), is so overwhelming that summary judgment on the issue must be entered for the plaintiffs." (Pls.' Mem. at 59). Plaintiffs cite in particular the language of Secretary Eizenstat in his Declaration dated January 18, 2007, in which he states that the "carefully negotiated" language attests that the language governing Defendants' interest obligations during the deferral period was intended to create a minimum interest figure, not a ceiling. (Eizenstat Decl. Para. 4). This, however, goes into the meaning of Para. 4, the subject of a subsequent section of this opinion.

■ The court has reviewed the entire record as it relates to the status of the Joint Statement. The question whether the Joint Statement contains within it a legally enforceable contract involves, first, an analysis of the Joint Statement, read in conjunction with the two other instruments constituting the Berlin Accords, namely, the Executive Agreement and the Foundation Law. On July 17, 2000, the day the Joint Statement was signed, the United States and Germany entered into the Executive Agreement. Shortly thereafter, the Bundestag enacted the Foundation Law that, among other things, established the Foundation as a German sovereign instrumentality and the "exclusive remedy and forum" for resolution of asserted claims against German companies arising out of the Nazi—era and World War II. Each document refers to the commonly—held objective of "all—embracing and enduring legal peace" for German companies.

Para. 4(d) of the Joint Statement, the critical undertaking in these cases, contained the following provisions:

i) the DM 5 billion contribution of German companies shall be due and payable to the Foundation and payments from the Foundation shall begin once all lawsuits against German companies arising out of the Nationalist Socialist era and World War II pending in U.S. Courts including those listed in Annex C and D are finally dismissed with prejudice by the Courts.

ii) The initial portion of the DM 5 billion German Government contribution will be made available to the Foundation by October 31, 2000. The remainder of the German Government contribution will be made available to the Federal Foundation by December 31, 2000.

iii) Contributions from the German Government will begin earning interest for the benefit of the Foundation immediately upon being made available to the Foundation. The German Government may advance some of its contributions to the partner organizations for certain start-up costs before the lawsuits are finally dismissed.

iv) The German companies will make available reasonable advanced funding to provide appropriate publicity of the upcoming availability of Foundation benefits.

v) Germany (sic) company funds will continue to be collected on a schedule and in a manner that will ensure that the interest earned thereon before and

after their delivery to the Foundation will reach at least 100 million DM.

■ The general rule under international law is that international diplomatic documents such as an international accord or treaty (and related instruments thereto), do not create privately enforceable rights. *See, e.g., Khalid v. Bush,* 355 F.Supp.2d 311, 327 (D.D.C.2005). To determine whether an international diplomatic document such as the Joint Statement may be an exception to the general rule and create privately enforceable rights, courts must look first to whether such a right is explicitly stated, and then to the language of the document as a whole. "When no right is explicitly stated, courts look to the treaty as a whole to determine whether it evidences an intent to provide a private right of action." *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 808 (D.C.Cir.1984) (Bork, J., concurring). If the document is clear, there is no need to consider anything outside its four corners, *see, e.g., Frolova v. Union of Socialist Republics,* 761 F.2d 370, 373 (7th Cir. 1985).

The Joint Statement does not contain an explicit statement that it is privately enforceable. Examination of the document as a whole, particularly when considered in conjunction with the Executive Agreement and the Foundation Law, does not disclose an intent to provide a right of action. In fact, when considered in conjunction with the Foundation Law, there is disclosed an intent, if not mandate, that disputes such as those that have arisen in this case be resolved by German authorities.

The Joint Statement, a step in the diplomatic resolution of the Nazi era claims against German companies, sets forth the steps that the signers of the Joint Statement were expected to take, e.g., those set forth in Para. 4(d) quoted above. The phrases of the Joint Statement that might be deemed to refer to future litigation rejected that possibility. Para. 11 of the Preamble states: "[T]he establishment of the Foundation does not create a basis for claims against the Federal Republic of Germany or its nationals." Para. 9 of the Preamble expresses the objective of all signatories that there be "all embracing and enduring legal peace" for German companies. The Joint Statement contains none of the provisions that usually accompany an agreement that contemplates legal action to enforce the agreement, such as disputes clauses, choice of forum clauses, or choice of law clauses.

The very title of the instrument—Joint *Statement*—negates the creation of a legally binding agreement. In international practice, governments may make "joint statements" or "declarations" that summarize a conference and express mutual intentions but do not establish legal obligations enforceable in any domestic court. The United States has signed numerous such documents that have been described as "not a treaty or agreement...." The International Law Commission, when developing the Vienna Convention on the Law of Treaties, excluded such documents from its definition of "treaty" because they are non-binding. *See* Report of the International Law Commission to the General Assembly, 19582 Y.B. Int'l Law Comm. 96–97 (1959). Note may be made of the fact that the Executive Agreement was signed by officials of the United States and German Governments accredited to enter into agreements binding on their governments. At the same signing ceremony, the United States and Germany had the Joint Statement signed by other people who were not so accredited.

That the Joint Statement speaks the language of diplomatic expectations is further evidenced by the fact that its Para. 4(b) provides that the United States and

German Governments "will sign an Executive Agreement .... and [s]uch agreement contains the obligation undertaken by the United States to assist in achieving all-embracing and enduring legal peace for German companies." Other paragraphs of the Joint Statement provide for the execution of the Executive Agreement, and still other paragraphs impose obligations upon Central and Eastern European States and Israel. In all this, there is nothing to suggest that the private lawyer signatories can extract from the comprehensive Joint Statement selected provisions for judicial enforcement.

The language of the Joint Statement is not that used to create enforceable obligations. The signatories are "participants," not "parties." After the Preamble, the signatories "declare" rather than "undertake" or "agree." The Para. 4(d) interest provision does not use the word "pay," but describes an anticipated result. It does not specify how the expected result is to be achieved; there is no reference to an interest start or end date or mention of a rate of interest.

Defendants contrast the language of the Executive Agreement with that of the Joint Statement. Unlike the Joint Statement, which avoids all "agreement" language, the Executive Agreement is replete with language of "agreement" from its title to constant use of the terms "parties," "agree," and "agreed."

Plaintiffs repeatedly contend that their lawyers would never have dismissed their class-action complaints in the United States courts relying only on a statement of principles, as distinguished from a legally enforceable contract. This argument has a surface plausibility, but it evaporates if one considers the Joint Statement in conjunction with the Berlin Accords in their entirety.

The entire negotiating process leading up to the Berlin Accords did not rely upon actions the United States courts would take. Rather, all the claimant participants relied on the power and persuasiveness of the United States and German Governments to bring the contending parties into agreement and to ensure that any agreement arrived at would be adhered to.

While the Joint Statement did not create legal, privately enforceable obligations, it provided that the United States and Germany would enter into an Executive Agreement (Para. 4(b)), and it provided that the German Bundestag would adopt the Foundation Law (Para. 3).

Article 1 (3) of the Executive Agreement states that Germany, not the United States or its courts, is to supervise the Foundation:

> The Federal Government of Germany assures that the Foundation will be subject to legal supervision by a German governmental authority; any person may request that the German governmental authority take measures to ensure compliance with the legal requirements of the Foundation.

Further, the Executive Agreement provided that Germany would adopt the Foundation Law (which was described in some detail in the Executive Agreement, Annex A). The Foundation Law provided that the "[c]ontributors to the Foundation's capital fund shall be companies joined together in [the Foundation Initiative of German Industry] and the Federal Government," (Law § 3(1)), and that the German Companies contribution would be "Five billion deutschmarks." (*Id.* § 3(2)1). The Law also provided that "[t]here is no obligation of the donors to make supplementary payments". (*Id.* § 3(3)). The Law also provided for an international Foundation Board of Trustees and for oversight of the Foundation by German

Government ministries. (*Id.* § 8). As the Federal German Republic pointed out in its amicus brief, if a claimant is dissatisfied with the action of the German Government ministries there are remedies available under German law, including the assistance of a German Administrative Court, to challenge the decision of the supervisory authority.

The remedies provided to any objectors by the Executive Agreement and the Foundation Law were those arrived at through a lengthy negotiation process. Just because the Plaintiffs cannot rely upon the Joint Statement as a private contract enforceable in United States courts, does not mean that they foolishly surrendered valuable rights with no means of enforcing the benefits that were the *quid pro quo.* The power and prestige of the United States and the Federal Republic of Germany stood ready to protect those rights, and mechanisms were available within the German Government in which any controversy over those rights could be resolved.

The language of the Joint Statement and the context in which it arose establish that it is a political document and not a contract conferring on Plaintiffs the right to bring suit in United States Courts.[8] Consequently, Defendants' motion to dismiss the *Gross* case will be granted.

B. *Gross Case Motions:* Plaintiffs in the *Gross* and *Schwartz Lee* cases have moved for summary judgment, supporting their motion with declarations and extensive documentation. Reliance is also had on the declarations and documentation submitted in support of the motion for partial summary judgment that Plaintiffs in the *Schwartz Lee* case filed. In response to these motions, Defendants filed declarations and extensive documentation. These all relate to the amount of interest and other payments that Plaintiffs claim the German companies owe pursuant to the Joint Statement.

If the court is correct in its holding that the Joint Statement confers no rights upon Plaintiffs that are enforceable in courts of the United States, the court should stop here and leave these weighty issues to the German authorities. However, because a higher court may disagree with this one, the court will address the question of the amount of interest, if any, that Defendants owe if the Joint Statement is viewed as a legally enforceable contract.

Defendants' motion was a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Rule 12(b) provides that if matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56. Once the court decides to convert a 12(b)(6) motion into one for summary judgment, the requirements of Rule 56 apply. *Rose v. Bartle,* 871 F.2d 331, 340 (3d Cir.1989).

Plaintiffs were not advised 10 days before the hearing on the pending motions that the court intended to convert Defendants' Rule 12(b)(6) motion into a Rule 56 motion, a step it decided to take after argument and after reviewing the vast and all-encompassing volume of evidence that

---

**8.** Plaintiffs cite certain international agreements as precedents for their contention that the Joint Statement is a judicially enforceable contract. None of these agreements are analogous to the Joint Statement and the other instruments constituting the Berlin Accords.

Plaintiffs seek to hold Defendants liable on account of the statement that GEFI's counsel, Mr. Witten, made to the court when seeking dismissal of a class action: "The money will be there, your Honor." Such a representation does not convert the question as to what "money will be there" into one to be resolved by an American court rather than the German authorities.

all parties have submitted. The arguments proceeded as if Defendants had moved for summary judgment, and in view of the intimate familiarity of each party with the case, none will suffer prejudice if the court converts Defendants' motion to dismiss in the *Gross* case ·to a Rule 56 motion. Thus cross-motions for summary judgment are to be decided in the *Gross* case.

1. *Summary Judgment Standards:* A grant of summary judgment is proper when the moving party has established that there is no genuine dispute of material fact and that "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court should view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. *Hugh v. Butler County Family YMCA,* 418 F.3d 265, 267 (3d Cir. 2005).

To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial. *See* Fed.R.Civ.P. 56(e). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Hugh,* 418 F.3d at 267 (citing *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505).

2. *Joint Statement Ambiguity:* The parties are in agreement that, whether one applies German or American law, the construction of a contract begins with the text. An unambiguous text with a "plain meaning" cannot be altered by extrinsic evidence. *American Cyanamid Co. v. Fermenta Animal Health Co.,* 54 F.3d 177, 181–82 (3d Cir.1995). An unarticulated subjective intent by one of the contracting parties to depart from the text's generally accepted meaning is universally ignored, because in interpreting a contract, the primary objective of the court is to derive the objective intention of the parties at the time the contract was made. *See, e.g., Halper v. Halper,* 164 F.3d 830, 842 (3d Cir. 1999) ("The undisclosed subjective intent of a participant in a transaction cannot be used to alter the intent clearly manifested in the documents to which he subscribed.").

In the present case, each party contends that, read in the context of the entire Joint Statement, the concluding sentence of Para. 4(d) of the Joint Statement has a plain meaning and is unambiguous: "German company funds will continue to be collected on a schedule and in a manner that will ensure that the interest earned thereon before and after their delivery to the Foundation will reach at least 100 million DM."

Plaintiffs argue that the plain meaning of the term "at least" connotes a minimum, which cannot possibly be construed as a floor. Nor can the word "interest" really mean "additional principal," as Defendants contend. Citing the Oxford English Dictionary (2nd ed.1989), Plaintiffs note that "at least" is "a qualifying phrase, attached to a quantitative designation to indicate that the amount is the smallest admissible," and "interest" is defined as "money paid for the use of money lent (the principal), or for forbearance of a debt, according to a fixed ratio."

Referring to the language "before and after [the funds] delivery to the Foundation," Plaintiffs contend that this was intended to assure GEFI that if the deferral period ended earlier than six months, they would receive credit toward the DM 100

million floor for interest earned on the funds "after" their earlier than anticipated transfer.

Defendants are equally insistent that the language of Para. 4(d) is unambiguous, and, consequently "the Court can, and therefore must, resolve this case on the basis of the language of the Joint Statement" (Defs.' Mem. in Opp'n 2). They note that there is nothing in the critical sentence of Para. 4(d) (or elsewhere) that speaks of interest to compensate for any "delay" from any point in time to any other. There is no statement of when interest would begin to accrue or cease to accrue; nor is there a provision for a rate of interest or a designation of the principal on which the interest was payable. It will be recalled that on July 17, 2000, GEFI was engaged in the continuing, difficult process of seeking funds and commitments to reach the DM 5 billion goal by the time legal peace had been achieved through the dismissal with prejudice of the lawsuits in the United States.

Defendants do not dispute that "at least" are floor words, not ceiling words, but contend that as a matter of ordinary usage, an obligation to pay "at least" one dollar is not an obligation to pay anything more than a dollar. Further, they argue that "at least" must be read in conjunction with the words "before and after." These words, according to Defendants, mean that "at least 100 million DM" could be earned over the whole period (both while contributions were being collected "before" their transfer to the Foundation, and by the Foundation "after" receiving the money).

Properly construed, Defendants argue: "The only steps to be taken with respect to the contribution by German companies were to pay DM 5 billion to the Foundation 'once all lawsuits against German companies arising out of the National Socialist era and World War II pending in U.S.

courts … [were] finally dismissed with prejudice by the courts,' and to arrange the timing so as to allow the accrual of 'at least 100 million DM.' That amount could have been earned entirely by the Foundation itself, after receipt of moneys from German companies. Nothing in Paragraph 4(d) required that *any* amount of interest be earned 'before' delivery of the funds to the Foundation, as long as 'at least 100 million DM' was earned in the period 'before and after' delivery." (Defs.' Mem. in Supp. 33).

Because the German companies had contributed to the Foundation DM 5 billion in "principal" plus DM 100 million in "interest," they have met the obligations of Para. 4(d) in accordance with its plain meaning and, according to Defendants, it follows that the *Gross* complaint should be dismissed.

Despite the persuasive arguments of each party, the court is not convinced that the "interest" language of Para. 4(d) has a plain meaning. Rather, that language, even in the context of Para. 4(d) in its entirety, is the ultimate in ambiguity.

Consequently, it is necessary to examine the circumstances in which the language was drafted in order to determine its meaning. Having completed such an examination, the court concludes that Plaintiffs' proposed construction of Para. 4(d) finds no support in the record, and that if this court were empowered to construe the Joint Statement, it would enter summary judgment for the Defendants.

The obligations of the German companies (and also of the German Government) to make payments to the Foundation were determined at three critical stages: i) the December, 1999, negotiations that led to the commitment of the German Government to pay DM 5 billion and the commitment of the German companies to pay DM

5 billion to the Foundation; ii) the March, 2000 negotiations that led to the German companies agreeing to pay an extra DM 100 million, and iii) the June–July, 2000 negotiations that led to the Berlin Accords.

3. *The December, 1999 Understanding:* There has already been described the intense negotiations, shepherded and prodded by Secretary Eizenstat and Count Lambsdorff that culminated in the determination of the amount to be paid to the Foundation. (See Background at 610–14). In early December, Count Lambsdorff told Secretary Eizenstat that "whatever Schroeder might be saying about sticking to 8 billion marks, if I could organize a unified front from the victims for a settlement of 10 billion marks, the chancellor would rethink his position." (*Imperfect Justice* at 255–56).

Secretary Eizenstat then met with the key class action plaintiffs' attorneys— Hausfeld, Weiss, Fagan and Neuborne, and with Singer of the Claims Conference. All but Hausfeld agreed to accept DM 10 billion. He insisted on an additional DM 500 million. After Secretary Eizenstat agreed to try to raise additional funds from American corporations which had had affiliations with German World War II companies, all the attorneys agreed to settle with the Germans for DM 10 billion. (*Imperfect Justice* at 256)

On December 12, 1999, Secretary Eizenstat informed Count Lambsdorff that he had a firm figure of DM 10 billion from the lawyers that he could take to Chancellor Schroeder. The Chancellor wanted a letter from President Clinton confirming the lawyers' agreement accepting the DM 10 billion and guaranteeing to end all legal action. (*Imperfect Justice* at 256). President Clinton sent such a letter to Chancel-

lor Schroeder on December 13. It read in part:

> Deputy Secretary Eizenstat was intensively engaged this past week with the plaintiffs' attorneys with whom he has dealt to move them closer to the German offers. On Sunday, he reported to Count Lambsdorff that they, the Conference for Jewish Material Claims Against Germany, the Central and Eastern European Governments and the Government of Israel would agree to settle at DM 10 billion ... This counteroffer is a firm commitment for settlement of which we both could be proud.

At this point, once again Mr. Hausfeld sought to squeeze more from the German side. On December 13 he wrote to Count Lambsdorff setting forth terms in total departure from those that had been agreed upon with Secretary Eizenstat and communicated to Count Lambsdorff and Chancellor Schroeder [9]:

1. The German side agrees to a 10 billion DM present value settlement, excluding costs of administration, distribution, notice and fees.

2. That there be firm commitment from non-German firms which used forced labor during World War II in an amount no less than 1 billion DM. (This would be a parallel mirror fund to be added to the 10 billion DM German commitment).

3. The reasonable administrative, distribution, notice costs and fees be paid by the German side over and above the 10 plus 1 billion DM commitment from German and non-German companies using forced labor during World War II.

On December 14, 1999, Chancellor Schroeder responded to President Clinton

---

**9.** Beneath Mr. Hausfeld's signature there also appeared the typewritten names: Martin Mendelsohn, Michael Smorodsky, Robert Lieff, Arnold Levin, Republic of Poland, Czech Republic, Republic of Belarus and Ukraine.

accepting the DM 10 billion capped settlement and categorically rejecting Mr. Hausfeld's demands. He stated that "we have decided to increase the financial endowment of the Federal Foundation to a total of 10 billion DM," and further:

Two aspects were particularly important for this decision: First of all, the amount of 10 billion DM which will be furnished by the German side is the final amount. All contributions of the Federal Foundation are included. Further demands, as they were presented by attorneys for the plaintiffs yesterday, are being rejected by the Federal Government in accordance with the U.S. government. The second central argument for your proposal are the substantial improvements concerning legal closure which were reached during the last few days. I appreciate very much the promise made by the U.S. Government to point to the foreign-policy interests in all pending and future litigation and to use its influence to reach a dismissal action. The same goes for the willingness of the U.S. Government to give a Statement of Interest which is independent from the attitude of the plaintiffs. I am by the way proceeding on the assumption that this consensus will take away the basis for legislative and administrative actions against German enterprises and that the U.S. Government will enforce the annulment of the actions on the Federal and state level.

. . .

The Federal Government went to the limits of what was possible in order to achieve [agreement]. Therefore it will decisively reject any further demands. I am also aware of the substantial efforts of the U.S. Government. I am very grateful for the special involvement in this cause to you, your government and especially to our special envoys, Stuart Eizenstat and Otto Graf Lambsdorff.

Thus, agreement between the heads of state for a capped fund of DM 10 billion and providing for legal peace was memorialized in President Clinton's December 13 letter to Chancellor Schroeder and in Chancellor Schroeder's December 14 response. This was formally announced and accepted by all parties to the negotiations on the occasion of the formal signing ceremony that took place on December 17, 1999.

There can be no question that the letter between the two heads of state constituted an understanding that incorporated the following elements:

i) ". . . the amount of 10 billion DM which will be furnished by the German side is the final amount"

ii) "All the other costs related to the Federal Foundation are included."

iii) "Further demands, as they were presented by attorneys for the plaintiffs yesterday, are being rejected by the Federal Government in accordance with the U.S. government."

iv) "The Federal Government went to the limits of what was possible to achieve [agreement]. Therefore it will decisively reject any further demands."

Secretary Eizenstat resisted Mr. Hausfeld's after the fact effort to sweeten the firm agreement of the heads of state as embodied in the exchange of letters:

Disagreement about the letters broke out even before the ink was dry. One was over legal fees. Hausfeld argued that the fees for the lawyers had to be over and above the 10 billion. The Germans balked 10 billion was 10 billion. My solution was to bury the legal fees in the amount we allocated for administrative fees. For once, Hausfeld was posi-

tive. "God bless you, and thank you for not forgetting us," he said. Singer added, "We thank you and the Jewish people thank you."

(*Imperfect Justice* at 258).

Mr. Hausfeld is not put down for long. Despite the fact that Plaintiffs' own evidence establishes conclusively that in December, 1999, the German side, both the Federal Government and the German companies, in exchange for legal peace, agreed to the payment of DM 10 billion to the Foundation and to nothing more than the payment of DM 10 billion. The *Schwartz Lee* Plaintiffs, represented by Mr. Hausfeld, contend that the German companies agreed to pay interest on their DM 5 billion share from December, 1999, and the *Gross* Plaintiffs contend that the German companies' 1999 agreement incorporated an understanding to pay interest after the July 17, 2001 signing of the Joint Statement.

These contentions have absolutely no basis in the record and are supported only by two distortions of the record. The first distortion is contained in Mr. Hausfeld's Declaration. He includes as an exhibit a copy of his December 13, 1999 letter to Count Lambsdorff setting forth his demands that were rejected in their totality in Chancellor Schroeder's December 14, 1999 letter. Mr. Hausfeld omits from his Declaration a copy of Chancellor Schroeder's letter and apparently believes he can make it disappear by including in its stead a copy of an April 3, 2000 letter from a Special Assistant to the President stating that the December, 1999 exchange of letters between the heads of state did not constitute "an international agreement or a statement of the existence of an international agreement." That letter, of course, has no relevance in the present case and does not achieve Mr. Hausfeld's purpose of

making the Chancellor's December 14 letter disappear and become of no effect.

The second ploy which Plaintiffs' counsel use to try to expand the December, 1999 commitment of the German side is use of a quotation from Secretary Eizenstat's book:

I then engaged in what I could only call creative accounting. I persuaded Lambsdorff and Gentz to add interest that would be earned on the money while we were getting the cases dismissed and setting up the foundation that would now be one joint private sector—federal government organization. They ended up agreeing to pay at least 100 million DM in interest. But the most ambitious was my idea to create a "mirror image" fund for the dozens of American companies whose big German subsidiaries had employed slave labor. According to a 1943 Treasury Department list, the most celebrated names included Ford, General Motors, Gillette, IBM, and Kodak, among many others.

(*Imperfect Justice* at 254).

From this quotation one might infer, and Plaintiffs ask the court to infer, that Count Lambsdorff for the German government and Dr. Gentz on behalf of GEFI, had agreed to the payment of "at least 100 million DM in interest" "while we were getting the cases dismissed and setting up the Foundation." The *Gross* Plaintiffs in their Memorandum in support of their motion for summary judgment wrote, "Thus, the agreement to pay interest during the deferral period was in place on December 17, 1999." (Mem. at p. 20, n. 27). Nothing could be further from the truth. Plaintiffs have grievously distorted Secretary Eizenstat's book (the pertinent chapters of which have been incorporated in Mr. Eizenstat's Declaration and are a part of *Plaintiffs'* evidence on these motions).

In a December 1, 1999 letter, Chancellor Schroeder reminded President Clinton

that he had already followed the President's recommendation contained in his November 13 letter and increased the German offer from DM 6 billion to DM 8 billion, warning that if that offer were declined the Foundation plan would probably collapse. (*Imperfect Justice* at 253). Secretary Eizenstat's reaction was, "so I needed to line up the victims' side quickly to agree to a deal for 10 billion DM and confirm for the Germans that it would really settle the wartime claims once and for all." (*Id*). With the German side still at DM 8 billion, Secretary Eizenstat then advanced the "creative accounting" concept: "I then engaged in what I could only call creative accounting. I persuaded Lambsdorff and Gentz to add interest that would be earned on the money while we were getting the cases dismissed and setting up the foundation." (*Id.* at 254). But that would have been interest on DM 8 billion.

Immediately thereafter, Secretary Eizenstat attempted and failed to obtain contributions from American corporations, which was part of the "creative accounting" scheme. (*Id.* 254–55). Having failed to obtain American company contributions, Secretary Eizenstat acknowledged that his "creative accounting" proposal was dead: "All my creative accounting still could not bridge the gap, with the Germans stuck at 8 billion and the lawyers at 11 billion." (*Id.* at 255). Thus ended the "creative accounting" notion. It played no part in the subsequent chain of events that led to the approval of a final capped sum of DM 10 billion, with nothing more to be added.

Those subsequent events were: (i) Count Lambsdorff's approach to Secretary Eizenstat to inform him that Chancellor Schroeder might agree to a DM 10 billion final figure (*Id.* 255–56); (ii) Secretary Eizenstat's prevailing upon the lawyers to accept a DM 10 billion final figure (*Id.* at 256); (iii) Secretary Eizenstat's December 12 telephone call to Count Lambsdorff giving him the DM 10 billion firm figure (*Id.*); (iv) President Clinton's December 13 letter to Chancellor Schroeder (*Id.* 258); and (v) Chancellor Schroeder's December 14 letter to President Clinton that accepted the DM 10 billion and rejected everything else (*Id.*).

To suggest that Secretary Eizenstat's passing proposal of an interest payment on an DM 8 billion offer, one of many proposals he made during the course of the negotiations, somehow became a part of the final December 17, 1999 agreement on the capped DM 10 billion, defies all reason. To suggest that it somehow shaped the July 17, 2000 Joint Statement represents a further flight of fantasy.

The record establishes conclusively that as of the end of December, 1999, the total amount that the German Government and German companies had undertaken to pay to the Foundation was DM 10 billion at the time legal peace was obtained—nothing more.

4. *March 2000 "Interest" Agreement:* Once the total sum of DM 10 billion had been agreed upon, the representatives of the victims had to divide this sum among the various categories of claimants. At all times during this process, it was recognized that the total pie to be divided was DM 10 billion. The allocation process was painful, and eventually Secretary Eizenstat and Count Lambsdorff had to take a leading role mediating among the contending participants. As Secretary Eizenstat described it: "Whatever semblance of unity there had been among the Eastern Europeans, plaintiffs' attorneys, and Claims Conference in persuading the Germans to pay the maximum possible broke into open warfare as they tried to divide the pie. The process brought out the worst in everyone." (*Imperfect Justice* at 261).

There came a point in March 2000 when it appeared that the whole process would collapse unless an additional DM 100 million could be found for some of the claimants, and Count Lambsdorff and Secretary Eizenstat appealed to GEFI to provide that amount. It is GEFI's contention that in view of the representations as to the DM 10 billion cap that GEFI was making to contributors and potential contributors, it did not want any additional amount to be deemed an increase in the capped amount of DM 10 billion. Rather, even though it was in fact such an increase, GEFI undertook to pay it from interest it collected on funds received and was holding pending legal peace and to designate it "interest." This understanding is confirmed by the Declarations of three of the persons who negotiated on behalf of GEFI and by a Declaration of Secretary Eizenstat's counterpart, Count Lambsdorff:

> Following the December 1999 agreement on a capped sum of DM 10 billion, the participants sought to reach agreement on an allocation of that amount for payments to the various categories of victims and all other programs and expenses of the Foundation. In March 2000, during these negotiations on allocation, it became apparent that political agreement among all participants in the talks could not be reached within the capped sum of DM 10 billion and that a further DM 100 million would be necessary to fund the allocated amounts. It was observed, however, that interest on the DM 10 billion capped amount could be used to meet the DM 100 million shortfall. In order to avoid affecting the previously agreed DM 10 billion capped sum, GEFI and the German Government took the position that the additional DM 100 million be designated as "interest," and a consensus was reached to this effect.

On 23 March 2000, the participants in the negotiations reached agreement on an allocation of the capped sum. That allocation agreement is attached to the Joint Statement as Annex B. It allocates DM 10 billion plus precisely DM 100 million in interest (DM 50 million in interest for slave and forced labor payments to Central and Eastern Europeans and DM 50 million in interest for insurance claims).

I am not aware of any discussion involving GEFI or any German companies in which any amount of expected interest—other than the DM 100 million which was unanimously agreed to and set forth in Annex B to the Joint Statement—was mentioned, let alone agreed to. There certainly was no agreement on the part of GEFI or German companies that any transfer of interest in excess of DM 100 million was expected.

(Gentz Decl., Paras. 15–16) (Dr. Gentz was a de facto spokesman and negotiator for GEFI, and in that capacity he participated in the international negotiations).

Second, in March 2000, during negotiations regarding how the DM 10 billion would be allocated among the different categories of victims and all other programs and expenses of the Foundation, it became apparent that political agreement could not be reached within the capped sum of DM 10 billion, and that further DM 100 million would be necessary to fund the allocated amounts. It was observed that interest on the DM 10 billion capped amount could be used to meet the DM 100 million shortfall. Thus, in order to avoid affecting the previously agreed DM 10 billion capped sum, GEFI and the German Government took the position that the additional DM 100 million be designated as "interest." On March 23, 2000, the participants in the negotiations resolved

the allocation issue (the result of which is attached to the Joint Statement as Appendix B), allocating DM 10 billion plus precisely DM 100 million in interest (DM 50 million in interest for slave and forced labor payments to Central and Eastern Europeans and DM 50 million in interest for insurance claims). I am not aware of any direct oral or written communication between any plaintiffs' lawyer and GEFI prior to the signing of the Berlin Accords regarding the subject of expected interest other than the DM 100 million which was unanimously agreed to and set forth in Annex B of the Joint Statement. At no point, did Burt Neuborne, Mr. Hausfeld, or their colleagues communicate to GEFI the theories regarding interest found in their briefs and declarations in this litigation, for example, the "deferral period" theory. GEFI never agreed to any of the interest theories Plaintiffs' counsel now put forward. As next described, the content of discussions regarding interest and the history of the drafting of the Joint Statement demonstrate that while Deputy Secretary Eizenstat made certain proposals relating to interest, GEFI rejected those suggestions, and Deputy Secretary Eizenstat acquiesced in GEFI's position.

(Witten Decl. at Paras. 9–11) (Mr. Witten was lead counsel for GEFI during the negotiations that lead to the Berlin Accords).

I understand that by the end of March 2000, the parties recognized that an additional DM 100 million was needed to satisfy all of the parties to the negotiations. To resolve the allocation problem, GEFI eventually agreed that it would collect the funds in a manner that would ensure that an additional DM 100 million would be available to cover the agreed allocation. That resolution to the allocation issue is reflected in Annex B to the Joint Statement. It allocates DM 10 billion plus precisely DM 100 million in interest (DM 50 million in interest for slave and forced labor payments to Central and Eastern Europeans and DM 50 million in interest for insurance claims).

In order to avoid affecting the previously agreed DM 10 billion capped sum, also being confirmed both by President Clinton and Chancellor Schroeder, GEFI and the German Government took the position that the additional DM 100 million be designated as "interest," and a consensus was reached to this effect.

(Kohler Decl., Paras. 17–18) (Dr. Kohler chaired the legal working group of GEFI).

When it became clear that my American counterpart had incurred certain verbal obligations with the two leading partners, the Polish Government and the World Jewish Congress, which could be only matched by raising the Foundation Initiative's contribution by 100 Mio. DM, after long and arduous talks the Foundation Initiative agreed under the proviso that this additional amount did not enter into the principal of the promised amount in public. This was the genesis of the word "interest", in reality covering the fact that so far the total amount of 10 bn. DM was not longer capped. So the interest was in reality no interest, which does not preclude the fact that once the sum was deposited in the Foundation's Account, it generated a much higher interest than this sum and, as a matter of fact, the Future Fund of the Foundation is meant to be financed perpetually from interest earned.

In regard to that issue, on April 19, 2000, I wrote the following in a letter to Deputy Secretary Eizenstat: "In December 1999 the companies of the Ger-

man Foundation Initiative agreed to do everything to contribute the amount of 5 billion DM to the Foundation capital, and in March this year they agreed to a specific allocation of further 100 Mio. DM generated by interest. Although the Initiative's difficulties raising this substantial amount are well known and have been deplored by the German Chancellor and myself publicly, I have no doubt that the Initiative will finally succeed. The Initiative, however, has always underlined that it will turn its contribution over to the Foundation only when the class action suits have been dismissed, which is hopefully the case well before the end of the year." My personal hope did not, however, become the basis for assumption of an interest obligation by the German companies.

(Lambsdorff Decl., Paras. 12, 13) (Count Lambsdorff was Secretary Eizenstat's German counterpart and worked with him to obtain the extra DM 100 million that was needed to prevent the Foundation project from collapsing).

There is no evidence whatsoever to contradict these declarations. In their declarations, Count Lambsdorff, Dr. Gentz and Mr. Witten describe meetings with Secretary Eizenstat in which the DM 100 million arrangement was discussed and assumed to be binding as they negotiated other issues. In his own declaration, Secretary Eizenstat does not challenge the March, 2000 understanding as described by Messrs. Lambsdorff, Gentz, Witten and Kohler. They stand unchallenged.

Thus, as of the end of March, 2000, the obligation of the German companies was simply to pay to the Foundation the sum of DM 5.1 billion. This, as of that date, establishes the meaning of Para. 4(d) of the Joint Statement. Whether "at least" is a ceiling or a floor is a non-issue. The so-called "interest" in the amount of DM 100 million was in fact, as Defendants contend, an addition to the original capped figure of DM 10 billion.

5. *Post–March, 2000 Negotiations:* Plaintiffs contend that GEFI agreed in Para. 4(d) of the Joint Statement to pay interest at 4% on any unpaid balance on GEFI's DM 5 billion principal obligation from and after July 17, 2000 (and perhaps from and after December 17, 1999), and to pay over to the Foundation all interest earned on the approximately 6000 contributions received from non-members of GEFI.

It has been determined that there is no evidence that interest is owing from December 17, 1999, and that Plaintiffs' claim that such interest is owing is based upon a distortion of the record. It has also been determined that the only obligation GEFI incurred to pay more than DM 5 billion was incurred in March, 2000, when, to save the Foundation project, GEFI agreed to pay an additional DM 100 million, calling it "interest" to avoid appearing to the public and contributors that they had breached the DM 10 billion cap that had been so widely publicized. If more is owing, GEFI must have agreed to it between March and July 17, 2000.

During that period, Secretary Eizenstat, to his credit, did his utmost to prevail upon GEFI to agree to expand the then DM 5.1 billion cap in order to ensure larger payments to the victims of the Nazi-era atrocities. In effect, he was attempting to achieve part or all of the objectives that Mr. Hausfeld sought in his December 13, 1999, letter to Count Lambsdorff, objectives that were categorically rejected in Chancellor Schroeder's December 14, 1999 letter to President Clinton.

Drafts of a Joint Statement were prepared and exchanged between GEFI and United States Government representatives

in which the United States Government sought to expand GEFI's payment obligations. GEFI rejected each proposal. These drafts, exchanged during the period March 16, 2000 and June 28, 2000, are described in Mr. Witten's Declaration (see Appendix A to this opinion).

Mr. Witten describes a critical June 30, 2000 meeting he attended with Secretary Eizenstat, at which Secretary Eizenstat again sought, unsuccessfully, to persuade the German companies to generate interest in addition to DM 100 million, and to specify a date as of which interest would begin to accrue. Mr. Witten rejected these requests, stating that "[the] German companies would not agree to transfer any funds until all cases had been dismissed; German companies had made a commitment to collect DM 5 billion and to earn DM 100 million interest; German companies had not made any other commitments." (Witten Decl. at Para. 13). Secretary Eizenstat pressed no further and "dropped his proposal and said he would as an alternative speak with Count Lambsdorff to see if the German Government's money (not the German companies' money) could earn interest." (Id.).

Secretary Eizenstat was more successful with the German Government and prevailed upon it to agree to pay its DM 5 billion share in two installments—one half by October 31, 2000 and one-half by December 31, 2000, even though legal peace had not been achieved. The funds would, of course, begin earning interest upon their payment to the Foundation. In light of this negotiation history, no reasonable jury could find that GEFI had agreed in the Joint Statement to pay, upon dismissal with prejudice of all the United States lawsuits, more than DM 5.1 billion. The evidence that Plaintiffs produce does not create a material issue of fact.

Professor Neuborne's Declarations parallel those of Mr. Hausfeld and Mr. Weiss, stating "the parties agreed that DM 100 million interest minimum payable by the Initiative would include interest on both German Foundation funds retained by the Initiative during the deferral period pending transfer to the Foundation, and funds transferred to the Foundation prior to the expiration of the deferral period." (Neuborne Decl. Para. 84). Later, Professor Neuborne states, "aided by exhortations from President Clinton and Chancellor Schroeder, on December 17, 1999, the parties firmly agreed to the establishment of DM 10 billion *plus interest*, in return for the dismissal with prejudice of all pending litigation and the signing of an Executive Agreement providing protection against future litigation." (Neuborne—Supp. Decl. Para. 16). (emphasis added). As the evidence cited above establishes, Professor Neuborne's statements are categorically in error. He offers no admissible evidence to support this. He and Mr. Hausfeld and Mr. Weiss recount what they demanded or were thinking during the negotiations. For example, Professor Neuborne states that "representatives of victims believed that the text of the Joint Statement assumed that interest would be earned on funds constituting the Initiative's DM 5 billion principal obligation: (a) during the deferral period; and (b) subsequent to payment to the Foundation, but before substantial payments could be distributed by the Foundation." (Id. Para. 79). Mr. Weiss recounts, "Thus, the parties assumed that within approximately six months of the execution of the Joint Statement, the Initiative would place its DM 5 billion obligation into the Foundation, together with a guaranteed 'interest' payment of 'at least DM 100 million' accrued during the deferral period. The Foundation would then consolidate the combined total of DM 5.1 billion with the German

Government funds already in the Foundation, plus the interest that had occurred on those funds, and so that all of the funds held by the Foundation would earn interest for the victims at 4% during the period needed to process claims." (Weiss Decl. Para. 16).

Beliefs and assumptions are not a substitute for evidence of what the parties actually agreed to. Professor Bazyler's article, upon which Plaintiffs rely, is rank hearsay. Moreover, he falls into the same egregious error into which Plaintiffs fell, citing page 254 of *Imperfect Justice* for the proposition that "at the November 13 [1999] plenary, [Secretary Eizenstat] persuaded the Initiative to commit to paying 'at least' DM 100 million in 'interest' during the period needed to secure the dismissal of cases pending in the United States.'" As described earlier in this opinion there was no such agreement and the proposals submitted at the November 13 plenary were superseded by subsequent negotiations, by the December 13 and 14 exchange of letters between President Clinton and Chancellor Schroeder, and the December 17, 1999, announcement of a capped payment of DM 10 billion. The balance of Professor Bazyler's article also exhibits a remarkable parallel to Plaintiffs' briefs, suggesting that he has abandoned his role as an historian and assumed that of a partisan. If he were acting as an historian he would have moved from page 254 and on to pages 255 *et seq.*, of *Imperfect Justice.*

Most interesting of all is Plaintiffs' reliance upon Secretary Eizenstat's one and one-half page Declaration. In the Declaration he incorporated Chapters 10–13 of his book and stated that sentence 7 of paragraph 4(d) of the Joint Statement:

> was intended to establish a minimum interest figure payable to the Foundation in connection with the deferral peri-od needed to attain "legal peace" of the German Foundation Industrial Initiative's obligation to pay DM 5 billion to the Foundation. The language, which was carefully negotiated, was not intended to establish an interest ceiling, or to describe an addition to principal. It was a highly contentious matter in negotiations and the understanding was carefully negotiated.

As should be abundantly clear from the foregoing sections of the opinion, the DM 100 million was a fixed sum that GEFI was obligated to pay to the Foundation, albeit from interest earned on funds collected. Whether the "at least" was a ceiling or a floor is a non-issue. What is so striking about Secretary Eizenstat's Declaration is not what it states in its one and one half pages, but what it *doesn't* state. If the Declarations of Count Lambsdorff, Mr. Witten, Dr. Gentz and Dr. Kohler concerning the December agreement on the DM 10 billion capped amount, the March 2000, agreement on the payment by GEFI of an extra DM 100 million and the June–July, 2000 final negotiations of the Joint Statement are believed, there is absolutely no basis for Plaintiffs' claims of additional payments of interest. The Declarations of Mr. Hausfeld, Mr. Weiss and Professor Neuborne of their beliefs, expectations, and anticipations are not evidence contradicting the categorical statements of Count Lambsdorff, Mr. Witten, Dr. Gentz, and Dr. Kohler. Only Secretary Eizenstat, who was a party to the discussions with GEFI's representatives, is in a position to address these statements, and nowhere does he do so.

Chapters 10–13 of Secretary Eizenstat's book, *Imperfect Justice,* upon which this opinion draws heavily, are incorporated by reference in Secretary Eizenstat's Declaration and thus are evidence that Plaintiffs submitted. As far as it goes, the book is

totally consistent with Defendants' view of the case. In fact, as shown above, it demonstrates the baselessness of Plaintiffs' claim that in December, 1999, Count Lambsdorff and Dr. Gentz agreed with Secretary Eizenstat to add the interest that would be earned on the money "while we were getting the cases dismissed and setting up the foundation." The book, however, does not address the March, 2000 agreement to supplement the DM 5 billion with an extra DM 100 million and, except for three sentences at p. 276, it does not address the lengthy negotiating process during which at least 10 drafts of the Joint Statement were exchanged and Secretary Eizenstat vigorously sought to prevail upon GEFI to pay more than the DM 5.1 billion.[10]

Nor does Secretary Eizenstat's Declaration address these matters. Secretary Eizenstat is perhaps the only person in a position to refute the Defendants' account of the March and July, 2000 events, because he personally dealt with Count Lambsdorff and GEFI's representatives.

Count Lambsdorff, at the outset of his Declaration, confirms that as of December 17, 1999, there was universal agreement that the total contribution of the German side was DM 10 billion, with no room for future increases. This was a position with which Secretary Eizenstat obviously agreed, because during his efforts to "divide the pie" he proceeded on the basis that he and Count Lambsdorff had only DM 10 billion to divide.

Count Lambsdorff recounted the circumstances leading to GEFI's agreement to pay an additional DM 100 million. Secretary Eizenstat had hit an impasse in allocating the DM 10 billion among the claimants and it became evident that he needed an additional DM 100 million to secure agreement among the contending claimants. Count Lambsdorff prevailed upon GEFI to provide the additional DM 100 million:

> ... after long and arduous talks the Foundation Initiative agreed under the provision that the additional amount did not enter into the principal of the promised amount in public. This was the genesis of the word "interest," in reality covering the fact that so far the total 10 billion DM was no longer capped. So the interest was in reality no interest.

Mr. Witten described the same process in his Declaration. Dr. Gentz stated in his: "In March 2000, during these negotiations on allocation, it became apparent that political agreement among all participants in the talks could not be reached within the capped sum of DM 10 billion and that a further DM 100 million would be necessary to fund the allocated amounts. It was observed, however, that interest on the DM 10 billion capped amount could be used to meet the DM 100 million shortfall. In order to avoid affecting the previously agreed DM 10 billion capped sum, GEFI and the German Government took the position that the additional DM 100 million be designated as 'interest,' and consensus was reached to this effect."

Dr. Kohler's Declaration was in accord. This agreement on GEFI's part to pay an additional DM 100 million and designate it "interest" is what was incorporated in Para. 4(d) of the Joint Statement. There

---

**10.** Those three sentences are consistent with Defendants' declarations:

> But Gentz's greatest concern was over turning of German industry's requirement to pay its 5 billion DM share of the 10 billion DM settlement. To avoid delay, I had suggested a certain date, like January 1, 2001. The Germans had rejected my suggestion, and in a major concession to them, I had reluctantly agreed that no payments would be required until all cases were dismissed. *Imperfect Justice* at 276.

was no agreement in March, 2002 to pay additional interest. Secretary Eizenstat was free to rebut these Declarations in his Declaration. He did not do so, and they stand unrebutted.

It is equally clear that during the negotiations of the final draft of the Joint Statement, every effort of Secretary Eizenstat to increase GEFI's obligation to pay interest in addition to the DM 100 million payment was rebuffed.

On April 19, 2000, Count Lambsdorff wrote to Secretary Eizenstat that "[i]n December 1999 the companies of the German Foundation Initiative agreed to do everything to contribute the amount of 5 billion DM to the Foundation capital, and in March this year they agreed to a specific allocation of further 100 M.O. DM generated by interest. . . . The Initiative, however, has always underlined that it will turn its contribution over to the Foundation only when the class action suits have been dismissed, which is hopefully the case well before the end of the year."

In his Declaration, Mr. Witten described in great detail his discussions with Secretary Eizenstat during which Secretary Eizenstat argued forcefully for an interest provision. He listed the numerous American drafts that sought to include an interest provision in the Joint Statement and GEFI's consistent rejection of these drafts. He described a June 12, 2000 meeting with Secretary Eizenstat:

> In particular, on June 12, 2000, I attended a meeting hosted by Deputy Secretary Eizenstat at the U.S. Treasury Department in Washington, D.C. with representatives of the U.S. and German Governments. The attendees included Graf Lambsdorff, Dr. Manfred Gentz, who was the de facto spokesman for GEFI. At that meeting, the German side reconfirmed its longstanding position that German company payments to

the Foundation would not be due until all cases were finally dismissed with prejudice. In response, Deputy Secretary Eizenstat said that plaintiffs' lawyers might object to this position but might be placated if the German companies agreed to pay interest on their DM 5 billion to the Foundation; and second to generate DM 100 million in interest. Dr. Gentz said GEFI would keep those commitments but would not discuss any other arrangements.

Mr. Witten described a June 30, 2000 meeting:

> On June 30, 2000, I attended another meeting with Deputy Secretary Eizenstat and other representatives of the U.S. Government at the U.S. Treasury Department in Washington, D.C. At that meeting Deputy Secretary Eizenstat again sought, unsuccessfully, to persuade German companies to generate interest in addition to the DM 100 million. . . . Echoing what Dr. Gentz had said on June 12, I told Deputy Secretary Eizenstat that: German companies would not agree to transfer any funds until all cases had been dismissed; German companies had made a commitment to collect DM 5 billion and to earn DM 100 million in interest; German companies had not made any other commitments.

Dr. Gentz's Declaration described the June 12, 2000 meeting with Secretary Eizenstat, confirming Mr. Witten's account that he agreed that the German companies would pay only the DM 5 billion and the additional DM 100 million.

If these accounts are not true, Secretary Eizenstat is in a position to declare them false. He has not done so, either in his Declaration or in his book, which also does not address these discussions and the refusals of the Germany companies to pay

more than DM 5.1 billion. Consequently, no factual issue exists. The Defendants' undisputed Declarations and the vast amount of documentary evidence support Defendants' account of what the German companies owe by way of interest and demolish the scenario that, with considerable ingenuity, Plaintiffs have created.

Were it the function of this court to decide the issue of the amount of interest Defendants owe by virtue of the Joint Statement, it would reject Plaintiffs' claims and grant summary judgment for the Defendants' on those claims.

C. *Schwartz–Lee Case Motions:* In their First Count, the *Schwartz Lee* Plaintiffs allege that in December, 1999, an agreement was reached requiring the German Government and German Industry including Deutsche Bank and Dresdner Bank, which are the only Defendants' in this case, to contribute DM 10 billion to the Foundation to terminate litigation pending in American courts against German defendants and to pay interest on this DM 10 billion. Plaintiffs rely on the December 13, 1999, letter Mr. Hausfeld wrote to Count Lambsdorff detailing the four demands Plaintiffs made upon the German side in addition to the DM 10 billion.

In his Declaration Mr. Hausfeld stated, "[t]he following day, December 14, 1999, Deputy Secretary Stuart Eizenstat telephoned me and told me that the German government and German Industry had accepted the December 13, 1999, offer. Mr. Eizenstat told me: 'Congratulations. The Germans have accepted. You have a deal.'" (Hausfeld Decl. Para. 76). On the basis of this Declaration and exhibits in evidence, the *Schwartz Lee* Plaintiffs have moved for a summary judgment that Defendant companies owe interest on their DM 5 billion share of the total settlement fund.

Defendants move to dismiss the First Count, a contract claim, for several reasons. First, the December correspondence could not form an agreement binding on the two Banks, because there is no allegation that any of the participants in the alleged correspondence and communications (Mr. Hausfeld, Secretary Eizenstat and Count Lambsdorff) had the authority to act on behalf of the Banks or that any offer was even transmitted to or accepted by the Banks. Second, any offer that Mr. Hausfeld made that could have led to an agreement was specifically rejected by Chancellor Schroeder in his December 14, 1999 letter to President Clinton. Third, the documents post-dating December, 1999, that are attached to and cited throughout the *Schwartz Lee* complaint, establish that no binding agreement was reached in December, 1999.

In the Second Count of their complaint the *Schwartz Lee* Plaintiffs allege that "Defendants and/or GEFI made numerous representations of fact, including the representations that funds were being collected on schedule, interest would accrue on the DM 10 billion present value as of December, 1999, and payment in full had timely occurred, among others. Defendants and/or the German Industry Initiative made these representations to induce Plaintiffs to act and/or refrain from acting and knew or should have known that these representations were false. Plaintiffs justifiably relied on these representations." (Compl. Para. 86).

Defendants contend that this Count must be dismissed for the simple reason that the complaint fails to identify a single statement made by any representative of the Banks, any statement directly attributed to the Banks, or any misrepresentations of any kind relied on by Plaintiffs.

In support of their motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), Defen-

dants rely upon the long recognized principle that a complaint should be dismissed if no relief could be granted, even accepting as true all the allegations and the reasonable inferences to be drawn therefrom. *Gasoline Sales, Inc. v. Aero Oil Co.,* 39 F.3d 70, 71–72 (3d Cir.1994). As the United States Supreme Court has recently articulated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.... Factual allegations must be enough to raise a right above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)....

*Bell Atlantic Corp. v. Twombly,* —— U.S. ——, ——– ——, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007) (citations omitted).

Applying New Jersey conflict of laws rules, Defendants concluded that the jurisdictions with an interest in the matter are Germany, for obvious reasons, and the District of Columbia, where some of the talks leading to the Berlin Accords took place. Defendants found no conflict in the laws of those two jurisdictions and argued that the laws of both those jurisdictions required dismissal of both Counts of the *Schwartz Lee* complaint.

The court's rulings in the *Gross* case are dispositive of the motions in the *Schwartz Lee* case. First, and most important, is the determination that the language of the Joint Statement and the context in which it was negotiated establish that it is a political document and not a contract conferring on either the *Gross* case Plaintiffs or the *Schwartz Lee* case Plaintiffs the right to bring suit in the United States Courts. This requires denial of the *Schwartz Lee* motion for partial summary judgment, and it requires dismissal of the *Schwartz Lee* complaint in its entirety.

As in the *Gross* case, if the court is in error in its holding that the Joint Statement confers no rights that are enforceable in courts of the United States, it would proceed to the merits of the motions in each case. Because Defendants' motion to dismiss *Schwartz Lee* relies upon the vast array of documents that accompany the complaint, and because *Schwartz Lee* and *Gross* have been briefed and argued together in the same fashion as a summary judgment motion, the court will treat Defendants' motion to dismiss the *Schwartz Lee* complaint as a cross-motion for summary judgment.

There is no reason to repeat all the reasons for granting Defendants' motion for summary judgment in the *Gross* case. There, it was found that: No agreement to pay interest on the DM 10 billion was arrived at in December 1999. In March, 2000, the German companies agreed to pay an additional DM 100 million, which, for specified reasons, was referred to as "interest." Prior to the signing of the Joint Statement on July 17, 2000, the German companies rejected every attempt of Secretary Eizenstat and the Plaintiffs' attorneys to include an interest component in addition to the obligation of the German companies to pay, DM 5.1 billion. In consequence of this negotiating history, Para. 4(d) of the Joint statement imposes no obligations on the German companies to pay, upon dismissal of the United States lawsuits, anything more than DM 5.1 billion.

The same evidence, or lack of it, applies to the *Schwartz Lee* claims. The Plaintiffs in that case, in fact, are in an even worse position than the Plaintiffs in the *Gross* case. The *Schwartz Lee* Plaintiffs'

claims rely primarily upon their contention that in December, 1999, the German side (German Government and German companies) agreed to pay interest from that date (and certainly from July 17, 2000) on the full DM 10 billion. This contention ignores everything in the post December, 1999 record that totally refutes it; it distorts the record in its reliance upon a quotation from *Imperfect Justice* taken out of context and in its reliance upon Mr. Hausfeld's attempt in his Declaration to expunge from the record Chancellor Schroeder's December 14, 1999 letter to President Clinton.

Of greater significance here is Secretary Eizenstat's failure to address Mr. Hausfeld's core allegation: "[t]he following day, December 14, 1999, Deputy Secretary Stuart Eizenstat telephoned me and told me that *the German government and German Industry had accepted the December 13, 1999, offer.* Mr. Eizenstat told me: 'Congratulations. The Germans have accepted. You have a deal.'" (Hausfeld Decl. Para. 76). The contention that the German Government and German Industry accepted Mr. Hausfeld's proposals defies everything in the record. Secretary Eizenstat could have confirmed Mr. Hausfeld's account in his Declaration. His failure to do so speaks volumes.

There is no admissible evidence that contradicts the evidence that Defendants have produced in support of their contentions that (i) the December, 1999 understanding did not contemplate that the German side would pay interest on the DM 10 billion, (ii) the March, 2000 commitment to pay DM 100 million included no commitment to pay interest in addition to the DM 100 million, and (iii) the German companies thereafter rejected all demands to pay anything in addition to the DM 5.1 billion.

If this court were called upon to decide the merits of the *Schwartz Lee* claims it would deny the *Schwartz Lee* motion for partial summary judgment, and it would grant Defendants' motion for summary judgment on both counts of the *Schwartz Lee* complaint.[11]

## IX. *Conclusion*

The Joint Statement, upon which both the *Gross* Plaintiffs and the *Schwartz Lee* Plaintiffs base their claims, is a political document and not a contract conferring on Plaintiffs the right to bring suit to enforce its terms in the United States courts. Under the Berlin Accords, any relief for alleged departures from the Joint Statement must be sought by resort to German authorities or institutions or through resort to diplomatic means. This conclusion requires that the *Gross* Plaintiffs' and the *Schwartz Lee* Plaintiffs' motions for summary judgment be denied and Defendants' motion to dismiss the complaint in each case be granted.

To meet the eventuality that on appeal it might be held that the Joint Statement conferred contractual rights upon the Plaintiffs in each case enforceable through lawsuits in United States courts, the court would convert Defendants' Rule 12(b)(6) motions to dismiss the complaints in the *Gross* and *Schwartz Lee* actions into Rule 56 motions. It would then deny the *Gross* Plaintiffs' and the *Schwartz Lee* Plaintiffs' motions for summary judgment and grant the Defendants' motions for summary judgment in the *Gross* case and in the *Schwartz Lee* case, dismissing both cases with prejudice. The Court will enter an order implementing this opinion.

It is the court's expectation that nothing in this opinion will detract from the tire-

---

11. The court's findings with respect to the Count One claims of necessity remove any basis for the misrepresentation claim asserted in Count Two.

less activities of all the participants in the negotiations that, under the dedicated leadership of Secretary Eizenstat and Count Lambsdorff, led to the creation of the unprecedented Foundation, "Remembrance, Responsibility and the Future."

## APPENDIX A

Portion of Roger M. Witten Declaration Describing Proposals that GEFI Pay Interest in Addition to DM 100 Million Agreed to in March, 2000

At various other times prior to the signing of the Joint Statement on July 17, 2000, participants in the negotiations proposed language—all rejected by the German side—that would have called on German companies to provide more interest to the Foundation than the DM 100 million ultimately agreed upon in paragraph 4(d):

a. The U.S. Government circulated a draft dated March 16, 2000 (attached as Exhibit E) which proposed the following provision 5(c): "The German companies will place their DM 5 billion contribution in an interest bearing account." The proposed language was not agreed on; indeed, this language was removed in a revised draft (dated March 21, 2000, attached as Exhibit F) circulated five days later. A GEFI draft circulated eight days later (dated March 29, 2000, attached as Exhibit G) also made no reference to interest. No such language appeared in any subsequent draft circulated to German companies or in the Joint Statement as signed.

b. The U.S. Government circulated a draft dated April 4, 2000 (attached as Exhibit H) which proposed the following language in brackets: "In addition, interest will start to accrue as of the date of this declaration on funds already pledged by German companies." The use of brackets indicated that agreement had not been reached to include the bracketed language. This language was not agreed on and does not appear in the signed version of the Joint Statement.

c. An April 17, 2000 draft (attached as Exhibit I) included the proposed provision: "In addition, interest will start to accrue as of the date of this declaration on funds already collected by German companies." This language was not agreed on and does not appear in the signed version of the Joint Statement.

d. The U.S. Government circulated a draft which German companies received on April 25, 2000 (attached as Exhibit J). It included the proposed sentence quoted in subparagraph c above and added a new proposed sentence in brackets: "The companies will ensure that at least DM 100 million in interest on their DM 5 billion contribution will be made available to the Foundation." This language was not agreed on and does not appear in the signed version of the Joint Statement.

e. A May 12, 2000 draft (attached as Exhibit K) was circulated to the participants with the following proposed provisions in paragraph 4(d): "The DM 5 billion contribution of German companies shall be due and payable to the Federal Foundation once the lawsuits against German companies arising out of the National Socialist era or World War II pending in U.S. courts are finally dismissed with prejudice by the courts. Nevertheless, the German companies will make available reasonable advanced funding to provide appropriate publicity of the upcoming availability of Foundation benefits. German company funds will continue to be collected on a schedule and in a manner that will ensure that the interest earned thereon before and after their delivery to the Foundation

will reach at least 100 million DM." The last sentence survived intact through all subsequent drafts and was included in the Joint Statement as signed.

f. A draft circulated by the U.S. Government on June 7, 2000 (attached as Exhibit L) proposed that German company payments to the foundation should begin upon dismissal of all cases "or in any event no later than October 31, 2000." This language was not agreed on and does not appear in the signed version of the Joint Statement.

g. A draft circulated by the German Government on June 19, 2000 (attached as Exhibit M) deleted the clause "or in any event no later than October 31, 2000." The language "or in any event no later than October 31, 2000" was not agreed on and does not appear in the signed version of the Joint Statement.

h. A U.S. Government draft dated June 24, 2000, as discussed above (attached as Exhibit D), included the proposed sentence at the end of paragraph 4(d): "The DM 5 billion contribution of German companies will be collected in full and begin to earn interest no later than October 31, 2000." This language was not agreed on and does not appear in the signed version of the Joint Statement.

i. A German Government draft dated June 28, 2000 (attached as Exhibit N) deleted the sentence that the U.S. Government had proposed set forth in subparagraph h above. This deleted sentence ("The DM 5 billion contribution of German companies will be collected in full and begin to earn interest no later than October 31, 2000.") was not agreed on and does not appear in the signed version of the Joint Statement.

j. After the June 30, 2000 meeting referred to above, the U.S. Government circulated a draft dated July 7, 2000 (attached as Exhibit O), which reflected the discussion on June 30. First, the draft specified due dates for the German Government contribution and stated that contributions from the German Government to the Foundation would "begin earning interest for the benefit of the Foundation immediately upon being made available to the Federal Foundation." Second, the draft deleted the previously proposed language setting a deadline prior to dismissal of all litigation for payment of the German company contribution and the previously proposed language requiring interest to accrue on the German company contribution for the benefit of the Foundation as of some specified date.